# Exhibit A

⚖ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
HABERSHAM COUNTY, GEORGIA
**16CV0583**
RUSSELL W. SMITH
NOV 01, 2016 04:50 PM

*David C. Wall*

David Wall, Clerk
Habersham County, Georgia

## IN THE SUPERIOR COURT OF HABERSHAM COUNTY

## STATE OF GEORGIA

GLOBAL DYNAMIC ENTERPRISES, LLC, KERMANI,

NAJMEH

CIVIL ACTION
NUMBER _____ **16CV0583** _____

PLAINTIFF

VS.

ECREATIVE GROUP, INC. , DBA d/b/a ENERGY &

COMMODITIES GLOBAL, LILLIE, BRIAN J,

ENTERPRISE HOLDINGS GROUP, LLC, THREE WIDE

MEDIA, LLC,, Lillie, Tracy K          DEFENDANT

### SUMMONS

TO THE ABOVE NAMED DEFENDANT:

You are hereby summoned and required to file with the Clerk of said court and served upon the Plaintiff's attorney, whose name and address is:

> **Rustin Smith**
> **Stewart, Melvin & Frost, LLP**
> **P. O. Box 3280**
> **200 Main Street, Suite 600**
> **Gainesville, Georgia 30503**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This __1__ day of ____November____, 20 **16** ____ .

Clerk of Superior Court

*David C. Wall*

David Wall, Clerk
Habersham County, Georgia

⚞ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
HABERSHAM COUNTY, GEORGIA
**16CV0583**
RUSSELL W. SMITH
NOV 01, 2016 04:50 PM

*David C. Wall*
David Wall, Clerk
Habersham County, Georgia

## IN THE SUPERIOR COURT OF HABERSHAM COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| GLOBAL DYNAMIC ENTERPRISES, LLC and NAJMEH KERMANI, | . | Civil Action File No. |
| | . | |
| Plaintiffs, | . | |
| | . | |
| v. | . | |
| | . | |
| ECREATIVE GROUP, INC. d/b/a ENERGY & COMMODITIES GLOBAL, BRIAN JAMES LILLIE, ENTERPRISE HOLDINGS GROUP, LLC, and TRACY KAYE LILLIE, | . | |
| Defendants. | .⁚ | |

## FIRST AMENDMENT TO COMPLAINT

Plaintiffs amend the Complaint to show that Tracy Kaye Lillie is a party Defendant in the style of the case and show the Court the following that is contained in the original Complaint:

### Parties, Jurisdiction, and Venue

1.

Plaintiff Global Dynamic Enterprises, LLC ("GDE") is a Georgia limited liability company organized and authorized to transact business in Georgia with its principal office located in Cobb County, Georgia.

2.

Plaintiff Najmeh Kermani is the managing member of GDE and maintains her personal residence in Cobb County, Georgia.

3.

Defendant eCreative Group, Inc. d/b/a Energy & Commodities Global ("ECG") is an Iowa corporation with its principal office located in Independence, Iowa. ECG may be served

664185-1
57083 0

with process on its president and CEO, Brian James Lillie, at 6421 Stone Ridge Court, Kannapolis, North Carolina 28081.

4.

Defendant Brian James Lillie may be served with process at his residence located at 6421 Stone Ridge Court, Kannapolis, North Carolina 28081.

5.

Defendant Enterprise Holdings Group, LLC ("EHG") is as an Iowa limited liability company with its principal office located in Independence, Iowa. EHG may be served with process on its managing member, Brian James Lillie, at 6421 Stone Ridge Court, Kannapolis, North Carolina 28081.

6.

Defendant Tracy Kaye Lillie may be served with process at her residence located at 6421 Stone Ridge Court, Kannapolis, North Carolina 28081.

7.

Defendants are subject to this Court's jurisdiction under O.C.G.A. § 9-10-91 because they transacted business within this state, committed a tortious act or omission within this state, and committed a tortious injury in this state caused by an act or omission outside this state and Defendants regularly do or solicit business, and engage in other persistent courses of conduct, and derive substantial revenue from goods used or consumed or services rendered in this state. Defendants are subject to this Court's venue under O.C.G.A. § 9-10-93 because a substantial part of the business was transacted in Habersham County, Georgia, and the tortious act, omission, or injury occurred in Habersham County, Georgia.

664185-1
57083 0

## Factual Allegations

8.

Defendant ECG is a brokerage group that specializes in the exportation of agricultural commodities. Plaintiff GDE is a brokerage group that concentrates in locating and identifying prospective purchasers of agricultural goods and commodities and connecting them with prospective sellers or providers of those goods.

9.

Beginning in June of 2012, GDE and Kermani contacted Fieldale Farms Corporation ("Fieldale") to discuss Fieldale potentially purchasing corn and soybean meal sold by ECG. Fieldale is an integrated poultry processor with its principal office located in Baldwin, Habersham County, Georgia.

10.

On July 30, 2012, ECG and GDE entered into a Business Venture Agreement, which provides that ECG will pay GDE a certain commission for identifying and locating purchasers of agricultural goods sold by ECG. A true and correct copy of the Business Venture Agreement, as amended, is attached as Exhibit A to this Complaint.

11.

Also on July 30, 2012, ECG and GDE entered into a Commission Agreement providing that GDE had identified Fieldale as a buyer of corn and soybean meal sold by ECG. The Commission Agreement provides that ECG will pay GDE $1,000,000.00 for its services in arranging for Fieldale to purchase the goods. A true and correct copy of the Commission Agreement is attached as Exhibit B to this Complaint.

12.

On July 30, 2012, the same day ECG and GDE entered into the Business Venture Agreement and Commission Agreement, Brian Lillie and Kermani visited Fieldale's headquarters in Baldwin, Habersham County, Georgia, to discuss the terms of the transaction with Fieldale. At the meeting, ECG and Brian Lillie represented to Fieldale, GDE, and Kermani that they could obtain below-market prices on corn and soybean meal. ECG and Brian Lillie made these same representations to GDE and Kermani before the meeting on July 30, 2012, which is what induced her to identify Fieldale as a buyer and arrange the transaction.

13.

ECG and Brian Lillie provided Fieldale, GDE, and Kermani with a copy of a License issued to ECG by the Office of Foreign Assets Control of the U.S. Department of the Treasury dated August 15, 2011 authorizing ECG to ship agricultural commodities to Iran.

14.

On August 21, 2012, ECG and Fieldale entered into a Delivery Contract providing that ECG will supply 55,000 dry metric tons of loose soybean meal for $24,035,000.00 and 55,000 dry metric tons of #2 yellow corn for $13,475,000.00. A true and correct copy of the Delivery Contract is attached as Exhibit C to this Complaint.

15.

The Commission Agreement supersedes the Business Venture Agreement with respect to the payment terms of the commission to GDE on the Delivery Contract procured from Fieldale.

16.

The Commission Agreement provides that ECG will pay the commission to GDE upon release of the bank guarantee to ECG. Pursuant to the Delivery Contract, the bank guarantee

664185-1
57083 0

would be released to ECG upon ECG delivering the first order to Fieldale on September 26, 2012. Therefore, ECG was bound to pay GDE its commission on September 26, 2012.

17.

Pursuant to the Delivery Contract, Fieldale wired s $1,000,000.00 deposit to ECG's account at Wells Fargo Bank in Iowa. Fieldale also obtained a stand by letter of credit for $2,751,000.00 as well as an irrevocable and transferrable documentary letter of credit for $33,759,000.00 from Rabobank Nederland.

18.

Unbeknownst to Fieldale and GDE, once Brian Lillie received the $1,000,000.00 into the ECG account, he and Defendant Tracy Lillie transferred those funds to other entities controlled by Brian Lillie, including without limitation Defendant EHG. Defendants Brian Lillie and Tracy Lillie, who are spouses, used Fieldale funds to pay down their business and personal debts, and alo used the funds to purchase their current residence located at 6421 Stone Ridge Court, Kannapolis, NC 28081 for a price of $750,000.00.

19.

The stand by letter of credit expired on December 18, 2012 because ECG never delivered the corn and soybean. For the same reason, the documentary letter of credit expired on December 21, 2012.

20.

ECG also failed to pay the $1,000,000.00 commission to GDE and Kermani.

21.

From August through December of 2012, ECG and Brian Lillie represented to Fieldale, GDE, and Kermani that they were unable to perform the Delivery Contract and Commission

664185-1
57083 0

Agreement because Wells Fargo mistakenly transferred Fieldale's deposit from the ECG account to one or more foreign banks, and those banks effectively "stole" the money or otherwise would not release the funds at their request.

22.

In a letter to Fieldale dated January 7, 2013, ECG and Brian Lillie attempt to explain the alleged foreign banking issue and offer to give Fieldale a Promissory Note that would refund the $1,000,000.00 deposit and $525,195.88 that Fieldale incurred in bank fees for the transaction. A true and correct copy of the letter is attached as Exhibit D.

23.

ECG executed the Promissory Note to Fieldale on January 23, 2013 to be paid in full on February 23, 2013. In the Note, ECG and Brian Lillie represent that ECG pledged as security certain bank drafts allegedly issued by Bank of China Limited Hong Kong and assigned to Defendant EHG. A true and correct copy of the Note is attached as Exhibit E.

24.

Both before and after ECG executed the Note to Fieldale, Brian Lillie repeatedly promised Kermani, verbally and in emails and text messages, that he would pay GDE the $1,000,000.00 commission as soon as he satisfied Fieldale's reimbursement requests. In fact, Kermani continued negotiating and working with Fieldale to allow time for Brian Lillie to close other deals so that he could supposedly obtain the funds to reimburse Fieldale and pay GDE its commission. ECG and Brian Lillie used the Note it gave to Fieldale, and the representations contained therein, to further induce GDE and Kermani into providing additional time to pay the commission.

25.

Ultimately, ECG failed to pay the Note to Fieldale and Fieldale had to file a lawsuit against both ECG and Brian Lillie alleging breach of contract and fraud. The suit was filed on January 4, 2014. ECG and Brian Lillie eventually settled the litigation with Fieldale.

26.

Throughout the litigation with Fieldale and after the settlement, Brian Lillie continued his verbal and written assurances that he could and would obtain the money to pay GDE its full commission.

27.

In a text message to Kermani dated March 1, 2016, Brian Lillie committed to paying $5,000 per week toward the $1,000,000.00 in commissions until he could pay it in full. However, he only made one payment of $5,000.00 and has made no more to date, leaving a principal balance of $995,000.00.

## Count One: Fraud as to All Defendants

28.

Plaintiffs incorporate the above paragraphs.

29.

Beginning in June of 2012 and through at least January 7, 2013, Defendant ECG and Brian Lillie repeatedly mispresented to GDE and Kermani, as well as Fieldale, that they could and would obtain below-market prices on corn and soybean meal.

30.

The representations were known by Defendants ECG and Brian Lillie to be and were false. In truth, Defendants ECG and Brian Lillie knew they were incapable of obtaining and delivering the goods as they represented to GDE, Kermani, and Fieldale.

31.

Defendants ECG and Brian Lillie, as well as Defendant EHG, also made knowingly false representations to Kermani, GDE, and Fieldale that certain foreign banking issues prevented them from performing the Delivery Contract. Defendants ECG, Brian Lillie, and EHG further made knowingly false representations that they had available certain bank drafts from a Chinese bank that were payable to EHG that could be used as collateral in the Note to Fieldale and to pay the commissions owed to Kermani and GDE.

32.

Defendant ECG, Brian Lillie, and EHG also made knowingly false representations to Kermani and GDE that it intended to and would pay the $1,000,000 commission in full until after March 1, 2016 at the earliest.

33.

Defendant Tracy Lillie, as accountant for Brian Lillie, ECG, EHG, and other entities controlled by Brian Lillie, colluded with the other Defendants and adopted their false representations by altering financial documents and tax returns to make it appear that ECG had properly handled the funds deposited by Fieldale.

34.

GDE and Kermani reasonably believed and relied in good faith upon the false representations, and were induced to perform the work to identify Fieldale as a buyer and arrange

the transaction, and to enter the Business Venture Agreement and Commission Agreement. Defendants' false representations further induced GDE and Kermani to give Defendants additional time to pay the $1,000,000.00 commissions until after March 1, 2016 at the earliest.

35.

Defendants' actions prevented and deterred Plaintiffs from discovering their fraudulent acts and omissions until after March 1, 2016 at the earliest, and induced them to forgo their legal remedies.

36.

Defendants' acts and omissions described above caused damages to Plaintiffs in the amount of $995,000.00 in principal, plus pre-judgment interest from September 26, 2012 to date at the legal rate of seven percent per year in the amount of $285,660.41, plus additional pre-judgment interest through the date of judgment and post-judgment interest at the legal rate, and interest on unliquidated damages to the extent Plaintiffs' damages under this Count are deemed unliquidated, plus reasonable attorney fees and expenses.

37.

To the extent Plaintiffs' damages under this Count are deemed unliquidated, Plaintiffs hereby give written notice pursuant to O.C.G.A. § 15-12-14 that they demand $995,000.00 to be paid within 30 days from the date of service of this action, and if such amount is not timely made, Plaintiffs are entitled to receive interest on $995,000.00 if the judgment in this case is for an amount not less than $995,000.00.

### Count Two: Conversion as to All Defendants

38.

Plaintiffs incorporate the above paragraphs.

39.

Defendants colluded under false pretenses to convert the $1,000,000.00 that Fieldale

deposited into the account of ECG to Defendants' own use by transferring all or part of those

funds into an account of EHG so that Brian and Tracy Lillie could use that money to pay

business and personal debts and to buy a home for themselves.

40.

The funds wrongfully converted by Defendants, or the resulting funds from ECG's

performance of the Delivery Contract, could have been used to pay all or part of the commission

owed to Plaintiffs under the Business Venture Agreement and Commission Agreement.

41.

The funds paid by Fieldale were rightfully in the hands of ECG; however, Defendants

misappropriated the funds for a use other than that for which the funds were entrusted to ECG

under circumstances indicating fraud.

42.

Defendants' acts and omissions described above caused damages to Plaintiffs in the

amount of $995,000.00 in principal, plus pre-judgment interest from September 26, 2012 to date

at the legal rate of seven percent per year in the amount of $285,660.41, plus additional pre-

judgment interest through the date of judgment and post-judgment interest at the legal rate, and

interest on unliquidated damages to the extent Plaintiffs' damages under this Count are deemed

unliquidated, plus reasonable attorney fees and expenses.

43.

To the extent Plaintiffs' damages under this Count are deemed unliquidated, Plaintiffs

hereby give written notice pursuant to O.C.G.A. § 15-12-14 that they demand $995,000.00 to be

paid within 30 days from the date of service of this action, and if such amount is not timely made, Plaintiffs are entitled to receive interest on $995,000.00 if the judgment in this case is for an amount not less than $995,000.00.

### Count Three: Breaches of Contracts as to ECG

44.

Plaintiff incorporates the above paragraphs.

45.

Defendant ECG breached its obligations under the Business Venture Agreement, as amended, and the Commission Agreement by failing to pay the balance of the commission owed to Plaintiffs, entitling them to damages in the amount of $995,000.00 in principal, plus pre-judgment interest from September 26, 2012 to date at the legal rate of seven percent per year in the amount of $285,660.41, plus additional pre-judgment interest through the date of judgment and post-judgment interest at the legal rate, and interest on unliquidated damages to the extent Plaintiffs' damages under this Count are deemed unliquidated, plus reasonable attorney fees and expenses.

46.

To the extent Plaintiffs' damages under this Count are deemed unliquidated, Plaintiffs hereby give written notice pursuant to O.C.G.A. § 15-12-14 that they demand $995,000.00 to be paid within 30 days from the date of service of this action, and if such amount is not timely made, Plaintiffs are entitled to receive interest on $995,000.00 if the judgment in this case is for an amount not less than $995,000.00.

## Count Four: Negligent Misrepresentations as to All Defendants

47.

Plaintiff incorporate the above paragraphs and allege this Count Four in the alternative to Count One.

48.

In a transaction in which Defendants had a pecuniary interest, Defendants negligently supplied Plaintiffs the false information described in Count One.

49.

Defendants intended Plaintiffs to receive the information or foresaw that someone in Plaintiffs' position would receive it, and intended to induce Plaintiffs to rely on the information as described in Count One.

50.

Plaintiffs justifiably relied on the information described in Count One, causing Plaintiffs to incur damages in the amount of $995,000.00 in principal, plus pre-judgment interest from September 26, 2012 to date at the legal rate of seven percent per year in the amount of $285,660.41, plus additional pre-judgment interest through the date of judgment and post-judgment interest at the legal rate, and interest on unliquidated damages to the extent Plaintiffs' damages under this Count are deemed unliquidated, plus reasonable attorney fees and expenses.

51.

To the extent Plaintiffs' damages under this Count are deemed unliquidated, Plaintiffs hereby give written notice pursuant to O.C.G.A. § 15-12-14 that they demand $995,000.00 to be paid within 30 days from the date of service of this action, and if such amount is not timely

made, Plaintiffs are entitled to receive interest on $995,000.00 if the judgment in this case is for an amount not less than $995,000.00.

## Count Five: Constructive Trust or Resulting Trust and Unjust Enrichment as to All Defendants

52.

Plaintiffs incorporate the above paragraphs.

53.

Defendants' acts and omissions described in the above paragraphs create circumstances that warrant placing a constructive trust or resulting trust for Plaintiffs' benefit on all property and funds held by Defendants, including without limitation the $995,000.00 owed to Plaintiffs for the commission, plus the applicable interest and attorney fees as described in the above paragraphs, as such property was obtained through fraud or otherwise, and have unjustly enriched Defendants such that they cannot enjoy the beneficial interest in the property without violating established principles of equity, pursuant to O.C.G.A. §§ 53-12-132; 53-12-130.

## Count Six: Violations of Federal RICO as to All Defendants

54.

Plaintiffs incorporate the above paragraphs.

55.

Defendants associated in fact with each other, and perhaps other entities and individuals, to conduct or engage in an enterprise as defined in 18 USC § 1961(4).

56.

Defendants engaged in racketeering activity in violation of 18 USC § 1961, et seq., the Racketeering Influenced and Corrupt Organizations Act, a) by placing matter to be sent or received by the Postal Service, or taking or receiving such matter for the purpose of executing a

664185-1
57083 0

scheme or artifice to defraud or obtain money or property by means of false and fraudulent pretenses and/or representations in violation of USC § 1341; b) by transmitting or causing to be transmitted by means of wire or other communications, writings or other transmissions, in connection with a scheme or artifice to defraud or obtain money or property by means of false or fraudulent pretenses or representations, in violation of 18 USC § 1343; c) by knowingly executing or attempting to execute a scheme or artifice to defraud a financial institution or to obtain any of the monies, funds and credits of a financial institution, by means of false or fraudulent pretenses, representations or promises in violation of 18 USC § 1344; and d) by knowingly engaging or attempting to engage in a monetary transaction in criminally derived property of a value greater than $10,000.00 in violation of 18 USC § 1957.

57.

Defendants have engaged in at least two such acts of racketeering activity, constituting a pattern of racketeering, as defined in 18 USC § 1961(5).

58.

Plaintiffs have been injured in their business or property by reason of the above violation of 18 USC § 1962 by the loss of the commission of $955,000.00 in principal, plus pre-judgment interest from September 26, 2012 to date at the legal rate of seven percent per year in the amount of $285,660.41, plus additional pre-judgment interest through the date of judgment and post-judgment interest at the legal rate, and interest on unliquidated damages to the extent Plaintiffs' damages under this Count are deemed unliquidated, plus reasonable attorney fees and expenses. Plaintiffs are also entitled to recover *three times* the actual damages, plus punitive damages and reasonable attorney fees and litigation expenses under the Fedearal RICO statute.

## Count Seven: Violations of Georgia RICO as to All Defendants

59.

Plaintiffs incorporate the above paragraphs.

60.

Defendants, by and through their agents: a) unlawfully acquired, maintained an interest in, and/or had control over, an enterprise or property of any nature, including money, through a pattern of racketeering activity; b) unlawfully associated with an enterprise to either conduct or participate in, either directly or indirectly, the enterprise through a pattern of racketeering activity; and c) are associated in fact and therefore engaged in at least two acts of racketeering activity by knowingly and willfully committing the acts and omissions described in the above Counts that constitute the crimes of False Statements, Fraud/Theft by Deception, Embezzlement/Theft by Conversion, and Larceny/Theft by Taking.

61.

Defendants have, individually, and in concert with each other, engaged in the above criminal acts which demonstrate a pattern of racketeering activity as defined at O.C.G.A. §16-14-3.

62.

Defendants have, jointly and severally, received direct monetary gain from the several transactions which were completed as the result of the above-described criminal acts.

63.

Plaintiffs are entitled to an order from this Court pursuant to O.C.G.A. §16-14-6 (b) enjoining the activities of defendants, and freezing the assets of defendants pending final resolution of this case.

64.

Pursuant to O.C.G.A. §16-14-6 (c), plaintiffs are entitled to an award of damages for the loss of the commission of $955,000.00 in principal, plus pre-judgment interest from September 26, 2012 to date at the legal rate of seven percent per year in the amount of $285,660.41, plus additional pre-judgment interest through the date of judgment and post-judgment interest at the legal rate, and interest on unliquidated damages to the extent Plaintiffs' damages under this Count are deemed unliquidated, plus reasonable attorney fees and expenses. Plaintiffs are also entitled to recover *three times* the actual damages, plus punitive damages and reasonable attorney fees and litigation expenses under the Georgia RICO statute.

## Count Eight: Punitive Damages as to All Defendants

65.

Plaintiffs incorporate the above paragraphs.

66.

Defendants' acts and omissions described in the above paragraphs and Counts, with the exception of Count Three for breaches of contracts, constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs to an award of punitive damages sufficient to punish, penalize, or deter Defendants from such conduct.

## Count Nine: Attorney Fees, Litigation Expenses, and Costs as to All Defendants

67.

Defendants incorporate the above paragraphs.

68.

Defendants have acted in bad faith, been stubbornly litigious, and caused unnecessary trouble and expense by forcing Plaintiffs to bring each of the above claims, entitling Plaintiffs to

an award for attorney fees and litigation expenses under O.C.G.A. § 13-6-11, and in any event an award for costs as a matter of course under O.C.G.A. § 9-11-54(d), in an amount to be proven at trial.

Therefore, Plaintiffs prays for:

A.   As to Counts One, Two, Three, Four, Five, Six, and Seven, judgment in the amount of $995,000.00 in principal, plus pre-judgment interest from September 26, 2012 to date at the legal rate of seven percent per year in the amount of $285,660.41, plus additional pre-judgment interest through the date of judgment and post-judgment interest at the legal rate, and interest on unliquidated damages to the extent any of Plaintiffs' damages are deemed unliquidated;

B.   Additionally, as to Counts Six and Seven, judgment for *three times* the damages proven under Counts Six and Seven;

C.   As to Count Eight, punitive damages in an amount sufficient to deter Defendants;

D.   As to Count Nine, Plaintiffs' attorney fees and litigation expenses in an amount to be proven at trial; and

E.   Any other relief the Court deems just and proper.

Submitted November ___1___, 2016.

Suite 600, Hunt Tower
200 Main Street
P.O. Box 3280
Gainesville, Georgia 30503
T. 770.536.0101
F. 770.532.2171

STEWART, MELVIN & FROST, LLP
Attorneys for Plaintiffs

By: _____
        Rustin L. Smith
        Georgia Bar No. 651657

664185-1
57083-0

# BUSINESS VENTURE AGREEMENT

**STATE OF GEORGIA**

**COUNTY OF CHEROKEE**

This **BUSINESS VENTURE AGREEMENT** entered this 30 day of July, 2012, is between **ECREATIVE GROUP, INC., ENERGY & COMMODITIES GLOBAL INC,** a duly authorized corporation under the laws of the State of Iowa, (Hereinafter referred to as "**FIRST PARTY**") and **GLOBAL DYNAMIC ENTERPRISES, LLC,** a duly authorized corporation under the laws of the State of Georgia, (Hereinafter referred to as "**SECOND PARTY**"). This **AGREEMENT** is made under and should be construed according to the laws of the State of Georgia. Now therefore,

## W I T N E S S E T H:

**WHEREAS, FIRST PARTY** is a brokerage group that specializes in the exportation of agricultural commodities including but not limited to corn, wheat, barley, sugar, soy, soybeans, soybean meal, etc; and

**WHEREAS, SECOND PARTY** is a group that concentrates in locating and identifying prospective purchasers, of agricultural goods and commodities, and setting these entities, groups, or individuals up with prospective sellers or providers of said goods; and

**WHEREAS, SECOND PARTY** has been able to locate and identify numerous prospective buyers of agricultural commodities, which include but are not limited to corn, wheat, barley, sugar, soy, feeds, etc., located in the Country of Iran, and a list of these entities and individuals are included in Attachment A, which is attached hereto and incorporated by reference herein; and

**WHEREAS,** the United States Government has maintained comprehensive economic sanctions on Iran since 1995, and has passed numerous laws to effectuate these goals, including but not limited to the Comprehensive Iran Sanctions Accountability & Divestment Act of 2010; the International Emergency Economic Powers Act, Sections 1701 to 1706 of Title 50 of the United States Code, which allows the President to exercise powers through Executive Orders that impose economic sanctions to address particular emergencies and delegate IEEPA powers for the admission of those Sanction programs; and

**WHEREAS,** the Executive Orders authorize the Secretary of the Treasury, in consultation with the Secretary of State, to take such actions including the promulgation of rules and regulations, as may be necessary to carry out the purposes of the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (Hereinafter referred to as "ITR"), 31 C.F.R. Part 560, to implement the sanctions imposed by the Executive Orders. Within the Department of the Treasury, the Office of Foreign Assets Control (Hereinafter referred to as "OFAC") is responsible for administrating the ITR and adjudicating requests for licenses to engage in transactions otherwise prohibited by the ITR. Unless licensed by OFAC, goods, technology, or services may not be exported, reexported, sold or supplied directly or indirectly from the United States or by a U.S. person wherever located to Iran or the Government of Iran; and

**EXHIBIT "A"**

WHEREAS, under the ITR, any United States person who wishes to engage in a transaction otherwise prohibited by the ITR must file an application for a license and receive approval from OFAC 31 CFR 560.500; 560.501; 501.801; and

WHEREAS, OFAC has authorized by license the exportation or reexportation of those commodities that constitute food, which includes certain agricultural commodities, to the Country of Iran despite the exhaustive list of sanctions imposed upon said nation; and

WHEREAS, FIRST PARTY has applied for and possesses a valid license authorizing exports of agricultural commodities to Iran pursuant to the Trade Sanctions Reform & Export Enhancement Act of 2000 (TRSA), the Iranian Transactions Regulations, 31 C.F.R. Part 560; and

WHEREAS, FIRST PARTY represents, in addition to its OFAC License, it has all other necessary licensing and meets all applicable provisions of law including financial, or trade requirements of agencies other than the Department of Treasury; Office of Foreign Assets Control, including but not limited to Export Administration Regulations, 15 C.F.R. Parts 730 et al. administered by the Department of Commerce to engage in the export of agricultural commodities; and

WHEREAS, due to each parties distinct and unique business attributes, the parties desire to enter into an Agreement to export agricultural goods as defined and allowed under all applicable laws, both domestic and abroad, to the Country of Iran and to provide and outline the terms and conditions for accomplishing this endeavor; and

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and intending to be legally bound, the parties hereto agree as follows:

### 1.

### DUTIES OF PARTIES

(a)     SECOND PARTY shall share its contacts and work product as contained in Attachment A, and shall work to establish additional contacts and customers located in the Country of Iran to purchase agricultural commodities in the form of corn, barley, wheat, soy, soybeans, soybean meal, and animal feed. However, SECOND PARTY shall not be solely limited to Iran but shall also attempt to locate other customers in the Middle East, which shall be defined to include the countries of Saudi Arabia, Turkey, and India for the purposes of selling the above defined agricultural products. SECOND PARTY shall be solely responsible for any and all costs and expenses associated with developing these relationships and customer bases. SECOND PARTY agrees to use its best efforts to perform its obligations hereunder and to give priority to procuring the customers described herein. SECOND PARTY shall work with the FIRST PARTY to procure all necessary information as may be required to place a prospective client or commodity on FIRST PARTY'S OFAC License. SECOND PARTY shall work with and communicate with FIRST PARTY as it relates to negotiations with prospective buyers on terms and conditions of all contracts stemming from this AGREEMENT and shall work with FIRST PARTY on setting up and resolving any bank related matters, including but not limited to setting up accounts, management of accounts, etc. for the transactions set forth herein. SECOND PARTY shall also be responsible for working with all buyers at the direction of FIRST PARTY as it relates to reviewing contracts, answering questions, and otherwise providing customer service.



(b)     **FIRST PARTY** shall be responsible for procuring the requested commodity and to obtain the best available market price at the given time. Said entity shall also have the following responsibilities: (i) the procuring and maintaining of any and all necessary licenses, certificates, or other similar documents in accordance with all state, federal, local, and international laws so that the terms of this agreement can be fulfilled; (ii) compliance with all terms as contained in the Foreign Corrupt Practices Act of 1977 as contained in 15 U.S.C. 78, et seq.; (iii) the providing of a satisfactory and marketable product that shall be delivered in accordance with the terms of any sales contract; (iv) for all costs associated with the procuring of any product, freight and shipping and delivery of the product, and any insurable guarantees associated with the product; (v) to abide by all rules and regulations governing export, subsidy, and destination controls; (vi) to provide information on orders, changes, quotations, complaints, cancellations, and similar data which is helpful to **SECOND PARTY** in an effort to facilitate the terms of this **AGREEMENT**; (vii) to provide information to **SECOND PARTY** as it relates to delivery dates, schedule changes, and other important details which may affect the processing and completion of any given order; (viii) taking the necessary steps to add new clients or prospective buyers to its OFAC License as well as being solely responsible for determining if it is necessary for the OFAC License to be amended in each instance; (ix) making sure all shipping documents are correct and in proper order for each transaction; (x) payment for any losses, fines, penalties, expenses, costs, damages incurred in any given transaction as well as being solely responsible for any costs or expenses associated with any and all bank or financing related matters, including but not limited to costs associated with setting up accounts, taxes which may be due, wire fees, costs associated with establishing any investment accounts, costs associated with fees to be paid to any investment company or banker that **FIRST PARTY** may choose to involve in these matters, etc.; (xi) to respond within reasonable time to requests for prices and delivery of the commodities covered by this agreement; (xii) working with **SECOND PARTY** to address and resolve any and all banking and financial issues surrounding each transaction including but not limited to setting up accounts, establishing signatures to be on the account; management of the account, coordinating any terms or conditions between **FIRST PARTY'S** bank and any banks utilized by any buyers under this **AGREEMENT**, etc.; and (xiii) to make timely payment of commissions and fees earned as specified herein to **SECOND PARTY** as well as paying of any other commissions which may be due to third parties.

**2.**

### PROCEDURE FOR CONDUCTING BUSINESS

(a)     **SECOND PARTY** shall take the necessary steps and procure the prospective Client/Buyer wherein the client desires to purchase an agricultural commodity as provided under the terms of this agreement.

(b)     **SECOND PARTY** shall direct the prospective Client/Buyer to send to it a "Letter of Intent" which includes but is not limited to the desired commodity, the amount of product, delivery matters, including method, desired arrival dates, etc.

(c)     Upon receipt of the Letter of Intent, **SECOND PARTY** shall forward the request to the **FIRST PARTY** in an effort to obtain a price along with product specifications as well as addressing any concerns or questions in relation to the given order. Upon receiving the necessary information from the **FIRST PARTY**, **SECOND PARTY** shall forward all pricing and terms to the Client/Buyer. As a part of this process, prospective Buyer shall agree to the **FIRST PARTY'S** terms and conditions for engagement and must be cleared through OFAC and included on **FIRST PARTY'S** License before a formal offer may be submitted.



(d)     Assuming the price and all terms are agreed upon between Seller and Buyer, **SECOND PARTY** shall send a Proforma Invoice at the direction of the **FIRST PARTY** to the Client/Buyer.

(e)     Assuming the prospective Buyer responds favorably to the Proforma Invoice, Buyer shall be required to remit an Irrevocable Corporate Purchase Offer (ICPO) wherein it agrees to the terms of the Formal Corporate Offer, and this shall be accompanied by a Bank Comfort Letter (BCL) signed by two (2) bank officers acknowledging financial capability and readiness to issue the payment instrument as required by **FIRST PARTY**. **FIRST PARTY** has standard payment terms including contract and purchase order guarantee in the form of a Standby Letter of Credit (SBLC) or Bank Guarantee (BG) from a top world bank. Standby Letter of Credit (SBLC) and Bank Guarantee (BG) language and terms shall be approved solely by **FIRST PARTY** on a case by case basis. Standard accepted validation of an approved bank instrument is no less than 1 year and 1 day, or contract duration plus one month for agreements including extensions and rollovers in excess of a calendar year.

(f)     **FIRST PARTY** shall be solely responsible for approving the Letter of Credit with Bank Guarantee from the prospective Client/Buyer.

(g)     Once agreement is reached between **FIRST PARTY** and buyers on banking issues, which shall include but not be limited to, payment method, payment process, payment terms, establishment of any Bank Guarantees, establishment of any standby letters of credit, etc., **FIRST PARTY** shall enter into a Purchase Agreement with the Client/Buyer with the assistance of **SECOND PARTY**. **SECOND PARTY** shall receive copies of all formal document correspondence including final contract with pertinent addendum and ancillary documentation. A Commission Agreement detailing **SECOND PARTY'S** compensation and agreed mode of disbursement shall be lodged with the final contract and deemed binding.

(h)     Thereafter, it shall then be the sole responsibility of the **FIRST PARTY** to make sure the requested product is loaded and shipped out to the specific destination.

(i)     **FIRST** and **SECOND PARTY** agree that, once the product arrives at the Buyer Destination and monies are released (regardless of whether in the form of cash monies, Bank Guarantees, etc.) to **FIRST PARTY**, **FIRST PARTY** shall issue a commission check or payment to **SECOND PARTY** immediately unless mutually agreed upon by the parties.

This shall constitute the working procedure for all transactions which are the subject of this **AGREEMENT**. This process shall be utilized for the term of the **AGREEMENT** unless otherwise agreed upon in writing by all parties. **FIRST PARTY** shall reserve the right to decline to offer for any reason and withdraw its offer to any service or commodity at any point, but shall provide notice to **SECOND PARTY** so that notice may be provided to the prospective Buyer. All unexpired valid formal offers shall be honored by **FIRST PARTY**.

3.

**COMMISSION & PAYMENT TERMS**

(a)     The **PARTIES** agree that, due to many variables surrounding each business transaction that will occur because of or as a result of this **AGREEMENT**, the commission or fees to be paid to **SECOND PARTY** can vary. Regardless of any variation, the parties acknowledge and agree that **SECOND PARTY'S** commission shall be based and set upon the total contract price of each transaction less the cost of the agricultural good and the cost of shipping. No other costs or expenses that **FIRST PARTY** shall incur shall be considered in arriving at said commission. No



costs or expenses incurred on the part of the **FIRST PARTY** other than those provided in this paragraph shall be used to reduce and/or set **SECOND PARTY'S** commission. (By the way of example, any cost of setting up an investment account or employing an investment banker shall not be considered or utilized to reduce the commissions of the **SECOND PARTY**). A separate fee/commission agreement shall be entered into and shall outline compensation to be paid to **SECOND PARTY** for every transaction to be performed in connection with this **AGREEMENT**. **FIRST PARTY** shall reveal and provide copies of all documents, including but not limited to Purchase Orders of similar documents related to each product purchased under this **AGREEMENT** along with invoices or similar documents in connection with shipping costs to **SECOND PARTY** so that the Commission Fee Agreement can be entered into. The fee or commission agreement shall be drafted and acknowledged by signature, and this shall be performed in conjunction with or simultaneously with any buyer/purchase agreement that is entered into between the **FIRST PARTY** and any Client/Buyer under the terms of this **AGREEMENT**. All commissions or fees shall be paid in U.S. dollars. Additionally, it is acknowledged by all parties hereto that there will be instances wherein monies shall be paid into banking accounts during the pendency of transactions which will be drawing interest as well as the fact that monies earned in cash transactions that are wired into **FIRST PARTY'S** account. It is agreed and acknowledged by all parties that all these monies shall also be subject to equal division between the parties and shall constitute monies to be paid to **SECOND PARTY** by **FIRST PARTY** in addition to its commission monies. All interest monies due to **SECOND PARTY** as well as all monies earned as a result as any cash wire transfers shall be addressed in the Commission Agreement as provided herein.

(b)     Commissions, fees, compensations, or remuneration's to be paid as a part of **AGREEMENT** shall be paid at the times such contracts designated, concluded or monies changing hands between parties, unless otherwise agreed among the "**PARTIES**". The "**PARTIES**" hereby irrevocable and unconditionally agree and guarantee to honor and respect all such fees, or remuneration arrangements made as part of a commission.

(c)     In the event of circumvention as defined below in paragraph four (4) below, **FIRST PARTY** shall pay a legal monetary penalty that is equal to the previous dollar amount received by **SECOND PARTY** from a similar commodity order. In other words, if **SECOND PARTY** were to be circumvented from a soy transaction, it shall be entitled to receive a commission on the circumvented transaction of no less than the dollar amount established under the most recent Commission Agreement involving the particular commodity multiplied by the number of metric tons and/or tonnage in connection with the circumvented transaction, (ex: previous amount received by **SECOND PARTY** under terms of the Commission Agreement in the amount of $20.00 per metric ton multiplied by the circumvented order amount consisting of 500,000 metric tons would constitute a commission of $10,000,000.) This process shall apply to each order that is circumvented and shall also include any interest monies along with any monies earned via cash transactions that are wired into **FIRST PARTY'S** account.

(d)     **FIRST PARTY** shall not engage in any type of conduct with any third party or entity, either directly or indirectly, to diminish or reduce any commissions to be paid to **SECOND PARTY** by means of manipulating the purchase price of any product or any shipping price for any product sold under the terms of this agreement. Any price breaks or reductions afforded to the **FIRST PARTY** by any supplier of product or shipper of any product shall be revealed and passed on to the **SECOND PARTY** as a part of this business agreement and shall not constitute separate monies of FIRST PARTY, but shall constitute monies to be split between parties when arriving at **SECOND PARTY'S** commission fee for each transaction.

# 4.

## NON-CIRCUMVENTION

The "PARTIES" shall not, directly or indirectly, interfere with, circumvent, avoid, by-pass, or obviate each other's interest, or the interest or relationship between the "PARTIES" with any individual or entity, including but not limited to producers, sellers, buyers, brokers, dealers, distributors, refiners, shippers, financial institutions, manufacturers, etc. to change, increase, or avoid directly or indirectly payment of fees, commissions, or continuance of pre-established relationship or intervene in un-contracted relationship with suppliers, manufacturers, or technology owners with intermediaries, entrepreneurs, legal counsel, or initiate buy/sell relationships, or Transactional relationships that by-pass one of the "PARTIES" with any person or entity, including but not limited to corporations, producers, partnerships, or individuals revealed by one of the "PARTIES" with any corporation, producer, partnership, or individual revealed or introduced by one of the "PARTIES" to one another in connection with any ongoing future transactions or supply agreements. Moreover, it is agreed that FIRST PARTY shall have no contact with any buyers or customers supplied, identified, or provided as a result of SECOND PARTY unless written permission is given to FIRST PARTY. SECOND PARTY shall be the sole person to have contact with said person or entity for purposes of entering into agricultural commodity sells under the terms of this AGREEMENT. If approached directly or indirectly by any of SECOND PARTY'S customers, buyers, or contacts, FIRST PARTY shall direct the person or entity to speak with SECOND PARTY as well as notify SECOND PARTY immediately. Last, FIRST PARTY acknowledges that the clients procured and supplied by SECOND PARTY on Attachment A, which is attached hereto and incorporated in reference herein, belong to and constitute the work product of SECOND PARTY and that FIRST PARTY has no right, claim, title, or privilege to same. The "PARTIES" hereto acknowledge and agree that those customers on Attachment A are the ones which are subject to the terms of this paragraph. Moreover, the "PARTIES" agree that, as SECOND PARTY procures new clients, this agreement shall be amended to reflect the SECOND PARTY'S right to future clients.

# 5.

## NON DISCLOSURE & CONFIDENTIALITY

(a)     Because of this AGREEMENT, the PARTIES may learn from one another, or from principles, the names and telephone numbers of investors, borrowers, lenders, agents, brokers, banks, lending corporations, individuals and/or trusts, or buyers and sellers hereinafter called contacts. The PARTIES with this acknowledge, accept, and agree that the identities of the contacts will be recognized by the other PARTY as exclusive and valuable contacts of the introducing PARTY and will remain so for the duration of this agreement.

(b)     The "PARTIES" shall not disclose or otherwise reveal directly or indirectly, to any third party, any confidential information provided by one party to the other, or otherwise acquired, particularly, contract terms,  product information or manufacturing processes, prices, fees, financing arrangements, schedules, and information concerning the identity of the sellers, producers, buyers, lenders, borrowers, brokers, distributors, or their representatives, and specific individual names, addresses, principals, or telex/fax/telephone numbers, e-mail addresses, references, products or technology information, advised by one "PARTY(S)" to another as being confidential or privileged, without the prior specific written consent or the "PARTY(S)" providing such information.

## 6.

## TERM OF AGREEMENT

This agreement shall be valid for a period of three (3) years from the date of the agreement; with additional two (2) years automatic roll-over renewals at the close of each Transaction or exchange of information, and thereafter at the end of any roll-over period, without the need of advisement, unless mutually agreed in writing to be terminated by all the **"PARTIES"** which termination can occur only at the end of any roll-over period. This agreement shall apply to the following: (a) all transactions originated during the term of this agreement, and (b) all subsequent transactions that are follow up, repeat, extended or renegotiated transactions of transactions originated during the term of this agreement.

## 7.

## PARTNERSHIP

This agreement shall not be construed as being an agreement of partnership, and none of the **"PARTIES"** shall have any claim against any separate dealing, venture or assets of any other party or shall any party be liable for any other.

## 8.

## AGREEMENT TO INFORM

(a)      All parties shall be informed of the development of all transactions subject to this **AGREEMENT** by receiving copies of any correspondence made between the parties as well as pursuant to the terms of the section entitled "Procedures for Conducting Business" above.

(b)      Each **PARTY** shall provide to the other on a regular basis such documentation as may reasonably be required to enable the other party to be assured of compliance with this **AGREEMENT**, and shall permit the other party to inspect its books of account and other records at such a reasonable times as the other party may request. In addition thereto, the **"PARTIES"** agree that they shall execute any necessary documents or releases which shall allow either party to gain full access to any and all information relative to the terms of this **AGREEMENT** including, but not limited to banking terms, banking accounts, commodity purchases, orders, invoices, shipping documents, etc.

## 9.

## ASSIGNMENT

This agreement is personal to the parties to this agreement and may not be assigned, in whole or in part, without the prior written consent of both parties hereto.

## 10.

## ADDITIONAL INSTRUMENTS

Each of the parties hereto shall properly endorse, execute and deliver such instruments or documents as may be necessary from time to time to effectuate the provisions of this **AGREEMENT.**

## 11.

### PRIOR OR SUBSEQUENT AGREEMENTS

The parties hereto cancel, annul, invalidate, repudiate and disavow any and all prior property or support agreements made by them at any time heretofore.

## 12.

### ENTIRE AGREEMENT, SEVERABILITY, BINDING EFFECT

Each party agrees that this **AGREEMENT** contains the entire understanding of the parties, there being no representation, promise, warranty, covenant, or undertaking other than those expressly set forth herein. The covenants and conditions of this **AGREEMENT** are to be construed together, but should any part or parts of this **AGREEMENT** be interpreted or construed to be unenforceable, void or without meaning, the remaining part or parts shall continue in full force and effect. This **AGREEMENT** shall apply to, bind and be obligatory upon the parties, and upon their assigns, personal representatives, administrators, and executors. Each party hereto expressly acknowledges and agrees that it has the power, authority and permission to enter into this **AGREEMENT** on behalf of its corporation.

## 13.

### MUTUAL COOPERATION

Each of the parties hereto shall cooperate fully with the other party to ensure that the provisions of this **AGREEMENT** are executed and carried out in good faith. This **AGREEMENT** shall be effective upon execution hereof by each party.

## 14.

### MODIFICATION

No modification or waiver of any of the terms herein shall be valid unless in writing and signed by both the parties. No waiver of any breach herein or default hereunder shall be deemed a waiver of any subsequent breach of default of the same or similar nature.

## 15.

### DISCLOSURE AND VOLUNTARY EXECUTION

Each party hereto declares that it has read the foregoing **AGREEMENT**, and that it fully understands the meaning and implication of each term, condition, promise, covenant, representation, and part of this **AGREEMENT**. Each party acknowledges that the execution of this **AGREEMENT** is a voluntary act, free of any coercion or duress. Further, each party acknowledges that it has had the opportunity to consult with legal counsel in regard to the terms and effects of this **AGREEMENT**.

## 16.

### GOVERNING LAW & JURISDICTION

The parties agree that it is their intention that this **AGREEMENT** and its performance, and all suits and special proceedings pursuant to this **AGREEMENT** shall be construed in accordance with

the laws of the State of Georgia and that in any action, special proceeding, or other proceeding that may be brought arising out of, in connection with, or by reason of this **AGREEMENT**, the laws of the State of Georgia shall be applicable and shall govern to the exclusion of the law of any other forum, without regard to the jurisdiction in which any action or special proceeding may be instituted.

**17.**

**SIGNATURES**

(a)  Signature on this agreement received by the way of Facsimile, Mail and/or email shall be deemed to be an executed contract. The parties agree that Electronic signature shall be valid and accepted to be an hand signature.

(b)  EDT (Electronic Document Transmissions) shall be deemed valid and enforceable in respect of any provisions of this Contract. As applicable, this agreement shall be: (i) incorporate U.S. Public Law 106-229, "Electronic Signatures in Global and National Commerce Act" or such other applicable law conforming to the UNCITRAL Model Law on Electronic Signatures (2001); (ii) ELECTRONIC COMMERCE AGREEMENT (ECE/TRADE/257, Geneva, May 2000) adopted by the United Nations Centre for Trade Facilitation and Electronic Business (UN/CEFACT)and; (iii) EDT documents shall be subject to European Community Directive No. 95/46/EEC, as applicable. Either Party may request hard copy of any document that has been previously transmitted by electronic means provided, however, that any such request shall in no matter delay the parties from performing their respective obligations and duties under EDT instruments.

**IN WITNESS WHEREOF, THE FIRST AND SECOND PARTIES** have executed this instrument on the date first appearing set out, consisting of (9) nine typed written pages, this page included, the proceeding pages bearing our initials on the original copy.

President, First Party
ECreative Group, Inc.
Energy & Commodities Global, Inc.

Secretary
Corporate Seal

Sworn to and subscribed before me this
___ day of _____ 2012.

_____
Notary Public

My Commission Expires:

President, Second Party
Global Dynamic Enterprises, LLC

Corporate Seal

Sworn and subscribed before me this
30th day of July 2012.

Melida Strickland
Notary Public

My Commission Expires: 9/16/14



# ATTACHMENT A
## CLIENT'S OF SECOND PARTY

1. FAJIR OMID IRANIAN CO.
   NO. 6, YAS ST. SHARIATI AVE.
   TEHRAN 1913635711 IRAN
   TELEPHONE: +98-021-22270767
   FAX: +98-021-22277187
   SIGNATORY: S.M.A. HOSSEINI

2. ZUFA AGRICULTURAL ENGINEERING CO.
   #5, KHOSRAVANI ALLEY, VAZIRIPUR STR., MOHSENI SQU.,
   MIRDAMAND BLVD
   TEHRAN, IRAN
   TELEPHONE: 98-21-264-008-25
   SIGNATORY: MR. HOSEIN GOLABGIRHA

3. TAKALOM COMPANY
   NO. 53, PARCHAM ST., TOWHID SQ.
   TEHRAN, IRAN
   P.O. BOX 14155/3671
   TELEPHONE: +9821-66739895-6
   SIGNATORY: _____

4. PETRO POLY PUD KISH
   NO 2002, 5TH FLOOR MITRA ALLEY, AFTER GHEYTARIEH STATION,
   SHARIATI AVE.
   TEHRAN, IRAN
   TEL: 0098-21-22674867
   SIGNATORY: M.R. MEHDIZADEH

5. PETROKAVALBORZ CO.
   #2, 1ST FLOOR, ARGENTINA SQ., BAYHAGHI AVE., 12TH EAST ALLEY
   TEHRAN, IRAN
   TELEPHONE: +982188735538
   FAX: +982188746027
   SIGNATORY: _____

6. HORTASH INTERNATIONAL TRADING CO LTD
   NO. 58, 2ND FLOOR, SHAHANAGHI ST., NORTH SHEIKH BAHAIE ST.,
   MOLLA SADRA ST., VANAK SQ.
   TEHRAN, IRAN
   TELEPHONE: +98(21)88613540-43
   SIGNATORY: _____

7. ETEHADIYEH MORGHDARAN MIHAN
   NO: 153 (TRADE BUILDING N 241), AZADI STREET
   TEHRAN, IRAN
   TELEPHONE: +98-21-66564507-11
   SIGNATORY: _____

8. DELVAR AFZAR INDUSTRIAL GASES CO
   NO. 5, 8TH FLOOR BIDAR ST., ELAHIYE EXIT MODARES HIGHWAY
   TEHRAN, IRAN
   TELEPHONE: (+98-21) 262218814/15
   E-MAIL: INFO@DELVARAFZAR.COM
   SIGNATORY: IRAJ GHORBANI

9. ROSHA TEJARAT CASPIAN
   AZEMANE BAMAMEYE SHOMALL-CENTRALL 13TH STR.
   PLOT NUMBER 18-9TH FLOOR
   TEHRAN, IRAN
   TELEPHONE: +989179630355
   FAX: +987112260751
   SIGNATORY: MR. ABDOOLRASOOL KHOSHROO Owner, CEO
              ABDOOLRASOOL RAHIM KHOSHROO, President

10. ILIA ZORAT CO
NO: 1370, ESHTEHARD INDUSTRIAL ZONE,
KARAJ, ALBORZ, IRAN
TEL/FAX: +98 26 37774264-56
SIGNATORY: _____

11. SABA BAHAR IRANIAN COMPANY
FATHE SHAGHAGI AVE NEAR GOMNAM
NO. 147 3RD FLOOR
TEHRAN IRAN
TELEPHONE: +98 21 220 31307
FAX: +98 21 22031308
SIGNATORY: _____

## FIRST AMENDED BUSINESS VENTURE AGREEMENT

STATE OF GEORGIA

COUNTY OF CHEROKEE

This **FIRST AMENDED BUSINESS VENTURE AGREEMENT** entered into this __30__ day of __July__ 2012 is between **ECREATIVE GROUP INC; ENERGY & COMMODITIES GLOBAL, INC.**, a duly authorized corporation under the laws of the State of Iowa (Hereinafter referred to as "FIRST PARTY") and **GLOBAL DYNAMIC ENTERPRISES, LLC**, a duly authorized corporation under the laws of the State of Georgia, (Hereinafter referred to as **"SECOND PARTY"**). This Amended AGREEMENT is made under and should be construed according to the laws of the State of Georgia. Now therefore,

### WITNESSETH:

WHEREAS, the parties previously entered into a **Business Venture Agreement** dated July 30, 2012 as it relates to the exportation and sale of agricultural commodities to country of Iran; and

WHEREAS, since the entry of said original Business Agreement, Second Party has been able to identify purchases or buyers for agricultural commodities located here in the United States; and

WHEREAS, the parties desire to expand the original **Business Venture Agreement** to include locating and selling agricultural commodities to individuals or entities located here in the United States;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and intending to be legally bound, the parties have agreed as follows:

1.

### AMENDED TERMS

The parties agree that the terms of original Business Venture Agreement dated July 30, 2012 shall be amended to allow the venture between the parties to include the providing and selling of agricultural commodities as defined in said agreement to individuals and entities located in the United States. Any and all terms of the original agreement shall be incorporated by reference herein as if stated verbatim and shall apply to this First Amendment.

2.

### INDENTITY OF U.S ENTITIES

Second Party has been able to locate U.S companies who have expressed and desire to purchase agricultural commodities. The names of these and entities are detailed on Exhibit A attached hereto and

incorporated by reference herein. It is agreed that **SECOND PARTY** shall be the sole person to have contact with said person or entity for purposes of entering into agricultural commodities sells under the terms of the original Business Venture Agreement dated July 30, 2012 incorporated by reference herein. **FIRST PARTY** acknowledges that the clients procured and supplied by **SECOND PARTY** on Attachment A, which is attached hereto and incorporated by reference herein, belong to and constitute the work product of **SECOND and FIRST PARTY** has no right, claim, title or privilege the same.

    · **IN WITNESS WHEREOF, FIRST AND SECOND PARTIES** have executed this instrument on the date first appearing set out, consisting (2) typed written pages, this page included, the proceeding pages bearing our initials on the original.

President, First Party
ECreative Group, Inc.
Energy & Commodities Global Inc.

Corporate Seal

Sworn to and subscribed before me this
this

_____day of _____2012


_____
Notary Public

My Commission Expires


President, Second Party
Global Dynamic Enterprises, LLC


_____

Corporate Seal

Sworn and subscribed before me

30 th day of July 2012


Melinda Strickland
Notary Public
My Commission Expires  9/16/14

# ATTACHMENT A
## (UNITED STATES CORPORATIONS)

1. FIELDALE FARMS CORPORATION
   P. O. Box 55
   BALDWIN, GA  30511
   TELEPHONE:  (706) 778-5100
   FAX:  (706) 778-3767
   ATTEN:  GUS ARRENDALE

2. MAR-JAC POULTRY
   1101 AIRPORT STREET, SW
   GAINESVILLE, GA  30501
   TELEPHONE:  (770) 531-5000
   ATTEN:  RANDY BRUCE

3. PECO FOODS
   CORPORATE OFFICE
   1020 LURLEEN WALLACE BLVD. NORTH
   P. O. BOX 1760
   TUSCALOOSA, AL  35401
   TELEPHONE:  (205) 345-4711
   FAX:  (205) 366-4533



<u>COMMISSION AGREEMENT</u>

**STATE OF GEORGIA**
**COUNTY OF CHEROKEE**

This **COMMISSION AGREEMENT** entered this 30th day of July, 2012, is between **ECREATIVE GROUP, INC., ENERGY & COMMODITIES GLOBAL INC**, a duly authorized corporation under the laws of the State of Iowa, (Hereinafter referred to as "**FIRST PARTY**") and **GLOBAL DYNAMIC ENTERPRISES, LLC**, a duly authorized corporation under the laws of the State of Georgia, (Hereinafter referred to as "**SECOND PARTY**"). This **COMMISSION AGREEMENT** is made under and should be construed according to the laws of the State of Georgia. Now therefore,

## <u>W I T N E S S E T H:</u>

**WHEREAS, FIRST PARTY** is a commodities brokerage group with world wide affiliations that specialize in the exportation of agricultural commodities including but not limited to corn, wheat, barley, sugar, soy, etc; and

**WHEREAS, SECOND PARTY** is a group that concentrates in locating and identifying prospective purchasers, who seek to buy various goods and commodities, and setting these entities, groups, or individuals up with prospective sellers or providers of the desired product; and

**WHEREAS, SECOND PARTY** has been able to locate and identify numerous prospective buyers of agricultural commodities, which include but are not limited to corn, wheat, barley, sugar, soy, feeds, etc., who are located in the Country of Iran/ U.S.A; and

**WHEREAS,** the parties have previously entered into a Business Venture Agreement, dated July 30, 2012, which outlines the parties rights, obligations, responsibilities, etc in selling agricultural commodities to the Country of Iran/U.S.A. Said Agreement is incorporated by reference herein, as if stated verbatim; and

**WHEREAS,** pursuant to the terms of the Parties Business Venture Agreement, **SECOND PARTY** has been able to locate an Iranian/U.S.A. Business known as Fieldale Farms to purchase corn/soybean meal ; and

**WHEREAS, SECOND PARTY** has provided information of her buyer to the **FIRST PARTY** and **FIRST PARTY** is satisfied that all terms and responsibilities imposed under the terms of the Business Venture Agreement have been met; and

**WHEREAS, FIRST PARTY** and the Business known as Fieldale Farms have been able to enter into a Sales Contract related to the purchase of corn/soybean in accordance with the terms and conditions of the parties Business Venture Agreement; and

EXHIBIT "B"

WHEREAS, FIRST PARTY acknowledges "but for" the efforts and contacts of SECOND PARTY it would have not been able to effectuate its contract with Fieldale Farms and that said efforts deserve compensation; and

WHEREAS, FIRST PARTY and SECOND PARTY have discussed and reached a commission agreement as it relates to monies to be paid to SECOND PARTY as compensation for her efforts in relation to this transaction; and

NOW THEREFORE, in consideration of the mutual covenants contained herein, and intending to be legally bound, the Parties hereto agree as follows:

## 1.
## COMMISSION AMOUNT & TERMS

FIRST PARTY shall pay to SECOND PARTY a commission fee of $1,000,000.00/One Million Dollars for the transaction dated July 30,2012 involving the Iranian/U.S.A Business Company Fieldale Farms wherein it purchased _corn/soybean meal. These monies shall be paid to SECOND PARTY upon release of the Bank Guarantee to FIRST PARTY. These monies shall be paid in U.S. dollars to SECOND PARTY and in accordance with the directions of SECOND PARTY as it relates to the particular bank institution, deposit method; etc. Currency conversions, when necessary, shall be based upon the prevailing free market rates of the payment is earned (not at the term of payment) as quoted in the Wall Street Journal or other authoritative source.

## 2.
## IDENTITY OF BUYER & OBLIGATIONS OF PARTIES

The Parties acknowledge that the identity of the Buyer, which is Fieldale Farms, shall remain solely the client of SECOND PARTY and all terms of the Non-Circumvention provision as well as the Non Disclosure & Confidentiality provision as contained in the Business Venture Agreement shall apply to this client, this transaction, and all future transactions involving this client and any future clients identified and procured by SECOND PARTY.

## 3.
## ENTIRE AGREEMENT, SEVERABILITY, BINDING EFFECT

Each party agrees that this AGREEMENT contains the entire understanding of the parties, there being no representation, promise, warranty, covenant, or undertaking other than those expressly set forth herein. The covenants and conditions of this AGREEMENT are to be construed together, but should any part or parts of this AGREEMENT be interpreted or construed to be unenforceable, void or without meaning, the remaining part or parts shall continue in full force and effect. This AGREEMENT shall apply to, bind and be obligatory upon the parties, and upon their heirs, assigns, personal representatives, administrators, and

executors. Each party hereto expressly acknowledges and agrees that he or she has the power, authority and permission to enter into this **AGREEMENT** on behalf of its corporation.

## 3.
## DISCLOSURE AND VOLUNTARY EXECUTION

Each party hereto declares that it has read the foregoing **AGREEMENT**, and that it fully understands the meaning and implication of each term, condition, promise, covenant, representation, and part of this **AGREEMENT**. Each party acknowledges that the execution of this **AGREEMENT** is a voluntary act, free of any coercion or duress. Further, each party acknowledges that it has had the opportunity to consult with legal counsel in regard to the terms and effects of this **AGREEMENT**.

## 4.
## GOVERNING LAW & JURISDICTION

The parties agree that it is their intention that this **AGREEMENT** and its performance, and all suits and special proceedings pursuant to this **AGREEMENT** shall be construed in accordance with the laws of the State of Georgia and that in any action, special proceeding, or other proceeding that may be brought arising out of, in connection with, or by reason of this**AGREEMENT**, the laws of the State of Georgia shall be applicable and shall govern to the exclusion of the law of any other forum, without regard to the jurisdiction in which any action or special proceeding may be instituted.

## 5.
## DISPUTE RESOLUTION

Any and all disputes, controversies, claims, or other disagreements arising out of or relating to this **COMMISSION AGREEMENT** or the actual or alleged breach thereof shall be finally settled through arbitration in accordance with rules of the American Arbitration Association. The arbitration shall be held in Georgia and shall be conducted under and in accordance with the American Arbitration Association Rules applicable to Georgia using the rules of law not equity. Such arbitration shall be conducted in English and will be conducted on confidential basis in accordance with the terms of this **COMMISSION AGREEMENT**.

IN WITNESS WHEREOF, THE FIRST AND SECOND PARTIES have executed this instrument on the date first appearing set out, consisting of (4) four typed written pages, this page included, the proceeding pages bearing our initials on the original copy. Each counterpart hereof shall be deemed an original of this AGREEMENT for all purposes.

President, First Party
ECreative Group, Inc.
Energy & Commodities Global, Inc.

President, Second Party
Global Dynamic Enterprises

Secretary
Corporate Seal

Corporate Seal

Sworn to and subscribed before me this

__day of_____2012.

Sworn to and subscribed before me this

__day of_____2012.

Notary Public
My Commission Expires:

Notary Public
My Commission Expires:



**Energy & Commodities Global**
*An aCreative Group, Inc. Company*

1827 1st Street West
Independence, Iowa 50644, USA
Corporate Office Phone: 319-334-5115  Fax: 704-973-0630
Satellite Office Phone: 704-935-5060

## DELIVERY CONTRACT

US Federal ID #: 20 - 1198639
IA Sec. of State ID; 490 OP-295254

| BUYER: | The following number must appear on all related correspondence, shipping papers, and invoices:  CONTRACT NUMBER: FD-000313 |
|---|---|
| FIELDALE FARMS CORPORATION<br>P.O. BOX 558<br>555 Broiler Blvd,<br>BALDWIN, GA 30511<br>PHONE: 706-778-5100    FAX: 706-778-3767<br>LEGAL SIGNATORY: TOM HENSLEY, PRESIDENT | |

| CONTRACT DATE | DESTINATION | FREIGHT TYPE | SHIPMENTS | PAYMENT TERMS |
|---|---|---|---|---|
| August 21, 2012 | BALDWIN, GEORGIA OR CLIENT SPECIFIED RAIL LEG | RAIL<br><br>NORFOLK SOUTHERN | PARTIAL SHIPMENTS ALLOWED<br><br>FIRST SHIPMENT TO BE DELIVERED 21-30 DAYS FROM DOWN PAYMENT WITH ADDITIONAL DELIVERIES TO IMMEDIATELY FOLLOW | CASH & SBLC DEPOSIT PLUS PAYMENT PER SHIPMENT VIA DLC<br><br>*See Section 3.1 for details* |

| QTY | UNIT | COMMODITY DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 55,000 | DRY METRIC TONS | **Soybean Meal (Loose)**<br>PROTEIN: Maximum 47.5%,   FAT: Minimum 0.5%,<br>FIBER: Maximum 3.5%,   MOISTURE: Maximum 12.5%,<br>UREASE ACTIVITY: pH Rise between 0.12 and 2.0 units<br>AFLATOXIN: Maximum 20 ppb, ASH: Maximum 6%<br>E.COLI COUNT: Negative, SALMONELLA: Negative,<br>MOULDY COLONY: 5 multiple 105<br>ORIGIN: USA<br>PACKING: BULK RAIL | $437.00 USD | $24,035,000.00 USD |
| 55,000 | DRY METRIC TONS | **YELLOW CORN #2    FEED PURPOSE**<br>TEST WEIGHT: Minimum 54 LBS/BUSHEL, PROTEIN: Minimum 6%,<br>MOISTURE CONTENT: Maximum 14%, BROKEN KERNALS AND<br>FOREIGN MATTERS: Maximum 3%, STARCH CONTENT: Average 60-<br>66%, HEAT DAMAGED KERNALS: Maximum 0.5%, TOTAL DAMAGED<br>KERNALS: Maximum 5%, ADMIXTURE: Basic 2.5%,<br>RADIATION: None, AFLATOXIN: 20 PPB Maximum Total,<br>SALMONELLA: Negative, E.COLI: Negative, FIBER: Minimum 2.7%,<br>ASH CONTENT: Maximum 1.5%, FAT CONTENT: Minimum 3.5%,<br>FREE OF MOLDING AND CHEMICALS<br>ORIGIN: USA<br>PACKING: BULK RAIL | $245.00 USD | $13,475,000.00 USD |

| | | |
|---|---|---|
| Weight for invoicing purposes shall be established by the current net weight. Weight franchise of +/- 3% shall be allowed against Bill of Lading weight. In case short weight exceeds +/- 3% the Seller shall compensate Buyer for the amount excluding the franchise on the basis of contracted price. | SUBTOTAL | $37,510,000.00 USD |
| | SALES TAX | NONE |
| | FREIGHT | PRE-PAID/INCLUSIVE |
| | OTHER | NONE |
| | TOTAL | $37,510,000.00 USD |

Seller Initials: _____          Buyer Initials: _____

EXHIBIT "C"



1. The Goods.
   1.1 The quality of grain delivered under this contract shall be determined delivered at Buyer Specified Delivery Point, Baldwin, Georgia. Original weights and first official grades to govern. All deliveries made under this contract shall be of the grade and quality specified herein and shall be accompanied by all necessary certificates of origin, quality, and inspection.
   1.2 All grain delivered under this contract shall be of merchantable quality, unadulterated, and unrestricted from movement in interstate commerce within the meaning of the federal Food, Drug and Cosmetic Act, Environmental Protection Agency tolerances, the U.S. Grain Standards Act and applicable state law.
   1.3 Acceptance of deliveries not meeting this contract grade and quality shall be at the option of the buyer. If the buyer elects to accept such deliveries not meeting the contract grade and quality, market scale discounts and premiums at the time of delivery will apply, unless otherwise specified in writing.

2. Termination.
   2.1 Neither party may cancel this order before loading of product at location of origin unless, after having notified the other of a material breach of this agreement that breach is not cured within fifteen (15) days from the date that the written notice of breach was mailed or delivered.
   2.2 Should the buyer cancel this order without cause, the buyer shall surrender ten percent (10%) of the total order amount without protest to the seller in which time seller will immediately refund to the Buyer any additional remaining pre-paid funds less the aforementioned ten percent (10%).
   2.3 Should the seller cancel this order without cause, a full refund of all previously pre-payment funds, including an additional ten percent (10%) interest of wired pre-payment funds must be delivered via wire transfer back to the originating account within fifteen (15) days of cancellation.

3. Terms of Payment.
   3.1 $1,000,000.00 USD deposit to be issued via MT-103 wire transfer to the account in Section 4.1 below.
   3.2 $2,751,000.00 USD Stand By Letter of Credit to be issued as guarantee of final payment of shipments. (*Last details for issuance of the SBLC to be supplied seller to issuing bank to bank.*)
   3.3 Irrevocable and Transferrable Documentary Letter of Credit in the amount of $33,759,000.00 USD to be issued as payment instrument, and to be open no less than four (4) months, to be drawn on via shipment by shipment basis upon delivery and presentation of *DOCUMENTS REQUIRED FOR PAYMENT* per DLC requirements below. *Last details for issuance of the DLC to be supplied prior to issuance bank to bank.*

   DOCUMENTS REQUIRED FOR PAYMENT
   A. SIGNED COMMERCIAL INVOICE IN (3) ORIGINALS AND (3) COPIES INDICATING
      - L/C NO. AND CONTRACT NO. FD-000313
      - LESS USD 1,000,000.00 REPRESENTING DEPOSIT RECEIVED' ON THE FIRST SHIPMENT'S INVOICE.
   B. 3 ORIGINAL AND 3 NON-NEGOTIABLE COPIES OF CLEAN ON BOARD MULTIMODDLE BILLS OF LADING MADE OUT TO ORDER AND BLANK ENDORSED, MARKED 'FREIGHT PAYABLES AS PER CHARTER PARTY' AND NOTIFY APPLICANT.
   C. WEIGHT CERTIFICATE/OFFICIAL WEIGHT CERTIFICATE IN (3) COPIES
   D. QUALITY CERTIFICATE (CORN) - ISSUED BY THE FEDERAL GRAIN INSPECTION SERVICE (FORM FGIS-905 TX) AND/OR QUALITY CERTIFICATE (SOYBEAN MEAL) - PRECESSORS GUARANTEED ANALYSIS OF PROTEIN, FAT, FIBER, AND ASH CONTENT.

4. Payment Beneficiary.
   4.1 Any and all payments, made via agreed MT-103 wire transfer, shall be issued in favor of eCreative Group, Inc. DBA Energy & Commodities Global, and wired to Wells Fargo Bank as defined herein:

   | | |
   |---|---|
   | Bank Name: | Wells Fargo Bank NA |
   | Bank Address: | 191 West 5th Street, Waterloo, IA 50701 |
   | Account Name: | eCreative Group, Inc. dba Energy & Commodities Global |
   | Signatory Officers: | Brian James Lillie |
   | Account Number (USD): | 3036930273 |
   | Incoming Routing Number: | 121000248 |
   | Bank Officer Name: | Sue Chizek |
   | Bank Officer Phone: | 319-236-4800 |

5. Force Majeure.
   5.1 Both parties will be exonerated from their obligations in case of a Force Majeure event.
   5.2 Force Majeure is understood as per provisions under ICC500 and means any event such as fire, explosions, hurricanes, floods, earthquakes and similar natural calamities, wars, epidemics, military operations, terrorism, riots, revolts, strikes, industrial unrest, governmental embargoes, or other unforeseeable actions occurring after the conclusion of this contract and outside the party's reasonable control and which cannot be avoided by the reasonable diligence that could delay or prevent the performance of other party's obligations in this contract.

Seller Initials: [initials]                    Buyer Initials: [initials]



5.3 The party to this contract whose performance of this contract is prevented by a Force Majeure event must notify the other party within seven (7) days of the effective date of occurrence, which notice is to be confirmed by a certificate issued by the local chamber of commerce and industry, including particulars of the event and expected duration. Failure to submit such a notification will prevent the parties' exoneration from contractual obligations under Force Majeure unless the event makes such notice impossible.

5.4 The performance of either party's obligation will be such that the obligation will be postponed with the period of the existence of the Force Majeure event plus a reasonable period to rehabilitating production and shipping. No penalty shall be payable for the duration of this delay.

5.5 Should the delay caused by a Force Majeure event last more than one (1) month, the parties will attempt to agree to a measure to allow the contract to continue. Should such an agreement not to be reached within thirty (30) days from the date of the certified Force Majeure event, the parties are entitled to terminate the contract.

5.6 The Force Majeure event does not exonerate the buyer from paying for the goods already delivered. No Force Majeure event can affect the last shipment that has arrived, but not yet paid.

6. **Interpretation, Law and Arbitration.** This Agreement constitutes the entire agreement between the parties on the subject matter hereof and supersedes any prior oral or written agreements between the parties on the subject matter herein. This Agreement can be modified only by a written document signed by both parties. This Agreement shall be interpreted in accordance with the laws of the State of Iowa, United States of America.

6.1 Except as otherwise expressly provided herein, this contract shall be subject to the National Grain and Feed Association's Trade Rules applicable on the date this purchase contract is signed. *(NGFA Trade Rules and Arbitration Rules are available upon request)*

6.2 This contract shall be governed by, and construed in accordance with, the laws of the State of Iowa if a matter not addressed by the NGFA's Trade Rules or the Arbitration Rules is at issue.

6.3 The parties to this contract agree that the sole remedy for resolution of any and all disagreements or disputes arising under this contract shall be through arbitration proceedings before the National Grain and Feed Association (NGFA) under NGFA Arbitration Rules. The decision and award determined through such arbitration shall be final and binding upon the buyer and seller. Judgment upon the arbitration award may be entered and enforced in any Court having jurisdiction thereof.

7. **Binding Effect.** This Agreement is binding upon, and shall inure to the benefit of, the heirs, representatives, successors, and assigns of the parties.

8. **Counterparts; Electronic and/or Faxed Copies.** Copies of this Agreement with electronic or faxed signature page(s) shall be binding and effective as to each party and may be used in lieu of an original of this Agreement and in lieu of original signature page(s). This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All such counterparts shall be construed together and shall constitute one document, but in making proof hereof it shall only be necessary to produce one such counterpart. The signatures to this Agreement may be executed on separate pages and when attached to this Agreement shall constitute one complete document.

9. **Legality.** The parties agree that the provisions contained in this Agreement are reasonable and are not known or believed to be in violation of any international, federal or state law or regulation. In the event a court of law finds any provision to be illegal or unenforceable, such court may modify such provision to make it valid and enforceable. Such modification shall not affect the remainder of this Agreement which shall continue at all times to be valid and enforceable.

10. **Number of Contract Copies.** Six copies of the agreement are to be signed and triplicate shall be kept by each party.

11. **Conclusion.** Until the exchange of originals, the parties agree the signed stamped copies of the agreement will be in full force and effect. Parties hereby confirm and accepted that the agreement sent by facsimile, courier or by email, is accepted as an original.

## SIGNATURE PAGE TO FOLLOW

Seller Initials: _BEL_                                                                                                     Buyer Initials: _____



IN WITNESS WHEREOF, the parties have caused the execution of this Agreement as of the day and year first above written.

The Seller
ECREATIVE GROUP, INC. dba ENERGY & COMMODITIES GLOBAL

By: _____     Date: ___8/21/12_____
　　Brian Lillie, Its President/CEO

Seal:

The Buyer
FIELDALE FARMS CORPORATION

By: _____     Date: ___1/31/11_____
　　Tom Hensley, Its President

Seal:

Seller Initials: _____     Buyer Initials: _____

CORP OFFICE: P.O. BOX 66 | 1027 1ST STREET WEST | INDEPENDENCE, IOWA 50644 | PH: 877-726-5112
REGIONAL OFFICE: 1934 J.N. PEASE PLACE | CHARLOTTE, NC 28262 | PH: 704-933-0060
FAX: 704-973-0620 | WEB: www.DOSCG.com | EMAIL: INFO@DOSCG.COM



## APPENDIX A - DELIVERY SCHEDULE

### YELLOW CORN #2

| DELIVERY DATE | UNIT | COST |
|---|---|---|
| 9/26/2012 | 9,167 | $ 2,245,915.00 |
| 10/3/2012 | 9,167 | $ 2,245,915.00 |
| 10/10/2012 | 9,167 | $ 2,245,915.00 |
| 10/17/2012 | 9,167 | $ 2,245,915.00 |
| 10/24/2012 | 9,167 | $ 2,245,915.00 |
| 10/31/2012 | 9,165 | $ 2,245,425.00 |

### SOYBEAN MEAL 47.5% PROTEIN

| DELIVERY DATE | UNIT | COST |
|---|---|---|
| 9/26/2012 | 1,140 | $ 498,180.00 |
| 9/28/2012 | 1,140 | $ 498,180.00 |
| 9/30/2012 | 1,140 | $ 498,180.00 |
| 10/2/2012 | 1,140 | $ 498,180.00 |
| 10/4/2012 | 1,140 | $ 498,180.00 |
| 10/6/2012 | 1,140 | $ 498,180.00 |
| 10/8/2012 | 1,140 | $ 498,180.00 |
| 10/10/2012 | 1,140 | $ 498,180.00 |
| 10/12/2012 | 1,140 | $ 498,180.00 |
| 10/14/2012 | 1,140 | $ 498,180.00 |
| 10/16/2012 | 1,140 | $ 498,180.00 |
| 10/18/2012 | 1,140 | $ 498,180.00 |
| 10/20/2012 | 1,140 | $ 498,180.00 |
| 10/22/2012 | 1,160 | $ 498,180.00 |
| 10/24/2012 | 1,140 | $ 498,180.00 |
| 10/26/2012 | 1,140 | $ 498,180.00 |
| 10/28/2012 | 1,140 | $ 498,180.00 |
| 10/30/2012 | 1,140 | $ 498,180.00 |
| 11/1/2012 | 1,140 | $ 498,180.00 |
| 11/3/2012 | 1,140 | $ 498,180.00 |
| 11/5/2012 | 1,140 | $ 498,180.00 |
| 11/7/2012 | 1,140 | $ 498,180.00 |
| 11/9/2012 | 1,140 | $ 498,180.00 |
| 11/11/2012 | 1,140 | $ 498,180.00 |
| 11/13/2012 | 1,140 | $ 498,180.00 |
| 11/15/2012 | 1,140 | $ 498,180.00 |
| 11/17/2012 | 1,140 | $ 498,180.00 |

Seller Initials: _____        Buyer Initials: _____

CORP OFFICE: P.O. BOX 66 | 1022 1ST STREET WEST | INDEPENDENCE, IOWA 50644 | PH: 877-334-5115
REGIONAL OFFICE: 1914 J.N. PEASE PLACE | CHARLOTTE, NC 28262 | PH: 704-973-5060
FAX: 704-973-0630 | WEB: www.GOECG.com | EMAIL: INFO@GOECG.COM



| | | |
|---|---|---|
| 11/19/2012 | 1,140 | $ 498,180.00 |
| 11/21/2012 | 1,140 | $ 498,180.00 |
| 11/23/2012 | 1,140 | $ 498,180.00 |
| 11/25/2012 | 1,140 | $ 498,180.00 |
| 11/27/2012 | 1,140 | $ 498,180.00 |
| 11/29/2012 | 1,140 | $ 498,180.00 |
| 12/1/2012 | 1,140 | $ 498,180.00 |
| 12/3/2012 | 1,140 | $ 498,180.00 |
| 12/5/2012 | 1,140 | $ 498,180.00 |
| 12/7/2012 | 1,140 | $ 498,180.00 |
| 12/9/2012 | 1,140 | $ 498,180.00 |
| 12/11/2012 | 1,140 | $ 498,180.00 |
| 12/13/2012 | 1,140 | $ 498,180.00 |
| 12/15/2012 | 1,140 | $ 498,180.00 |
| 12/17/2012 | 1,140 | $ 498,180.00 |
| 12/19/2012 | 1,140 | $ 498,180.00 |
| 12/21/2012 | 1,140 | $ 498,180.00 |
| 12/23/2012 | 1,140 | $ 498,180.00 |
| 12/25/2012 | 1,140 | $ 498,180.00 |
| 12/27/2012 | 1,140 | $ 498,180.00 |
| 12/29/2012 | 1,140 | $ 498,180.00 |
| 12/31/2012 | 280 | $ 122,360.00 |

Seller Initials: _____

Buyer Initials: _____

CORP OFFICE: P.O. BOX 66 | 1827 1ST STREET WEST | INDEPENDENCE, IOWA 50644 | PH: 877-334-3115
REGIONAL OFFICE: 1914 J.N. PEASE PLACE | CHARLOTTE, NC 28262 | PH: 704-935-5800
FAX: 704-973-0630 | WEB: www.GOECG.com | EMAIL: INFO@GOECG.COM



Date: January 7, 2013

To:    Fieldale Farms c/o Eddie Elrod, Tom Hensley, and Gus Arrendale

From: eCreative Group, Inc. DBA Energy & Commodities Global

Gentleman:

First and foremost please allow me to apologize for the delays and issues we've encountered with regards to this transaction. This is certainly not the norm for us and it has taken great toll on me and my staff as I am sure it has yours. It is regrettably the most stressful and difficult transaction we've encountered.

My purpose for formally writing this letter is to not only offer my apologies but also to inform you of where we stand and how I see us being able to move forward one way or the other. Obviously the end goal is to provide Fieldale Farms with product below market price for the foreseeable future and build a lasting working relationship. I believe it is fair to say that that would be the most rewarding way forward for both parties. However, with the complications we have encountered on the banking side of this I fear that not only has my reputation been irreversibly soiled but also your trust in me and my company to be able to perform for Fieldale Farms.

Per my discussions with Eddie in the past week, as I am sure you are aware, I am diligently working to get the first tranche of funds released to us to engage the delivery of product to Fieldale. This process has been a trying one. Both our funders and their bank in Indonesia have constantly telling us that funds were released previously however to date we have not seen them clear our account. We have been provided with the transfer slip for the first tranche as well but cannot seem to garner the actual wire confirmation number from them so that our bankers in Hong Kong can chase up the funds. Without such, Louis is unable to be proactive.

The option of simply cancelling the transaction with them so that deposit funds can be immediately released has also been discussed and I have gone through this with my partners over the weekend. If we take such action it will certainly cancel the first tranche of funds which equals $3 million (of which we planned to pay back the deposit plus the interest Fieldale accrued on the DLC). It will result in a transfer of your initial deposit amount alone within an estimated 5-10 business days (primarily because I'll have to rehash this process of getting funds from Bank Mandiri all over again). I am trying to avoid this as I would like not to have to have the DLC interest outstanding if at all possible. However, if this is the step you'd like me to take I can certainly do so. If we take this route ECG will have to fund the accrued interest from the DLC apart from this transaction which may take a few weeks for me to cover from other transactions.

Aside from the transaction and funding at hand I personally am finishing up a couple other transactions that I have earmarked funds from to make Fieldale Farms whole should further delays from Bank Mandiri occur. Both transactions are to close the middle of this week with funds being available within 3-5 banking days after closing. Neither of these transactions are commodity based so the issue of deliveries and such does not exist. They are simply financial/consulting transactions that will result in payment fairly quickly. It is these transactions that I was referring to when telling Eddie last week that I believed I could work out being able to make deliveries to Fieldale at the discounted product rate without requiring the issuance of a DLC or other bank instrument.

EXHIBIT "D"

Page 1 of 2



Consequently, I am asking for a little more time to follow the Bank Mandiri issues, as well as my other transactions, through so that ECG may make Fieldale Farms whole and hopefully salvage a relationship that would benefit both parties long term. Again, I cannot express my gratitude enough for your patience and express my complete understanding of your increased level of concern. On a personal level, it is tearing me up that have had to deal with such incompetence at Bank Mandiri and that it has resulted in a major black eye for my company.

In closing, should you require me to engage the cancellation with the funder and Bank Mandiri could you kindly provide me with a cancellation letter from Fieldale Farms so that I may include it with my documentation to them?

I sincerely appreciate your understanding gentlemen and hope that you can see it within you to forgive myself and my company for the issues that have occurred and hope that we may work to rectify the relationship in a mutually beneficial fashion upon clearing all this up.

Sincerely Yours,

Brian J. Lillie
President/CEO
eCreative Group, Inc.
DBA Energy & Commodities Global

*P.S. I would also like to offer the execution of a promissory note from ECG to Fieldale Farms in relation to the funds owed back to Fieldale so that we have a formal obligation in place for both parties. This will allow me to issue an official pay order with regards to the other transaction so that I may have them distribute funds directly to you upon closing and pay out.*

CORP OFFICE: P.O. BOX 66 | 1827 1ST STREET WEST | INDEPENDENCE, IOWA 50644 | PH: 877-334-5115
REGIONAL OFFICE: 1914 J.N. PEASE PLACE | CHARLOTTE, NC 28262 | PH: 704-935-5060
FAX: 704-973-0630 | WEB: www.GOECG.com | EMAIL: INFO@GOECG.COM

**Rustin L. Smith**

| | |
|---|---|
| From: | Brian Lillie <brian@ecreativegroup.com> |
| Sent: | Monday, January 07, 2013 2:33 PM |
| To: | 'Naj K' |
| Subject: | read this through and give me your thoughts before is send it over |
| Attachments: | ECG-Fieldale 1-7-2013.pdf |

Brian Lillie
President/CEO
Office: 877-334-5115 || Direct: 704-497-2397

eCreative Group, Inc. || Energy & Commodities Global || ECG Action || Enterprise Holdings Group LLC || Three Wide Media LLC

DISCLAIMER: This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited. Sender is a Business Advisor, Consultant, and Facilitator and makes no warranties, representations, or guarantees as to the recipient, seller, or parties. All due diligence is the responsibility of the recipient. Upon receipt you, as the Recipient, hereby acknowledge this warning and disclaimer.

## PROMISSORY NOTE

$1,525,195.00

January 23, 2013
Independence, Iowa

FOR VALUE RECEIVED, the undersigned, eCreative Group, Inc. DBA Energy & Commodities Global, an Iowa S-Class Corporation ("Borrower") with its principal place of business located at 1827 1st Street West, Independence, IA 50644, promises to pay to the order of Fieldale Farms Corporation ("Lender"), at 555 Broiler Blvd., Baldwin, GA 30511, or at such other address as Holder designates to Borrower in writing, the sum of ONE MILLION FIVE HUNDRED TWENTY FIVE THOUSAND ONE HUNDRED NINETY FIVE UNITED STATES DOLLARS ($1,525,195.00 USD), together with interest from the date of this Note on the unpaid principal balance from time to time outstanding, at the flat rate of 4%.

### I. TERMS OF REPAYMENT

a. **Payments.** Unpaid principal after the Due Date shown below shall accrue interest at a rate of 2% monthly until paid.

The unpaid principal and accrued interest shall be payable in full on February 23, 2013 (the "Due Date").

b. **Application of Payments.** All payments on this Note shall be applied first in payment of accrued interest and any remainder in payment of principal.

c. **Acceleration of Debt.** If any payment obligation under this Note is not paid when due, the remaining unpaid principal balance and any accrued interest shall become due immediately at the option of the Lender.

### II. SECURITY

This Note shall be secured by Bank Drafts issued by Bank of China Limited Hong Kong and assigned to Enterprise Holdings Group LLC (See Exhibits A and B). The Lender is not required to rely on the above security instrument and the assets secured therein for the payment of this Note in the case of default, but may proceed directly against the Borrower.

### III. PREPAYMENT

The Borrower reserves the right to prepay this Note by making payment in full of the then remaining unpaid principal and accrued interest.

### IV. COLLECTION COSTS

If any payment obligation under this Note is not paid when due, the Borrower promises to pay all costs of collection, including reasonable attorney fees, whether or not a lawsuit is commenced as part of the collection process.

Document Reference No: PDPN 1-23-13 (RE_FD00031J)     LENDER INITIALS: ᴳᴳⱼ     BORROWER INITIALS: ᴮᴮ

*NEEDS EXACT DRAFT INFO*

**EXHIBIT "E"**

## V. DEFAULT

If any of the following events of default occur, this Note and any other obligations of the Borrower to the Lender, shall become due immediately, without demand or notice:

1) the failure of the Borrower to pay the principal and any accrued interest in full on or before the Due Date;
2) the death of the Borrower or Lender;
3) the filing of bankruptcy proceedings involving the Borrower as a debtor;
4) the application for the appointment of a receiver for the Borrower;
5) the making of a general assignment for the benefit of the Borrower's creditors;
6) the insolvency of the Borrower;
7) a misrepresentation by the Borrower to the Lender for the purpose of obtaining or extending credit.

In addition, the Borrower shall be in default if there is a sale, transfer, assignment, or any other disposition of any assets pledged as security for the payment of this Note, or if there is a default in any security agreement which secures this Note.

## VI. SEVERABILITY OF PROVISIONS

If any one or more of the provisions of this Note are determined to be unenforceable, in whole or in part, for any reason, the remaining provisions shall remain fully operative.

## VII. MISCELLANEOUS

All payments of principal and interest on this Note shall be paid in the legal currency of the United States. The Borrower waives presentment for payment, protest, and notice of protest and nonpayment of this Note.

No renewal or extension of this Note, delay in enforcing any right of the Lender under this Note, or assignment by Lender of this Note shall affect the liability or the obligations of the Borrower. All rights of the Lender under this Note are cumulative and may be exercised concurrently or consecutively at the Lender's option.

## VIII. GOVERNING LAW

This Note shall be construed in accordance with the laws of the State of Georgia.

IN WITNESS WHEREOF, this Agreement has been executed and delivered in the manner prescribed by law as of ___1 – 23 – 2013_____.

BORROWER

ECREATIVE GROUP, INC. DBA ENERGY & COMMODITIES GLOBAL

By: _____
      Brian Lillie, Its CEO

STATE OF _North Carolina_ )
                                            ) SS.
COUNTY OF _Cumberland_ )

On this _23rd_ day of _January_, before me personally appeared Brian Lillie, the CEO of eCreative Group, Inc., and known to be the individual authorized as signatory for the Borrower, whom executed the foregoing instrument on behalf of the corporation.

_____
Notary Public

LENDER

FIELDALE FARMS CORPORATION

By: _____
      Eddie Elrod, Its CFO

STATE OF _GEORGIA_ )
                                    ) SS.
COUNTY OF _____ )

On this ____ day of _____, before me personally appeared Eddie Elrod, the CFO of Fieldale Farms Corporation, and known to be the individual authorized as signatory for the Lender, whom executed the foregoing instrument on behalf of the corporation.

_____
Notary Public

## EXHIBIT A

### SECURITY AGREEMENT

This Agreement is made on January 25, 2013, between eCreative Group, Inc. DBA Energy & Commodities Global,
Borrower, address:
1827 1st Street West, Suite B
Independence, IA 50644 USA


and Fieldale Farms Corporation,
Secured Party, address:
555 Broiler Blvd,
Baldwin, GA 30511 USA


For valuable consideration, the parties agree as follows:

1.  The Borrower grants the Secured Party a security interest under Article 9 of the Uniform Commercial Code (U.C.C.) in the following property or asset which will be considered collateral:

    One (1) Bank Draft issued by Bank of China Limited Hong Kong and assigned to Enterprise Holdings Group LLC in the aggregate amount of $2,500,000.00 (TWO MILLION FIVE HUNDRED THOUSAND UNITED STATES DOLLARS). The Bank Drafts are cashable on December 18, 2013 by the bearer of the drafts.

    The Bank Draft number is: _____

2.  This security interest is granted to secure payment by the Borrower to the Secured Party on the following obligation:

    PROMISSORY NOTE NUMBER: FDPN 1-23-13 (RE_FD000313)

3.  In the event of default by the Borrower in payment of any of the amounts due on the obligation listed under Paragraph 2, the Secured Party may declare the entire obligation immediately due and payable and will have all of the remedies of a secured party under the Uniform Commercial Code.

4.  In the event of such default, Borrower will also be responsible for any costs of collection, including court costs and reasonable attorney fees.

5.  The Borrower agrees allow the Secured Party to maintain physical possession to the collateral and the Secured Party agrees to use reasonable care in holding the collateral and agrees not to sell or dispose of the collateral.

6.  The Borrower represents that the collateral is owned free and clear and that there are no other security agreements, indebtedness, or liens relating to the property offered as collateral. Borrower also states that it has full authority to grant this security interest.

7.  No modification of this agreement will be effective unless it is in writing and is signed by both parties. This agreement binds and benefits both parties and any successors.

8.  Time is of the essence of this agreement. This document, including any attachments, is the entire agreement between the parties. This agreement is governed by the laws of the State of Georgia.

The parties have signed this agreement on the date specified at the beginning of this agreement.

_____
Signature of Borrower

_____
Printed Name of Borrower

_____
Signature of Secured Party

_____
Printed Name of Secured Party

STATE OF North Carolina )
                        ) SS.
COUNTY OF ___Cabarrus___ )

    On this 23rd day of January, 2015, Brian Lillie, authorized signatory of the Borrower, personally appeared before me and I acknowledge that he executed the foregoing instrument.

_____
Notary Public

EXHIBIT B

BANK DRAFT AND BANK CONFIRMATION LETTER

Kepada PT Bank Mandiri (Persero) Tbk
harap dilakukan transaksi berikut

tanggal

APLIKASI

PENERIMA

SUMBER DANA TRANSAKSI

BERITA UNTUK PENERIMA

BIAYA TRANSAKSI

⚜ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
HABERSHAM COUNTY, GEORGIA

**16CV0583**
RUSSELL W. SMITH
NOV 01, 2016 04:24 PM

*David C. Wall*
David Wall, Clerk
Habersham County, Georgia

IN THE SUPERIOR COURT OF HABERSHAM COUNTY
STATE OF GEORGIA

GLOBAL DYNAMIC ENTERPRISES,
LLC and NAJMEH KERMANI,

      Plaintiffs,

v.

ECREATIVE GROUP, INC. d/b/a
ENERGY & COMMODITIES GLOBAL,
BRIAN JAMES LILLIE, and
ENTERPRISE HOLDINGS GROUP,
LLC,

      Defendants.

Civil Action File No.

_____

## COMPLAINT

Plaintiffs show the Court as follows:

### Parties, Jurisdiction, and Venue

1.

Plaintiff Global Dynamic Enterprises, LLC ("GDE") is a Georgia limited liability company organized and authorized to transact business in Georgia with its principal office located in Cobb County, Georgia.

2.

Plaintiff Najmeh Kermani is the managing member of GDE and maintains her personal residence in Cobb County, Georgia.

3.

Defendant eCreative Group, Inc. d/b/a Energy & Commodities Global ("ECG") is an Iowa corporation with its principal office located in Independence, Iowa. ECG may be served

with process on its president and CEO, Brian James Lillie, at 6421 Stone Ridge Court, Kannapolis, North Carolina 28081.

4.

Defendant Brian James Lillie may be served with process at his residence located at 6421 Stone Ridge Court, Kannapolis, North Carolina 28081.

5.

Defendant Enterprise Holdings Group, LLC ("EHG") is as an Iowa limited liability company with its principal office located in Independence, Iowa. EHG may be served with process on its managing member, Brian James Lillie, at 6421 Stone Ridge Court, Kannapolis, North Carolina 28081.

6.

Defendant Tracy Kaye Lillie may be served with process at her residence located at 6421 Stone Ridge Court, Kannapolis, North Carolina 28081.

7.

Defendants are subject to this Court's jurisdiction under O.C.G.A. § 9-10-91 because they transacted business within this state, committed a tortious act or omission within this state, and committed a tortious injury in this state caused by an act or omission outside this state and Defendants regularly do or solicit business, and engage in other persistent courses of conduct, and derive substantial revenue from goods used or consumed or services rendered in this state. Defendants are subject to this Court's venue under O.C.G.A. § 9-10-93 because a substantial part of the business was transacted in Habersham County, Georgia, and the tortious act, omission, or injury occurred in Habersham County, Georgia.

## Factual Allegations

8.

Defendant ECG is a brokerage group that specializes in the exportation of agricultural commodities. Plaintiff GDE is a brokerage group that concentrates in locating and identifying prospective purchasers of agricultural goods and commodities and connecting them with prospective sellers or providers of those goods.

9.

Beginning in June of 2012, GDE and Kermani contacted Fieldale Farms Corporation ("Fieldale") to discuss Fieldale potentially purchasing corn and soybean meal sold by ECG. Fieldale is an integrated poultry processor with its principal office located in Baldwin, Habersham County, Georgia.

10.

On July 30, 2012, ECG and GDE entered into a Business Venture Agreement, which provides that ECG will pay GDE a certain commission for identifying and locating purchasers of agricultural goods sold by ECG. A true and correct copy of the Business Venture Agreement, as amended, is attached as Exhibit A to this Complaint.

11.

Also on July 30, 2012, ECG and GDE entered into a Commission Agreement providing that GDE had identified Fieldale as a buyer of corn and soybean meal sold by ECG. The Commission Agreement provides that ECG will pay GDE $1,000,000.00 for its services in arranging for Fieldale to purchase the goods. A true and correct copy of the Commission Agreement is attached as Exhibit B to this Complaint.

12.

On July 30, 2012, the same day ECG and GDE entered into the Business Venture Agreement and Commission Agreement, Brian Lillie and Kermani visited Fieldale's headquarters in Baldwin, Habersham County, Georgia, to discuss the terms of the transaction with Fieldale. At the meeting, ECG and Brian Lillie represented to Fieldale, GDE, and Kermani that they could obtain below-market prices on corn and soybean meal. ECG and Brian Lillie made these same representations to GDE and Kermani before the meeting on July 30, 2012, which is what induced her to identify Fieldale as a buyer and arrange the transaction.

13.

ECG and Brian Lillie provided Fieldale, GDE, and Kermani with a copy of a License issued to ECG by the Office of Foreign Assets Control of the U.S. Department of the Treasury dated August 15, 2011 authorizing ECG to ship agricultural commodities to Iran.

14.

On August 21, 2012, ECG and Fieldale entered into a Delivery Contract providing that ECG will supply 55,000 dry metric tons of loose soybean meal for $24,035,000.00 and 55,000 dry metric tons of #2 yellow corn for $13,475,000.00. A true and correct copy of the Delivery Contract is attached as Exhibit C to this Complaint.

15.

The Commission Agreement supersedes the Business Venture Agreement with respect to the payment terms of the commission to GDE on the Delivery Contract procured from Fieldale.

16.

The Commission Agreement provides that ECG will pay the commission to GDE upon release of the bank guarantee to ECG. Pursuant to the Delivery Contract, the bank guarantee

would be released to ECG upon ECG delivering the first order to Fieldale on September 26, 2012. Therefore, ECG was bound to pay GDE its commission on September 26, 2012.

17.

Pursuant to the Delivery Contract, Fieldale wired s $1,000,000.00 deposit to ECG's account at Wells Fargo Bank in Iowa. Fieldale also obtained a stand by letter of credit for $2,751,000.00 as well as an irrevocable and transferrable documentary letter of credit for $33,759,000.00 from Rabobank Nederland.

18.

Unbeknownst to Fieldale and GDE, once Brian Lillie received the $1,000,000.00 into the ECG account, he and Defendant Tracy Lillie transferred those funds to other entities controlled by Brian Lillie, including without limitation Defendant EHG. Defendants Brian Lillie and Tracy Lillie, who are spouses, used Fieldale funds to pay down their business and personal debts, and alo used the funds to purchase their current residence located at 6421 Stone Ridge Court, Kannapolis, NC 28081 for a price of $750,000.00.

19.

The stand by letter of credit expired on December 18, 2012 because ECG never delivered the corn and soybean. For the same reason, the documentary letter of credit expired on December 21, 2012.

20.

ECG also failed to pay the $1,000,000.00 commission to GDE and Kermani.

21.

From August through December of 2012, ECG and Brian Lillie represented to Fieldale, GDE, and Kermani that they were unable to perform the Delivery Contract and Commission

Agreement because Wells Fargo mistakenly transferred Fieldale's deposit from the ECG account to one or more foreign banks, and those banks effectively "stole" the money or otherwise would not release the funds at their request.

22.

In a letter to Fieldale dated January 7, 2013, ECG and Brian Lillie attempt to explain the alleged foreign banking issue and offer to give Fieldale a Promissory Note that would refund the $1,000,000.00 deposit and $525,195.88 that Fieldale incurred in bank fees for the transaction. A true and correct copy of the letter is attached as Exhibit D.

23.

ECG executed the Promissory Note to Fieldale on January 23, 2013 to be paid in full on February 23, 2013. In the Note, ECG and Brian Lillie represent that ECG pledged as security certain bank drafts allegedly issued by Bank of China Limited Hong Kong and assigned to Defendant EHG. A true and correct copy of the Note is attached as Exhibit E.

24.

Both before and after ECG executed the Note to Fieldale, Brian Lillie repeatedly promised Kermani, verbally and in emails and text messages, that he would pay GDE the $1,000,000.00 commission as soon as he satisfied Fieldale's reimbursement requests. In fact, Kermani continued negotiating and working with Fieldale to allow time for Brian Lillie to close other deals so that he could supposedly obtain the funds to reimburse Fieldale and pay GDE its commission. ECG and Brian Lillie used the Note it gave to Fieldale, and the representations contained therein, to further induce GDE and Kermani into providing additional time to pay the commission.

664185-1
57083 0

25.

Ultimately, ECG failed to pay the Note to Fieldale and Fieldale had to file a lawsuit against both ECG and Brian Lillie alleging breach of contract and fraud. The suit was filed on January 4, 2014. ECG and Brian Lillie eventually settled the litigation with Fieldale.

26.

Throughout the litigation with Fieldale and after the settlement, Brian Lillie continued his verbal and written assurances that he could and would obtain the money to pay GDE its full commission.

27.

In a text message to Kermani dated March 1, 2016, Brian Lillie committed to paying $5,000 per week toward the $1,000,000.00 in commissions until he could pay it in full. However, he only made one payment of $5,000.00 and has made no more to date, leaving a principal balance of $995,000.00.

## Count One: Fraud as to All Defendants

28.

Plaintiffs incorporate the above paragraphs.

29.

Beginning in June of 2012 and through at least January 7, 2013, Defendant ECG and Brian Lillie repeatedly mispresented to GDE and Kermani, as well as Fieldale, that they could and would obtain below-market prices on corn and soybean meal.

30.

The representations were known by Defendants ECG and Brian Lillie to be and were false. In truth, Defendants ECG and Brian Lillie knew they were incapable of obtaining and delivering the goods as they represented to GDE, Kermani, and Fieldale.

31.

Defendants ECG and Brian Lillie, as well as Defendant EHG, also made knowingly false representations to Kermani, GDE, and Fieldale that certain foreign banking issues prevented them from performing the Delivery Contract. Defendants ECG, Brian Lillie, and EHG further made knowingly false representations that they had available certain bank drafts from a Chinese bank that were payable to EHG that could be used as collateral in the Note to Fieldale and to pay the commissions owed to Kermani and GDE.

32.

Defendant ECG, Brian Lillie, and EHG also made knowingly false representations to Kermani and GDE that it intended to and would pay the $1,000,000 commission in full until after March 1, 2016 at the earliest.

33.

Defendant Tracy Lillie, as accountant for Brian Lillie, ECG, EHG, and other entities controlled by Brian Lillie, colluded with the other Defendants and adopted their false representations by altering financial documents and tax returns to make it appear that ECG had properly handled the funds deposited by Fieldale.

34.

GDE and Kermani reasonably believed and relied in good faith upon the false representations, and were induced to perform the work to identify Fieldale as a buyer and arrange

the transaction, and to enter the Business Venture Agreement and Commission Agreement. Defendants' false representations further induced GDE and Kermani to give Defendants additional time to pay the $1,000,000.00 commissions until after March 1, 2016 at the earliest.

35.

Defendants' actions prevented and deterred Plaintiffs from discovering their fraudulent acts and omissions until after March 1, 2016 at the earliest, and induced them to forgo their legal remedies.

36.

Defendants' acts and omissions described above caused damages to Plaintiffs in the amount of $995,000.00 in principal, plus pre-judgment interest from September 26, 2012 to date at the legal rate of seven percent per year in the amount of $285,660.41, plus additional pre-judgment interest through the date of judgment and post-judgment interest at the legal rate, and interest on unliquidated damages to the extent Plaintiffs' damages under this Count are deemed unliquidated, plus reasonable attorney fees and expenses.

37.

To the extent Plaintiffs' damages under this Count are deemed unliquidated, Plaintiffs hereby give written notice pursuant to O.C.G.A. § 15-12-14 that they demand $995,000.00 to be paid within 30 days from the date of service of this action, and if such amount is not timely made, Plaintiffs are entitled to receive interest on $995,000.00 if the judgment in this case is for an amount not less than $995,000.00.

### Count Two: Conversion as to All Defendants

38.

Plaintiffs incorporate the above paragraphs.

39.

Defendants colluded under false pretenses to convert the $1,000,000.00 that Fieldale deposited into the account of ECG to Defendants' own use by transferring all or part of those funds into an account of EHG so that Brian and Tracy Lillie could use that money to pay business and personal debts and to buy a home for themselves.

40.

The funds wrongfully converted by Defendants, or the resulting funds from ECG's performance of the Delivery Contract, could have been used to pay all or part of the commission owed to Plaintiffs under the Business Venture Agreement and Commission Agreement.

41.

The funds paid by Fieldale were rightfully in the hands of ECG; however, Defendants misappropriated the funds for a use other than that for which the funds were entrusted to ECG under circumstances indicating fraud.

42.

Defendants' acts and omissions described above caused damages to Plaintiffs in the amount of $995,000.00 in principal, plus pre-judgment interest from September 26, 2012 to date at the legal rate of seven percent per year in the amount of $285,660.41, plus additional pre-judgment interest through the date of judgment and post-judgment interest at the legal rate, and interest on unliquidated damages to the extent Plaintiffs' damages under this Count are deemed unliquidated, plus reasonable attorney fees and expenses.

43.

To the extent Plaintiffs' damages under this Count are deemed unliquidated, Plaintiffs hereby give written notice pursuant to O.C.G.A. § 15-12-14 that they demand $995,000.00 to be

paid within 30 days from the date of service of this action, and if such amount is not timely made, Plaintiffs are entitled to receive interest on $995,000.00 if the judgment in this case is for an amount not less than $995,000.00.

## Count Three: Breaches of Contracts as to ECG

44.

Plaintiff incorporates the above paragraphs.

45.

Defendant ECG breached its obligations under the Business Venture Agreement, as amended, and the Commission Agreement by failing to pay the balance of the commission owed to Plaintiffs, entitling them to damages in the amount of $995,000.00 in principal, plus pre-judgment interest from September 26, 2012 to date at the legal rate of seven percent per year in the amount of $285,660.41, plus additional pre-judgment interest through the date of judgment and post-judgment interest at the legal rate, and interest on unliquidated damages to the extent Plaintiffs' damages under this Count are deemed unliquidated, plus reasonable attorney fees and expenses.

46.

To the extent Plaintiffs' damages under this Count are deemed unliquidated, Plaintiffs hereby give written notice pursuant to O.C.G.A. § 15-12-14 that they demand $995,000.00 to be paid within 30 days from the date of service of this action, and if such amount is not timely made, Plaintiffs are entitled to receive interest on $995,000.00 if the judgment in this case is for an amount not less than $995,000.00.

## Count Four: Negligent Misrepresentations as to All Defendants

47.

Plaintiff incorporate the above paragraphs and allege this Count Four in the alternative to Count One.

48.

In a transaction in which Defendants had a pecuniary interest, Defendants negligently supplied Plaintiffs the false information described in Count One.

49.

Defendants intended Plaintiffs to receive the information or foresaw that someone in Plaintiffs' position would receive it, and intended to induce Plaintiffs to rely on the information as described in Count One.

50.

Plaintiffs justifiably relied on the information described in Count One, causing Plaintiffs to incur damages in the amount of $995,000.00 in principal, plus pre-judgment interest from September 26, 2012 to date at the legal rate of seven percent per year in the amount of $285,660.41, plus additional pre-judgment interest through the date of judgment and post-judgment interest at the legal rate, and interest on unliquidated damages to the extent Plaintiffs' damages under this Count are deemed unliquidated, plus reasonable attorney fees and expenses.

51.

To the extent Plaintiffs' damages under this Count are deemed unliquidated, Plaintiffs hereby give written notice pursuant to O.C.G.A. § 15-12-14 that they demand $995,000.00 to be paid within 30 days from the date of service of this action, and if such amount is not timely

made, Plaintiffs are entitled to receive interest on $995,000.00 if the judgment in this case is for an amount not less than $995,000.00.

### Count Five: Constructive Trust or Resulting Trust and Unjust Enrichment as to All Defendants

52.

Plaintiffs incorporate the above paragraphs.

53.

Defendants' acts and omissions described in the above paragraphs create circumstances that warrant placing a constructive trust or resulting trust for Plaintiffs' benefit on all property and funds held by Defendants, including without limitation the $995,000.00 owed to Plaintiffs for the commission, plus the applicable interest and attorney fees as described in the above paragraphs, as such property was obtained through fraud or otherwise, and have unjustly enriched Defendants such that they cannot enjoy the beneficial interest in the property without violating established principles of equity, pursuant to O.C.G.A. §§ 53-12-132; 53-12-130.

### Count Six: Violations of Federal RICO as to All Defendants

54.

Plaintiffs incorporate the above paragraphs.

55.

Defendants associated in fact with each other, and perhaps other entities and individuals, to conduct or engage in an enterprise as defined in 18 USC § 1961(4).

56.

Defendants engaged in racketeering activity in violation of 18 USC § 1961, et seq., the Racketeering Influenced and Corrupt Organizations Act, a) by placing matter to be sent or received by the Postal Service, or taking or receiving such matter for the purpose of executing a

664185-1
57083.0

scheme or artifice to defraud or obtain money or property by means of false and fraudulent pretenses and/or representations in violation of USC § 1341; b) by transmitting or causing to be transmitted by means of wire or other communications, writings or other transmissions, in connection with a scheme or artifice to defraud or obtain money or property by means of false or fraudulent pretenses or representations, in violation of 18 USC § 1343; c) by knowingly executing or attempting to execute a scheme or artifice to defraud a financial institution or to obtain any of the monies, funds and credits of a financial institution, by means of false or fraudulent pretenses, representations or promises in violation of 18 USC § 1344; and d) by knowingly engaging or attempting to engage in a monetary transaction in criminally derived property of a value greater than $10,000.00 in violation of 18 USC § 1957.

57.

Defendants have engaged in at least two such acts of racketeering activity, constituting a pattern of racketeering, as defined in 18 USC § 1961(5).

58.

Plaintiffs have been injured in their business or property by reason of the above violation of 18 USC § 1962 by the loss of the commission of $955,000.00 in principal, plus pre-judgment interest from September 26, 2012 to date at the legal rate of seven percent per year in the amount of $285,660.41, plus additional pre-judgment interest through the date of judgment and post-judgment interest at the legal rate, and interest on unliquidated damages to the extent Plaintiffs' damages under this Count are deemed unliquidated, plus reasonable attorney fees and expenses. Plaintiffs are also entitled to recover *three times* the actual damages, plus punitive damages and reasonable attorney fees and litigation expenses under the Fedearal RICO statute.

## Count Seven: Violations of Georgia RICO as to All Defendants

59.

Plaintiffs incorporate the above paragraphs.

60.

Defendants, by and through their agents: a) unlawfully acquired, maintained an interest in, and/or had control over, an enterprise or property of any nature, including money, through a pattern of racketeering activity; b) unlawfully associated with an enterprise to either conduct or participate in, either directly or indirectly, the enterprise through a pattern of racketeering activity; and c) are associated in fact and therefore engaged in at least two acts of racketeering activity by knowingly and willfully committing the acts and omissions described in the above Counts that constitute the crimes of False Statements, Fraud/Theft by Deception, Embezzlement/Theft by Conversion, and Larceny/Theft by Taking.

61.

Defendants have, individually, and in concert with each other, engaged in the above criminal acts which demonstrate a pattern of racketeering activity as defined at O.C.G.A. §16-14-3.

62.

Defendants have, jointly and severally, received direct monetary gain from the several transactions which were completed as the result of the above-described criminal acts.

63.

Plaintiffs are entitled to an order from this Court pursuant to O.C.G.A. §16-14-6 (b) enjoining the activities of defendants, and freezing the assets of defendants pending final resolution of this case.

64.

Pursuant to O.C.G.A. §16-14-6 (c), plaintiffs are entitled to an award of damages for the loss of the commission of $955,000.00 in principal, plus pre-judgment interest from September 26, 2012 to date at the legal rate of seven percent per year in the amount of $285,660.41, plus additional pre-judgment interest through the date of judgment and post-judgment interest at the legal rate, and interest on unliquidated damages to the extent Plaintiffs' damages under this Count are deemed unliquidated, plus reasonable attorney fees and expenses. Plaintiffs are also entitled to recover *three times* the actual damages, plus punitive damages and reasonable attorney fees and litigation expenses under the Georgia RICO statute.

### Count Eight: Punitive Damages as to All Defendants

65.

Plaintiffs incorporate the above paragraphs.

66.

Defendants' acts and omissions described in the above paragraphs and Counts, with the exception of Count Three for breaches of contracts, constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs to an award of punitive damages sufficient to punish, penalize, or deter Defendants from such conduct.

### Count Nine: Attorney Fees, Litigation Expenses, and Costs as to All Defendants

67.

Defendants incorporate the above paragraphs.

68.

Defendants have acted in bad faith, been stubbornly litigious, and caused unnecessary trouble and expense by forcing Plaintiffs to bring each of the above claims, entitling Plaintiffs to

an award for attorney fees and litigation expenses under O.C.G.A. § 13-6-11, and in any event an award for costs as a matter of course under O.C.G.A. § 9-11-54(d), in an amount to be proven at trial.

Therefore, Plaintiffs prays for:

A.     As to Counts One, Two, Three, Four, Five, Six, and Seven, judgment in the amount of $995,000.00 in principal, plus pre-judgment interest from September 26, 2012 to date at the legal rate of seven percent per year in the amount of $285,660.41, plus additional pre-judgment interest through the date of judgment and post-judgment interest at the legal rate, and interest on unliquidated damages to the extent any of Plaintiffs' damages are deemed unliquidated;

B.     Additionally, as to Counts Six and Seven, judgment for *three times* the damages proven under Counts Six and Seven;

C.     As to Count Eight, punitive damages in an amount sufficient to deter Defendants;

D.     As to Count Nine, Plaintiffs' attorney fees and litigation expenses in an amount to be proven at trial; and

E.     Any other relief the Court deems just and proper.

Submitted November ___/___, 2016.

Suite 600, Hunt Tower
200 Main Street
P.O. Box 3280
Gainesville, Georgia 30503
T. 770.536.0101
F. 770.532.2171

STEWART, MELVIN & FROST, LLP
Attorneys for Plaintiffs

By: _____
    Rustin L. Smith
    Georgia Bar No. 651657

664185-1
57083.0

BUSINESS VENTURE AGREEMENT

**STATE OF GEORGIA**

**COUNTY OF CHEROKEE**

This **BUSINESS VENTURE AGREEMENT** entered this 30 day of July 2012, is between ECREATIVE GROUP, INC., ENERGY & COMMODITIES GLOBAL INC, a duly authorized corporation under the laws of the State of Iowa, (Hereinafter referred to as "FIRST PARTY") and GLOBAL DYNAMIC ENTERPRISES, LLC, a duly authorized corporation under the laws of the State of Georgia, (Hereinafter referred to as "SECOND PARTY"). This AGREEMENT is made under and should be construed according to the laws of the State of Georgia. Now therefore,

WITNESSETH:

**WHEREAS, FIRST PARTY** is a brokerage group that specializes in the exportation of agricultural commodities including but not limited to corn, wheat, barley, sugar, soy, soybeans, soybean meal, etc; and

**WHEREAS, SECOND PARTY** is a group that concentrates in locating and identifying prospective purchasers, of agricultural goods and commodities, and setting these entities, groups, or individuals up with prospective sellers or providers of said goods; and

**WHEREAS, SECOND PARTY** has been able to locate and identify numerous prospective buyers of agricultural commodities, which include but are not limited to corn, wheat, barley, sugar, soy, feeds, etc., located in the Country of Iran, and a list of these entities and individuals are included in Attachment A, which is attached hereto and incorporated by reference herein; and

**WHEREAS**, the United States Government has maintained comprehensive economic sanctions on Iran since 1995, and has passed numerous laws to effectuate these goals, including but not limited to the Comprehensive Iran Sanctions Accountability & Divestment Act of 2010; the International Emergency Economic Powers Act, Sections 1701 to 1706 of Title 50 of the United States Code, which allows the President to exercise powers through Executive Orders that impose economic sanctions to address particular emergencies and delegate IEEPA powers for the admission of those Sanction programs; and

**WHEREAS**, the Executive Orders authorize the Secretary of the Treasury, in consultation with the Secretary of State, to take such actions including the promulgation of rules and regulations, as may be necessary to carry out the purposes of the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (Hereinafter referred to as "ITR"), 31 C.F.R. Part 560, to implement the sanctions imposed by the Executive Orders. Within the Department of the Treasury, the Office of Foreign Assets Control (Hereinafter referred to as "OFAC") is responsible for administrating the ITR and adjudicating requests for licenses to engage in transactions otherwise prohibited by the ITR. Unless licensed by OFAC, goods, technology, or services may not be exported, reexported, sold or supplied directly or indirectly from the United States or by a U.S. person wherever located to Iran or the Government of Iran; and

**EXHIBIT "A"**

**WHEREAS**, under the ITR, any United States person who wishes to engage in a transaction otherwise prohibited by the ITR must file an application for a license and receive approval from OFAC 31 CFR 560.500; 560.501; 501.801; and

**WHEREAS**, OFAC has authorized by license the exportation or reexportation of those commodities that constitute food, which includes certain agricultural commodities, to the Country of Iran despite the exhaustive list of sanctions imposed upon said nation; and

**WHEREAS**, **FIRST PARTY** has applied for and possesses a valid license authorizing exports of agricultural commodities to Iran pursuant to the Trade Sanctions Reform & Export Enhancement Act of 2000 (TRSA), the Iranian Transactions Regulations, 31 C.F.R. Part 560; and

**WHEREAS**, **FIRST PARTY** represents, in addition to its OFAC License, it has all other necessary licensing and meets all applicable provisions of law including financial, or trade requirements of agencies other than the Department of Treasury; Office of Foreign Assets Control, including but not limited to Export Administration Regulations, 15 C.F.R. Parts 730 et al. administered by the Department of Commerce to engage in the export of agricultural commodities; and

**WHEREAS**, due to each parties distinct and unique business attributes, the parties desire to enter into an Agreement to export agricultural goods as defined and allowed under all applicable laws, both domestic and abroad, to the Country of Iran and to provide and outline the terms and conditions for accomplishing this endeavor; and

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, and intending to be legally bound, the parties hereto agree as follows:

## 1.

## DUTIES OF PARTIES

(a)      **SECOND PARTY** shall share its contacts and work product as contained in Attachment A, and shall work to establish additional contacts and customers located in the Country of Iran to purchase agricultural commodities in the form of corn, barley, wheat, soy, soybeans, soybean meal, and animal feed. However, **SECOND PARTY** shall not be solely limited to Iran but shall also attempt to locate other customers in the Middle East, which shall be defined to include the countries of Saudi Arabia, Turkey, and India for the purposes of selling the above defined agricultural products. **SECOND PARTY** shall be solely responsible for any and all costs and expenses associated with developing these relationships and customer bases. **SECOND PARTY** agrees to use its best efforts to perform its obligations hereunder and to give priority to procuring the customers described herein. **SECOND PARTY** shall work with the **FIRST PARTY** to procure all necessary information as may be required to place a prospective client or commodity on **FIRST PARTY'S** OFAC License. **SECOND PARTY** shall work with and communicate with **FIRST PARTY** as it relates to negotiations with prospective buyers on terms and conditions of all contracts stemming from this **AGREEMENT** and shall work with **FIRST PARTY** on setting up and resolving any bank related matters, including but not limited to setting up accounts, management of accounts, etc. for the transactions set forth herein. **SECOND PARTY** shall also be responsible for working with all buyers at the direction of **FIRST PARTY** as it relates to reviewing contracts, answering questions, and otherwise providing customer service.

(b)     **FIRST PARTY** shall be responsible for procuring the requested commodity and to obtain the best available market price at the given time. Said entity shall also have the following responsibilities: (i) the procuring and maintaining of any and all necessary licenses, certificates, or other similar documents in accordance with all state, federal, local, and international laws so that the terms of this agreement can be fulfilled; (ii) compliance with all terms as contained in the Foreign Corrupt Practices Act of 1977 as contained in 15 U.S.C. 78, et seq.; (iii) the providing of a satisfactory and marketable product that shall be delivered in accordance with the terms of any sales contract; (iv) for all costs associated with the procuring of any product, freight and shipping and delivery of the product, and any insurable guarantees associated with the product; (v) to abide by all rules and regulations governing export, subsidy, and destination controls; (vi) to provide information on orders, changes, quotations, complaints, cancellations, and similar data which is helpful to **SECOND PARTY** in an effort to facilitate the terms of this **AGREEMENT**; (vii) to provide information to **SECOND PARTY** as it relates to delivery dates, schedule changes, and other important details which may affect the processing and completion of any given order; (viii) taking the necessary steps to add new clients or prospective buyers to its **OFAC** License as well as being solely responsible for determining if it is necessary for the **OFAC** License to be amended in each instance; (ix) making sure all shipping documents are correct and in proper order for each transaction; (x) payment for any losses, fines, penalties, expenses, costs, damages incurred in any given transaction as well as being solely responsible for any costs or expenses associated with any and all bank or financing related matters, including but not limited to costs associated with setting up accounts, taxes which may be due, wire fees, costs associated with establishing any investment accounts, costs associated with fees to be paid to any investment company or banker that **FIRST PARTY** may choose to involve in these matters, etc.; (xi) to respond within reasonable time to requests for prices and delivery of the commodities covered by this agreement; (xii) working with **SECOND PARTY** to address and resolve any and all banking and financial issues surrounding each transaction including but not limited to setting up accounts, establishing signatures to be on the account; management of the account, coordinating any terms or conditions between **FIRST PARTY'S** bank and any banks utilized by any buyers under this **AGREEMENT**, etc.; and (xiii) to make timely payment of commissions and fees earned as specified herein to **SECOND PARTY** as well as paying of any other commissions which may be due to third parties.

2.

### PROCEDURE FOR CONDUCTING BUSINESS

(a)     **SECOND PARTY** shall take the necessary steps and procure the prospective Client/Buyer wherein the client desires to purchase an agricultural commodity as provided under the terms of this agreement.

(b)     **SECOND PARTY** shall direct the prospective Client/Buyer to send to it a "Letter of Intent" which includes but is not limited to the desired commodity, the amount of product, delivery matters, including method, desired arrival dates, etc.

(c)     Upon receipt of the Letter of Intent, **SECOND PARTY** shall forward the request to the **FIRST PARTY** in an effort to obtain a price along with product specifications as well as addressing any concerns or questions in relation to the given order. Upon receiving the necessary information from the **FIRST PARTY**, **SECOND PARTY** shall forward all pricing and terms to the Client/Buyer. As a part of this process, prospective Buyer shall agree to the **FIRST PARTY'S** terms and conditions for engagement and must be cleared through OFAC and included on **FIRST PARTY'S** License before a formal offer may be submitted.



(d)     Assuming the price and all terms are agreed upon between Seller and Buyer, **SECOND PARTY** shall send a Proforma Invoice at the direction of the **FIRST PARTY** to the Client/Buyer.

(e)     Assuming the prospective Buyer responds favorably to the Proforma Invoice, Buyer shall be required to remit an Irrevocable Corporate Purchase Offer (ICPO) wherein it agrees to the terms of the Formal Corporate Offer, and this shall be accompanied by a Bank Comfort Letter (BCL) signed by two (2) bank officers acknowledging financial capability and readiness to issue the payment instrument as required by **FIRST PARTY**. **FIRST PARTY** has standard payment terms including contract and purchase order guarantee in the form of a Standby Letter of Credit (SBLC) or Bank Guarantee (BG) from a top world bank. Standby Letter of Credit (SBLC) and Bank Guarantee (BG) language and terms shall be approved solely by **FIRST PARTY** on a case by case basis. Standard accepted validation of an approved bank instrument is no less than 1 year and 1 day, or contract duration plus one month for agreements including extensions and rollovers in excess of a calendar year.

(f)     **FIRST PARTY** shall be solely responsible for approving the Letter of Credit with Bank Guarantee from the prospective Client/Buyer.

(g)     Once agreement is reached between **FIRST PARTY** and buyers on banking issues, which shall include but not limited to, payment method, payment process, payment terms, establishment of any Bank Guarantees, establishment of any standby letters of credit, etc., **FIRST PARTY** shall enter into a Purchase Agreement with the Client/Buyer with the assistance of **SECOND PARTY**. **SECOND PARTY** shall receive copies of all formal document correspondence including final contract with pertinent addendum and ancillary documentation. A Commission Agreement detailing **SECOND PARTY'S** compensation and agreed mode of disbursement shall be lodged with the final contract and deemed binding.

(h)     Thereafter, it shall then be the sole responsibility of the **FIRST PARTY** to make sure the requested product is loaded and shipped out to the specific destination.

(i)     **FIRST** and **SECOND PARTY** agree that, once the product arrives at the Buyer Destination and monies are released (regardless of whether in the form of cash monies, Bank Guarantees, etc.) to **FIRST PARTY**, **FIRST PARTY** shall issue a commission check or payment to **SECOND PARTY** immediately unless mutually agreed upon by the parties.

This shall constitute the working procedure for all transactions which are the subject of this **AGREEMENT**. This process shall be utilized for the term of the **AGREEMENT** unless otherwise agreed upon in writing by all parties. **FIRST PARTY** shall reserve the right to decline to offer for any reason and withdraw its offer to any service or commodity at any point, but shall provide notice to **SECOND PARTY** so that notice may be provided to the prospective Buyer. All unexpired valid formal offers shall be honored by **FIRST PARTY**.

3.

## COMMISSION & PAYMENT TERMS

(a)     The **PARTIES** agree that, due to many variables surrounding each business transaction that will occur because of or as a result of this **AGREEMENT**, the commission or fees to be paid to **SECOND PARTY** can vary. Regardless of any variation, the parties acknowledge and agree that **SECOND PARTY'S** commission shall be based and set upon the total contract price of each transaction less the cost of the agricultural good and the cost of shipping. No other costs or expenses that **FIRST PARTY** shall incur shall be considered in arriving at said commission. No



costs or expenses incurred on the part of the **FIRST PARTY** other than those provided in this paragraph shall be used to reduce and/or set **SECOND PARTY'S** commission. (By the way of example, any cost of setting up an investment account or employing an investment banker shall not be considered or utilized to reduce the commissions of the **SECOND PARTY**). A separate fee/commission agreement shall be entered into and shall outline compensation to be paid to **SECOND PARTY** for every transaction to be performed in connection with this **AGREEMENT**. **FIRST PARTY** shall reveal and provide copies of all documents, including but not limited to Purchase Orders of similar documents related to each product purchased under this **AGREEMENT** along with invoices or similar documents in connection with shipping costs to **SECOND PARTY** so that the Commission Fee Agreement can be entered into. The fee or commission agreement shall be drafted and acknowledged by signature, and this shall be performed in conjunction with or simultaneously with any buyer/purchase agreement that is entered into between the **FIRST PARTY** and any Client/Buyer under the terms of this **AGREEMENT**. All commissions or fees shall be paid in U.S. dollars. Additionally, it is acknowledged by all parties hereto that there will be instances wherein monies shall be paid into banking accounts during the pendency of transactions which will be drawing interest as well as the fact that monies earned in cash transactions that are wired into **FIRST PARTY'S** account. It is agreed and acknowledged by all parties that all these monies shall also be subject to equal division between the parties and shall constitute monies to be paid to **SECOND PARTY** by **FIRST PARTY** in addition to its commission monies. All interest monies due to **SECOND PARTY** as well as all monies earned as a result as any cash wire transfers shall be addressed in the Commission Agreement as provided herein.

(b)     Commissions, fees, compensations, or remuneration's to be paid as a part of **AGREEMENT** shall be paid at the times such contracts designated, concluded or monies changing hands between parties, unless otherwise agreed among the "**PARTIES**". The "**PARTIES**" hereby irrevocable and unconditionally agree and guarantee to honor and respect all such fees, or remuneration arrangements made as part of a commission.

(c)     In the event of circumvention as defined below in paragraph four (4) below, **FIRST PARTY** shall pay a legal monetary penalty that is equal to the previous dollar amount received by **SECOND PARTY** from a similar commodity order. In other words, if **SECOND PARTY** were to be circumvented from a soy transaction, it shall be entitled to receive a commission on the circumvented transaction of no less than the dollar amount established under the most recent Commission Agreement involving the particular commodity multiplied by the number of metric tons and/or tonnage in connection with the circumvented transaction, (ex: previous amount received by **SECOND PARTY** under terms of the Commission Agreement in the amount of $20.00 per metric ton multiplied by the circumvented order amount consisting of 500,000 metric tons would constitute a commission of $10,000,000.) This process shall apply to each order that is circumvented and shall also include any interest monies along with any monies earned via cash transactions that are wired into **FIRST PARTY'S** account.

(d)     **FIRST PARTY** shall not engage in any type of conduct with any third party or entity, either directly or indirectly, to diminish or reduce any commissions to be paid to **SECOND PARTY** by means of manipulating the purchase price of any product or any shipping price for any product sold under the terms of this agreement. Any price breaks or reductions afforded to the **FIRST PARTY** by any supplier of product or shipper of any product shall be revealed and passed on to the **SECOND PARTY** as a part of this business agreement and shall not constitute separate monies of **FIRST PARTY**, but shall constitute monies to be split between parties when arriving at SECOND PARTY'S commission fee for each transaction.

**4.**

## NON-CIRCUMVENTION

The **"PARTIES"** shall not, directly or indirectly, interfere with, circumvent, avoid, by-pass, or obviate each other's interest, or the interest or relationship between the "PARTIES" with any individual or entity, including but not limited to producers, sellers, buyers, brokers, dealers, distributors, refiners, shippers, financial institutions, manufacturers, etc. to change, increase, or avoid directly or indirectly payment of fees, commissions, or continuance of pre-established relationship or intervene in un-contracted relationship with suppliers, manufacturers, or technology owners with intermediaries, entrepreneurs, legal counsel, or initiate buy/sell relationships, or Transactional relationships that by-pass one of the **"PARTIES"** with any person or entity, including but not limited to corporations, producers, partnerships, or individuals revealed by one of the **"PARTIES"** with any corporation, producer, partnership, or individual revealed or introduced by one of the **"PARTIES"** to one another in connection with any ongoing future transactions or supply agreements. Moreover, it is agreed that **FIRST PARTY** shall have no contact with any buyers or customers supplied, identified, or provided as a result of **SECOND PARTY** unless written permission is given to **FIRST PARTY**. **SECOND PARTY** shall be the sole person to have contact with said person or entity for purposes of entering into agricultural commodity sells under the terms of this **AGREEMENT**. If approached directly or indirectly by any of **SECOND PARTY'S** customers, buyers, or contacts, **FIRST PARTY** shall direct the person or entity to speak with **SECOND PARTY** as well as notify **SECOND PARTY** immediately. Last, **FIRST PARTY** acknowledges that the clients procured and supplied by **SECOND PARTY** on Attachment A, which is attached hereto and incorporated in reference herein, belong to and constitute the work product of **SECOND PARTY** and that **FIRST PARTY** has no right, claim, title, or privilege to same. The **"PARTIES"** hereto acknowledge and agree that those customers on Attachment A are the ones which are subject to the terms of this paragraph. Moreover, the **"PARTIES"** agree that, as **SECOND PARTY** procures new clients, this agreement shall be amended to reflect the **SECOND PARTY'S** right to future clients.

**5.**

## NON DISCLOSURE & CONFIDENTIALITY

(a)      Because of this **AGREEMENT**, the **PARTIES** may learn from one another, or from principles, the names and telephone numbers of investors, borrowers, lenders, agents, brokers, banks, lending corporations, individuals and/or trusts, or buyers and sellers hereinafter called contacts. The **PARTIES** with this acknowledge, accept, and agree that the identities of the contacts will be recognized by the other **PARTY** as exclusive and valuable contacts of the introducing **PARTY** and will remain so for the duration of this agreement.

(b)      The **"PARTIES"** shall not disclose or otherwise reveal directly or indirectly, to any third party, any confidential information provided by one party to the other, or otherwise acquired, particularly, contract terms,  product information or manufacturing processes, prices, fees, financing arrangements, schedules, and information concerning the identity of the sellers, producers, buyers, lenders, borrowers, brokers, distributors, or their representatives, and specific individual names, addresses, principals, or telex/fax/telephone numbers, e-mail addresses, references, products or technology information, advised by one **"PARTY(S)"** to another as being confidential or privileged, without the prior specific written consent or the **"PARTY(S)"** providing such information.

## 6.

## TERM OF AGREEMENT

This agreement shall be valid for a period of three (3) years from the date of the agreement; with additional two (2) years automatic roll-over renewals at the close of each Transaction or exchange of information, and thereafter at the end of any roll-over period, without the need of advisement, unless mutually agreed in writing to be terminated by all the **"PARTIES"** which termination can occur only at the end of any roll-over period. This agreement shall apply to the following: (a) all transactions originated during the term of this agreement, and (b) all subsequent transactions that are follow up, repeat, extended or renegotiated transactions of transactions originated during the term of this agreement.

## 7.

## PARTNERSHIP

This agreement shall not be construed as being an agreement of partnership, and none of the **"PARTIES"** shall have any claim against any separate dealing, venture or assets of any other party or shall any party be liable for any other.

## 8.

## AGREEMENT TO INFORM

(a)     All parties shall be informed of the development of all transactions subject to this **AGREEMENT** by receiving copies of any correspondence made between the parties as well as pursuant to the terms of the section entitled "Procedures for Conducting Business" above.

(b)     Each **PARTY** shall provide to the other on a regular basis such documentation as may reasonably be required to enable the other party to be assured of compliance with this **AGREEMENT**, and shall permit the other party to inspect its books of account and other records at such a reasonable times as the other party may request. In addition thereto, the **"PARTIES"** agree that they shall execute any necessary documents or releases which shall allow either party to gain full access to any and all information relative to the terms of this **AGREEMENT** including, but not limited to banking terms, banking accounts, commodity purchases, orders, invoices, shipping documents, etc.

## 9.

## ASSIGNMENT

This agreement is personal to the parties to this agreement and may not be assigned, in whole or in part, without the prior written consent of both parties hereto.

## 10.

## ADDITIONAL INSTRUMENTS

Each of the parties hereto shall properly endorse, execute and deliver such instruments or documents as may be necessary from time to time to effectuate the provisions of this **AGREEMENT**.

## 11.

### PRIOR OR SUBSEQUENT AGREEMENTS

The parties hereto cancel, annul, invalidate, repudiate and disavow any and all prior property or support agreements made by them at any time heretofore.

## 12.

### ENTIRE AGREEMENT, SEVERABILITY, BINDING EFFECT

Each party agrees that this **AGREEMENT** contains the entire understanding of the parties, there being no representation, promise, warranty, covenant, or undertaking other than those expressly set forth herein. The covenants and conditions of this **AGREEMENT** are to be construed together, but should any part or parts of this **AGREEMENT** be interpreted or construed to be unenforceable, void or without meaning, the remaining part or parts shall continue in full force and effect. This **AGREEMENT** shall apply to, bind and be obligatory upon the parties, and upon their assigns, personal representatives, administrators, and executors. Each party hereto expressly acknowledges and agrees that it has the power, authority and permission to enter into this **AGREEMENT** on behalf of its corporation.

## 13.

### MUTUAL COOPERATION

Each of the parties hereto shall cooperate fully with the other party to ensure that the provisions of this **AGREEMENT** are executed and carried out in good faith. This **AGREEMENT** shall be effective upon execution hereof by each party.

## 14.

### MODIFICATION

No modification or waiver of any of the terms herein shall be valid unless in writing and signed by both the parties. No waiver of any breach herein or default hereunder shall be deemed a waiver of any subsequent breach of default of the same or similar nature.

## 15.

### DISCLOSURE AND VOLUNTARY EXECUTION

Each party hereto declares that it has read the foregoing **AGREEMENT**, and that it fully understands the meaning and implication of each term, condition, promise, covenant, representation, and part of this **AGREEMENT**. Each party acknowledges that the execution of this **AGREEMENT** is a voluntary act, free of any coercion or duress. Further, each party acknowledges that it has had the opportunity to consult with legal counsel in regard to the terms and effects of this **AGREEMENT**.

## 16.

### GOVERNING LAW & JURISDICTION

The parties agree that it is their intention that this **AGREEMENT** and its performance, and all suits and special proceedings pursuant to this **AGREEMENT** shall be construed in accordance with

the laws of the State of Georgia and that in any action, special proceeding, or other proceeding that may be brought arising out of, in connection with, or by reason of this AGREEMENT, the laws of the State of Georgia shall be applicable and shall govern to the exclusion of the law of any other forum, without regard to the jurisdiction in which any action or special proceeding may be instituted.

## 17.

### SIGNATURES

(a)     Signature on this agreement received by the way of Facsimile, Mail and/or email shall be deemed to be an executed contract. The parties agree that Electronic signature shall be valid and accepted as a hand signature.

(b)     EDT (Electronic Document Transmissions) shall be deemed valid and enforceable in respect of any provisions of this Contract. As applicable, this agreement shall be: (i) incorporate U.S. Public Law 106-229, "Electronic Signatures in Global and National Commerce Act" or such other applicable law conforming to the UNCITRAL Model Law on Electronic Signatures (2001); (ii) ELECTRONIC COMMERCE AGREEMENT (ECE/TRADE/257, Geneva, May 2000) adopted by the United Nations Centre for Trade Facilitation and Electronic Business (UN/CEFACT)and; (iii) EDT documents shall be subject to European Community Directive No. 95/46/EEC, as applicable. Either Party may request hard copy of any document that has been previously transmitted by electronic means provided, however, that any such request shall in no matter delay the parties from performing their respective obligations and duties under EDT instruments.

**IN WITNESS WHEREOF, THE FIRST AND SECOND PARTIES** have executed this instrument on the date first appearing set out, consisting of (9) nine typed written pages, this page included, the proceeding pages bearing our initials on the original copy.

President, First Party
ECreative Group, Inc.
Energy & Commodities Global, Inc.

President, Second Party
Global Dynamic Enterprises, LLC

Secretary
Corporate Seal

Corporate Seal

Sworn to and subscribed before me this

Sworn and subscribed before me this

___ day of _____ 2012.

30th day of July 2012.

_Melinda Strickland_

Notary Public

Notary Public

My Commission Expires:

My Commission Expires: 9/16/14



# ATTACHMENT A
## CLIENT'S OF SECOND PARTY

1. FAJIR OMID IRANIAN CO.
   NO. 6, YAS ST. SHARIATI AVE.
   TEHRAN 1913635711 IRAN
   TELEPHONE: +98-021-22270767
   FAX: +98-021-22277187
   SIGNATORY: S.M.A. HOSSEINI

2. ZUFA AGRICULTURAL ENGINEERING CO.
   #5, KHOSRAVANI ALLEY, VAZIRIPUR STR., MOHSENI SQU.,
   MIRDAMAND BLVD
   TEHRAN, IRAN
   TELEPHONE: 98-21-264-008-25
   SIGNATORY: MR. HOSEIN GOLABGIRHA

3. TAKALOM COMPANY
   NO. 53, PARCHAM ST., TOWHID SQ.
   TEHRAN, IRAN
   P.O. BOX 14155/3671
   TELEPHONE: +9821-66739895-6
   SIGNATORY: _____

4. PETRO POLY PUD KISH
   NO 2002, 5TH FLOOR MITRA ALLEY, AFTER GHEYTARIEH STATION,
   SHARIATI AVE.
   TEHRAN, IRAN
   TEL: 0098-21-22674867
   SIGNATORY: M.R. MEHDIZADEH



5. PETROKAVALBORZ CO.
   #2, 1ST FLOOR, ARGENTINA SQ., BAYHAGHI AVE., 12TH EAST ALLEY
   TEHRAN, IRAN
   TELEPHONE: +982188735538
   FAX: +982188746027
   SIGNATORY: _____

6. HORTASH INTERNATIONAL TRADING CO LTD
   NO. 58, 2ND FLOOR, SHAHANAGHI ST., NORTH SHEIKH BAHAIE ST.,
   MOLLA SADRA ST., VANAK SQ.
   TEHRAN, IRAN
   TELEPHONE: +98(21)88613540-43
   SIGNATORY: _____

7. ETEHADIYEH MORGHDARAN MIHAN
   NO: 153 (TRADE BUILDING N 241), AZADI STREET
   TEHRAN, IRAN
   TELEPHONE: +98-21-66564507-11
   SIGNATORY: _____

8. DELVAR AFZAR INDUSTRIAL GASES CO
   NO. 5, 8TH FLOOR BIDAR ST., ELAHIYE EXIT MODARES HIGHWAY
   TEHRAN, IRAN
   TELEPHONE: (+98-21) 262218814/15
   E-MAIL: INFO@DELVARAFZAR.COM
   SIGNATORY: IRAJ GHORBANI

9. ROSHA TEJARAT CASPIAN
   AZEMANE BAMAMEYE SHOMALL-CENTRALL 13TH STR.
   PLOT NUMBER 18-9TH FLOOR
   TEHRAN, IRAN
   TELEPHONE: +989179630355
   FAX: +987112260751
   SIGNATORY: MR. ABDOOLRASOOL KHOSHROO Owner, CEO
              ABDOOLRASOOL RAHIM KHOSHROO, President



10. ILIA ZORAT CO
NO: 1370, ESHTEHARD INDUSTRIAL ZONE,
KARAJ, ALBORZ, IRAN
TEL/FAX: +98 26 37774254-56
SIGNATORY: _____

11. SABA BAHAR IRANIAN COMPANY
FATHE SHAGHAGI AVE NEAR GOMNAM
NO. 147 3RD FLOOR
TEHRAN IRAN
TELEPHONE: +98 21 220 31307
FAX: +98 21 22031308
SIGNATORY: _____

# FIRST AMENDED BUSINESS VENTURE AGREEMENT

STATE OF GEORGIA

COUNTY OF CHEROKEE

This FIRST AMENDED BUSINESS VENTURE AGREEMENT entered into this __30__ day of __July__ 2012 is between ECREATIVE GROUP INC; ENERGY & COMMODITIES GLOBAL, INC., a duly authorized corporation under the laws of the State of Iowa (Hereinafter referred to as "FIRST PARTY") and GLOBAL DYNAMIC ENTERPRISES, LLC, a duly authorized corporation under the laws of the State of Georgia, (Hereinafter referred to as "SECOND PARTY"). This Amended AGREEMENT is made under and should be construed according to the laws of the State of Georgia. Now therefore,

## WITNESSETH:

WHEREAS, the parties previously entered into a Business Venture Agreement dated July 30, 2012 as it relates to the exportation and sale of agricultural commodities to country of Iran; and

WHEREAS, since the entry of said original Business Agreement, Second Party has been able to identify purchases or buyers for agricultural commodities located here in the United States; and

WHEREAS, the parties desire to expand the original Business Venture Agreement to include locating and selling agricultural commodities to individuals or entities located here in the United States;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and intending to be legally bound, the parties have agreed as follows:

1.

## AMENDED TERMS

The parties agree that the terms of original Business Venture Agreement dated July 30, 2012 shall be amended to allow the venture between the parties to include the providing and selling of agricultural commodities as defined in said agreement to individuals and entities located in the United States. Any and all terms of the original agreement shall be incorporated by reference herein as if stated verbatim and shall apply to this First Amendment.

2.

## INDENTITY OF U.S ENTITIES

Second Party has been able to locate U.S companies who have expressed and desire to purchase agricultural commodities. The names of these and entities are detailed on Exhibit A attached hereto and

incorporated by reference herein. It is agreed that SECOND PARTY shall be the sole person to have contact with said person or entity for purposes of entering into agricultural commodities sells under the terms of the original Business Venture Agreement dated July 30, 2012 incorporated by reference herein. FIRST PARTY acknowledges that the clients procured and supplied by SECOND PARTY on Attachment A, which is attached hereto and incorporated by reference herein, belong to and constitute the work product of SECOND and FIRST PARTY has no right, claim, title or privilege the same.

IN WITNESS WHEREOF, FIRST AND SECOND PARTIES have executed this instrument on the date first appearing set out, consisting (2) typed written pages, this page included, the proceeding pages bearing our initials on the original.

President, First Party
ECreative Group, Inc.
Energy & Commodities Global, Inc.

Corporate Seal

Sworn to and subscribed before me this
this

_____ day of _____ 2012

_____
Notary Public

My Commission Expires

President, Second Party
Global Dynamic Enterprises, LLC

Corporate Seal

Sworn and subscribed before me

30th day of July 2012

_____
Notary Public
My Commission Expires 9/16/14

## ATTACHMENT A
## (UNITED STATES CORPORATIONS)

1. **FIELDALE FARMS CORPORATION**
   P. O. Box 55
   BALDWIN, GA 30511
   TELEPHONE: (706) 778-5100
   FAX: (706) 778-3767
   ATTEN: GUS ARRENDALE

2. **MAR-JAC POULTRY**
   1101 AIRPORT STREET, SW
   GAINESVILLE, GA 30501
   TELEPHONE: (770) 531-5000
   ATTEN: RANDY BRUCE

3. **PECO FOODS**
   CORPORATE OFFICE
   1020 LURLEEN WALLACE BLVD. NORTH
   P. O. BOX 1760
   TUSCALOOSA, AL 35401
   TELEPHONE: (205) 345-4711
   FAX: (205) 366-4533



<u>COMMISSION AGREEMENT</u>

**STATE OF GEORGIA**
**COUNTY OF CHEROKEE**

This **COMMISSION AGREEMENT** entered this 30th day of July, 2012, is between **ECREATIVE GROUP, INC., ENERGY & COMMODITIES GLOBAL INC**, a duly authorized corporation under the laws of the State of Iowa, (Hereinafter referred to as **"FIRST PARTY"**) and **GLOBAL DYNAMIC ENTERPRISES, LLC**, a duly authorized corporation under the laws of the State of Georgia, (Hereinafter referred to as **"SECOND PARTY"**). This **COMMISSION AGREEMENT** is made under and should be construed according to the laws of the State of Georgia. Now therefore,

## W I T N E S S E T H:

**WHEREAS, FIRST PARTY** is a commodities brokerage group with world wide affiliations that specialize in the exportation of agricultural commodities including but not limited to corn, wheat, barley, sugar, soy, etc; and

**WHEREAS, SECOND PARTY** is a group that concentrates in locating and identifying prospective purchasers, who seek to buy various goods and commodities, and setting these entities, groups, or individuals up with prospective sellers or providers of the desired product; and

**WHEREAS, SECOND PARTY** has been able to locate and identify numerous prospective buyers of agricultural commodities, which include but are not limited to corn, wheat, barley, sugar, soy, feeds, etc., who are located in the Country of Iran/ U.S.A; and

**WHEREAS,** the parties have previously entered into a Business Venture Agreement, dated July 30, 2012, which outlines the parties rights, obligations, responsibilities, etc in selling agricultural commodities to the Country of Iran/U.S.A. Said Agreement is incorporated by reference herein, as if stated verbatim; and

**WHEREAS,** pursuant to the terms of the Parties Business Venture Agreement, **SECOND PARTY** has been able to locate an Iranian/U.S.A. Business known as Fieldale Farms to purchase corn/soybean meal ; and

**WHEREAS, SECOND PARTY** has provided information of her buyer to the **FIRST PARTY** and **FIRST PARTY** is satisfied that all terms and responsibilities imposed under the terms of the Business Venture Agreement have been met; and

**WHEREAS, FIRST PARTY** and the Business known as Fieldale Farms have been able to enter into a Sales Contract related to the purchase of corn/soybean in accordance with the terms and conditions of the parties Business Venture Agreement; and

EXHIBIT "B"

WHEREAS, **FIRST PARTY** acknowledges "but for" the efforts and contacts of **SECOND PARTY** it would have not been able to effectuate its contract with Fieldale Farms and that said efforts deserve compensation; and

WHEREAS, **FIRST PARTY** and **SECOND PARTY** have discussed and reached a commission agreement as it relates to monies to be paid to **SECOND PARTY** as compensation for her efforts in relation to this transaction; and

NOW THEREFORE, in consideration of the mutual covenants contained herein, and intending to be legally bound, the Parties hereto agree as follows:

### 1.
### COMMISSION AMOUNT & TERMS

**FIRST PARTY** shall pay to **SECOND PARTY** a commission fee of $1,000,000.00/One Million Dollars for the transaction dated July 30,2012 involving the Iranian/U.S.A Business Company Fieldale Farms wherein it purchased _corn/soybean meal. These monies shall be paid to **SECOND PARTY** upon release of the Bank Guarantee to **FIRST PARTY**. These monies shall be paid in U.S. dollars to **SECOND PARTY** and in accordance with the directions of **SECOND PARTY** as it relates to the particular bank institution, deposit method; etc. Currency conversions, when necessary, shall be based upon the prevailing free market rates of the payment is earned (not at the term of payment) as quoted in the Wall Street Journal or other authoritative source.

### 2.
### IDENTITY OF BUYER & OBLIGATIONS OF PARTIES

The Parties acknowledge that the identity of the Buyer, which is Fieldale Farms, shall remain solely the client of **SECOND PARTY** and all terms of the Non-Circumvention provision as well as the Non Disclosure & Confidentiality provision as contained in the Business Venture Agreement shall apply to this client, this transaction, and all future transactions involving this client and any future clients identified and procured by **SECOND PARTY.**

### 3.
### ENTIRE AGREEMENT, SEVERABILITY, BINDING EFFECT

Each party agrees that this **AGREEMENT** contains the entire understanding of the parties, there being no representation, promise, warranty, covenant, or undertaking other than those expressly set forth herein. The covenants and conditions of this **AGREEMENT** are to be construed together, but should any part or parts of this **AGREEMENT** be interpreted or construed to be unenforceable, void or without meaning, the remaining part or parts shall continue in full force and effect. This **AGREEMENT** shall apply to, bind and be obligatory upon the parties, and upon their heirs, assigns, personal representatives, administrators, and

executors. Each party hereto expressly acknowledges and agrees that he or she has the power, authority and permission to enter into this **AGREEMENT** on behalf of its corporation.

## 3.
### DISCLOSURE AND VOLUNTARY EXECUTION

Each party hereto declares that it has read the foregoing **AGREEMENT**, and that it fully understands the meaning and implication of each term, condition, promise, covenant, representation, and part of this **AGREEMENT**. Each party acknowledges that the execution of this **AGREEMENT** is a voluntary act, free of any coercion or duress. Further, each party acknowledges that it has had the opportunity to consult with legal counsel in regard to the terms and effects of this **AGREEMENT**.

## 4.
### GOVERNING LAW & JURISDICTION

The parties agree that it is their intention that this **AGREEMENT** and its performance, and all suits and special proceedings pursuant to this **AGREEMENT** shall be construed in accordance with the laws of the State of Georgia and that in any action, special proceeding, or other proceeding that may be brought arising out of, in connection with, or by reason of this**AGREEMENT**, the laws of the State of Georgia shall be applicable and shall govern to the exclusion of the law of any other forum, without regard to the jurisdiction in which any action or special proceeding may be instituted.

## 5.
### DISPUTE RESOLUTION

Any and all disputes, controversies, claims, or other disagreements arising out of or relating to this **COMMISSION AGREEMENT** or the actual or alleged breach thereof shall be finally settled through arbitration in accordance with rules of the American Arbitration Association. The arbitration shall be held in Georgia and shall be conducted under and in accordance with the American Arbitration Association Rules applicable to Georgia using the rules of law not equity. Such arbitration shall be conducted in English and will be conducted on confidential basis in accordance with the terms of this **COMMISSION AGREEMENT**.

IN WITNESS WHEREOF, THE FIRST AND SECOND PARTIES have executed this instrument on the date first appearing set out, consisting of (4) four typed written pages, this page included, the proceeding pages bearing our initials on the original copy. Each counterpart hereof shall be deemed an original of this AGREEMENT for all purposes.


President, First Party
ECreative Group, Inc.
Energy & Commodities Global, Inc.


President, Second Party
Global Dynamic Enterprises


Secretary
Corporate Seal

Corporate Seal

Sworn to and subscribed before me this

___day of_____2012.


Notary Public
My Commission Expires:

Sworn to and subscribed before me this

___day of_____2012.

Notary Public
My Commission Expires:



**Energy & Commodities Global**
*An eCreative Group, Inc. Company*

1877 1st Street West
Independence, Iowa 50644, USA
Corporate Office Phone: 319-334-5115  Fax: 704-973-0630
Satellite Office Phone: 704-935-5060

## DELIVERY CONTRACT

US Federal ID #: 20 - 1198639
IA Sec. of State ID: 490 OP-295254

| BUYER: | The following number must appear on all related correspondence, |
|---|---|
| FIELDALE FARMS CORPORATION | shipping papers, and invoices:  CONTRACT NUMBER: FD-000313 |
| P.O. BOX 558 | |
| 555 Broiler Blvd. | |
| BALDWIN, GA 30511 | |
| PHONE: 706-778-5100    FAX: 706-778-3767 | |
| LEGAL SIGNATORY: TOM HENSLEY, PRESIDENT | |

| CONTRACT DATE | DESTINATION | FREIGHT TYPE | SHIPMENTS | PAYMENT TERMS |
|---|---|---|---|---|
| August 21, 2012 | BALDWIN, GEORGIA OR CLIENT SPECIFIED RAIL LEG | RAIL  NORFOLK SOUTHERN | PARTIAL SHIPMENTS ALLOWED  FIRST SHIPMENT TO BE DELIVERED 21-30 DAYS FROM DOWN PAYMENT WITH ADDITIONAL DELIVERIES TO IMMEDIATELY FOLLOW | CASH & SBLC DEPOSIT PLUS PAYMENT PER SHIPMENT VIA DLC  *See Section 3.1 for details* |

| QTY | UNIT | COMMODITY DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 55,000 | DRY METRIC TONS | **Soybean Meal (Loose)** PROTEIN: Minimum 47.5%,  FAT: Minimum 0.5%, FIBER: Maximum 3.5%,  MOISTURE: Maximum 12.5%, UREASE ACTIVITY: pH rise between 0.12 and 2.0 units AFLATOXIN: Maximum 20 ppb, ASH: Maximum 6% E.COLI COUNT: Negative, SALMONELLA: Negative, MOULDY COLONY: 5 multiple 100 ORIGIN: USA PACKING: BULK RAIL | $437.00 USD | $24,035,000.00 USD |
| 55,000 | DRY METRIC TONS | **YELLOW CORN #2      FEED PURPOSE** TEST WEIGHT: Minimum 54 LBS/BUSHEL, PROTEIN: Minimum 8%, MOISTURE CONTENT: Maximum 14%, BROKEN KERNELS AND FOREIGN MATTERS: Maximum 3%, STARCH CONTENT: Average 60-68%, HEAT DAMAGED KERNALS: Maximum 0.5%, TOTAL DAMAGED KERNALS: Maximum 5%, ADMIXTURE: Bgts 2.5%, RADIATION Item, AFLATOXIN: 20 PPB Maximum Total, SALMONELLA: Negative, E.COLI: Negative, FIBER: Minimum 2.7%, ASH CONTENT: Maximum 1.5%, FAT CONTENT: Minimum 3.5%, FREE OF HOLDING AND CHEMICALS ORIGIN: USA PACKING: BULK RAIL | $245.00 USD | $13,475,000.00 USD |

Weight for invoicing purposes shall be established by the current net weight. Weight franchise of +/- 3% shall be allowed against Bill of Lading weight. In case short weight exceeds +/- 3% the Seller shall compensate Buyer for the amount excluding the franchise on the basis of contracted price.

| | |
|---|---|
| SUBTOTAL | $37,510,000.00 USD |
| SALES TAX | NONE |
| FREIGHT | PRE-PAID/INCLUSIVE |
| OTHER | NONE |
| TOTAL | $37,510,000.00 USD |

Seller Initials: ___   Buyer Initials: ___

EXHIBIT "C"



1. The Goods.

 1.1 The quality of grain delivered under this contract shall be determined delivered at Buyer Specified Delivery Point, Baldwin, Georgia. Original weights and first official grades to govern. All deliveries made under this contract shall be of the grade and quality specified herein and shall be accompanied by all necessary certificates of origin, quality, and inspection.

 1.2 All grain delivered under this contract shall be of merchantable quality, unadulterated, and unrestricted from movement in interstate commerce within the meaning of the Federal Food, Drug and Cosmetic Act, Environmental Protection Agency tolerances, the U.S. Grain Standards Act and applicable state law.

 1.3 Acceptance of deliveries not meeting the contract grade and quality shall be at the option of the buyer. If the buyer elects to accept such deliveries not meeting the contract grade and quality, market scale discounts and premiums at the time of delivery will apply, unless otherwise specified in writing.

2. Termination.

 2.1 Neither party may cancel this order before loading of product at location of origin unless, after having notified the other of a material breach of this agreement that breach is not cured within fifteen (15) days from the date that the written notice of breach was mailed or delivered.

 2.2 Should the buyer cancel this order without cause, the buyer shall surrender ten percent (10%) of the total order amount without protest to the seller in which time seller will immediately refund to the buyer any additional remaining pre-paid funds less the aforementioned ten percent (10%).

 2.3 Should the seller cancel this order without cause, a full refund of all previously pre-payment funds, including an additional ten percent (10%) interest on wired pre-payment funds must be delivered via wire transfer back in the originating account of the buyer within fifteen (15) days of cancellation.

3. Terms of Payment.

 3.1 $1,000,000.00 USD deposit to be issued via MT-103 wire transfer in the account in Section 4.1 below.

 3.2 $2,751,000.00 USD Stand By Letter of Credit to be issued as guarantee of final payment of shipments. *Bank details for issuance of the SBLC to be supplied prior to issuance bank-to-bank.*

 3.3 Irrevocable and Transferable Documentary Letter of Credit in the amount of $33,759,000.00 USD to be issued as payment instrument, and to be open no less than four (4) months, to be drawn on per shipment by shipment basis upon delivery and presentation of *DOCUMENTS REQUIRED FOR PAYMENT* per DLC requirements below. *Bank details for issuance of the DLC to be supplied prior to issuance bank-to-bank.*

 **DOCUMENTS REQUIRED FOR PAYMENT**

   A. SIGNED COMMERCIAL INVOICE IN (3) ORIGINALS AND (3) COPIES INDICATING
      - L/C NO. AND CONTRACT NO. FD-000313
      - LESS USD 1,000,000.00 REPRESENTING DEPOSIT RECEIVED' ON THE FIRST SHIPMENT'S INVOICE.
   B. 3 ORIGINAL AND 3 NON-NEGOTIABLE COPIES OF CLEAN ON BOARD MULTIMODDLE BILLS OF LADING MADE OUT TO ORDER AND BLANK ENDORSED, MARKED 'FREIGHT PAYABLES AS PER CHARTER PARTY' AND NOTIFY APPLICANT.
   C. WEIGHT CERTIFICATE/OFFICIAL WEIGHT CERTIFICATE IN (3) COPIES
   D. QUALITY CERTIFICATE (CORN) - ISSUED BY THE FEDERAL GRAIN INSPECTION SERVICE (FORM FGIS-905 TX) AND/OR QUALITY CERTIFICATE (SOYBEAN MEAL) - PROCESSORS GUARANTEED ANALYSIS OF PROTEIN, FAT, FIBER, AND ASH CONTENT.

4. Payment Beneficiary.

 4.1 Any and all payments, made via agreed MT-103 wire transfer, shall be issued in favor of eCreative Group, Inc. DBA Energy & Commodities Global, and wired to Wells Fargo Bank as defined herein:

   | | |
   |---|---|
   | Bank Name: | Wells Fargo Bank NA |
   | Bank Address: | 191 West 5th Street, Waterloo, IA 50701 |
   | Account Name: | eCreative Group, Inc. dba Energy & Commodities Global |
   | Signatory Officers: | Brian James Lillie |
   | Account Number (USD): | 3036930273 |
   | Incoming Routing Number: | 121000248 |
   | Bank Officer Name: | Sue Chizek |
   | Bank Officer Phone: | 319-236-4800 |

5. Force Majeure.

 5.1 Both parties will be exonerated from their obligations in case of a Force Majeure event.

 5.2 Force Majeure is understood as per provisions under INCO500 and means any event such as fire, explosions, hurricanes, floods, earthquakes and similar natural calamities, wars, epidemics, military operations, terrorism, riots, revolts, strikes, industrial unrest, government embargoes, or other unforeseeable actions occurring after the conclusion of this contract and outside the party's reasonable control and which cannot be avoided by the reasonable diligence that could delay or prevent the performance of either party's obligations in this contract.

Seller Initials: _____        Buyer Initials: _____



5.3 The party to this contract whose performance of this contract is prevented by a Force Majeure event must notify the other party within seven (7) days of the effective date of occurrence, which notice is to be confirmed by a certificate issued by the local chamber of commerce and industry, including particulars of the event and expected duration. Failure to submit such a notification will prevent the parties' exoneration from contractual obligations under Force Majeure unless the event makes such notice impossible.

5.4 The performance of either party's obligation will be such that the obligation will be postponed with the period of the existence of the Force Majeure event plus a reasonable period to rehabilitating production and shipping. No penalty shall be payable for the duration of this delay.

5.5 Should the delay caused by a Force Majeure event last more than one (1) month, the parties will attempt to agree to a measure to allow the contract to continue. Should such an agreement not to be reached within thirty (30) days from the date of the certified Force Majeure event; the parties are entitled to terminate the contract.

5.6 The Force Majeure event does not exonerate the Buyer from paying for the goods already delivered. No Force Majeure event can affect the last shipment that has arrived, but not yet paid.

6. **Interpretation, Law, and Arbitration.** This Agreement constitutes the entire agreement between the parties on the subject matter hereof and supersedes any prior oral or written agreements between the parties on the subject matter herein. This Agreement can be modified only by a written document signed by both parties. This Agreement shall be interpreted in accordance with the laws of the State of Iowa, United States of America.

6.1 Except as otherwise expressly provided herein, this contract shall be subject to the National Grain and Feed Association's Trade Rules applicable on the date this purchase contract is signed. *(NGFA Trade Rules and Arbitration Rules are available upon request)*

6.2 This contract shall be governed by, and construed in accordance with, the laws of the State of Iowa if a matter not addressed by the NGFA's Trade Rules or the Arbitration Rules is at issue.

6.3 The parties to this contract agree that the sole remedy for resolution of any and all disagreements or disputes arising under this contract shall be through arbitration proceedings before the National Grain and Feed Association (NGFA) under NGFA Arbitration Rules. The decision and award determined through such arbitration shall be final and binding upon the buyer and seller. Judgment upon the arbitration award may be entered and enforced in any Court having jurisdiction thereof.

7. **Binding Effect.** This Agreement is binding upon, and shall inure to the benefit of, the heirs, representatives, successors, and assigns of the parties.

8. **Counterparts: Electronic and/or Faxed Copies.** Copies of this Agreement with electronic or faxed signature page(s) shall be binding and effective as to each party and may be used in lieu of an original of this Agreement and in lieu of original signature page(s). This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All such counterparts shall be construed together and shall constitute one document, but in making proof hereof it shall only be necessary to produce one such counterpart. The signatures to this Agreement may be executed on separate pages and when attached to this Agreement shall constitute one complete document.

9. **Legality.** The parties agree that the provisions contained in this Agreement are reasonable and are not known or believed to be in violation of any international, federal or state law or regulation. In the event a court of law finds any provision to be illegal or unenforceable, such court may modify such provision to make it valid and enforceable. Such modification shall not affect the remainder of this Agreement which shall continue at all times to be valid and enforceable.

10. **Number of Contract Copies.** Six copies of the agreement are to be signed and triplicate shall be kept by each party.

11. **Conclusion.** Until the exchange of originals, the parties agree the signed stamped copies of the agreement will be in full force and effect. Parties hereby confirm and accepted that the agreement sent by facsimile, courier or by email, is accepted as an original.

### SIGNATURE PAGE TO FOLLOW

Seller Initials: ___  Buyer Initials: ___

CORP OFFICE: P.O. BOX 66 | 1077 1ST STREET WEST | INDEPENDENCE, IOWA 50644 | PH: 877-338-5312
REGIONAL OFFICE: 1914 J.N. PEASE PLACE | CHARLOTTE, NC 28262 | PH: 704-535-5868
FAX: 704-973-0430 | WEB: www.GOECG.com | EMAIL: INFO@GOECG.COM



IN WITNESS WHEREOF, the parties have caused the execution of this Agreement as of the day and year first above written.

The Seller
ECREATIVE GROUP, INC. dba ENERGY & COMMODITIES GLOBAL

By: _____          Date: ___5/21/12_____
    Brian Lillie, its President/CEO

Seal:

The Buyer
FIELDALE FARMS CORPORATION

By: _____          Date: _____
    Tom Hensley, its President

Seal:

Seller Initials: _____          Buyer Initials: _____



## APPENDIX A - DELIVERY SCHEDULE

### YELLOW CORN #2

| DELIVERY DATE | TM | COST |
|---|---|---|
| 9/26/2012 | 9,167 | $ 2,245,915.00 |
| 10/3/2012 | 9,167 | $ 2,245,915.00 |
| 10/10/2012 | 9,167 | $ 2,245,915.00 |
| 10/17/2012 | 9,167 | $ 2,245,915.00 |
| 10/24/2012 | 9,167 | $ 2,245,915.00 |
| 10/31/2012 | 9,165 | $ 2,245,425.00 |

### SOYBEAN MEAL 47.5% PROTEIN

| DELIVERY DATE | TM | COST |
|---|---|---|
| 9/26/2012 | 1,140 | $ 498,180.00 |
| 9/28/2012 | 1,140 | $ 498,180.00 |
| 9/30/2012 | 1,140 | $ 498,180.00 |
| 10/2/2012 | 1,140 | $ 498,180.00 |
| 10/4/2012 | 1,140 | $ 498,180.00 |
| 10/6/2012 | 1,140 | $ 498,180.00 |
| 10/8/2012 | 1,140 | $ 498,180.00 |
| 10/10/2012 | 1,140 | $ 498,180.00 |
| 10/12/2012 | 1,140 | $ 498,180.00 |
| 10/14/2012 | 1,140 | $ 498,180.00 |
| 10/16/2012 | 1,140 | $ 498,180.00 |
| 10/18/2012 | 1,140 | $ 498,180.00 |
| 10/20/2012 | 1,140 | $ 498,180.00 |
| 10/22/2012 | 1,140 | $ 498,180.00 |
| 10/24/2012 | 1,140 | $ 498,180.00 |
| 10/26/2012 | 1,140 | $ 498,180.00 |
| 10/28/2012 | 1,140 | $ 498,180.00 |
| 10/30/2012 | 1,140 | $ 498,180.00 |
| 11/1/2012 | 1,140 | $ 498,180.00 |
| 11/3/2012 | 1,140 | $ 498,180.00 |
| 11/5/2012 | 1,140 | $ 498,180.00 |
| 11/7/2012 | 1,140 | $ 498,180.00 |
| 11/9/2012 | 1,140 | $ 498,180.00 |
| 11/11/2012 | 1,140 | $ 498,180.00 |
| 11/13/2012 | 1,140 | $ 498,180.00 |
| 11/15/2012 | 1,140 | $ 498,180.00 |
| 11/17/2012 | 1,140 | $ 498,160.00 |

Seller Initials: [signature]                Buyer Initials: [signature]

CORP OFFICE: P.O. BOX 66 | 1827 1ST STREET WEST | INDEPENDENCE, IOWA 50644 | PH: 877-234-3115
REGIONAL OFFICE: 1914 J.N. PEASE PLACE | CHARLOTTE, NC 28262 | PH: 704-935-5040
FAX: 704-973-0430 | WEB: www.ODECG.com | EMAIL: INFO@ODECG.COM



| | | |
|---|---|---|
| 11/19/2012 | 1,140 | $ 498,180.00 |
| 11/21/2012 | 1,140 | $ 498,180.00 |
| 11/23/2012 | 1,140 | $ 498,180.00 |
| 11/25/2012 | 1,140 | $ 498,180.00 |
| 11/27/2012 | 1,140 | $ 498,180.00 |
| 11/29/2012 | 1,140 | $ 498,180.00 |
| 12/1/2012 | 1,140 | $ 498,180.00 |
| 12/3/2012 | 1,140 | $ 498,180.00 |
| 12/5/2012 | 1,140 | $ 498,180.00 |
| 12/7/2012 | 1,140 | $ 498,180.00 |
| 12/9/2012 | 1,140 | $ 498,180.00 |
| 12/13/2012 | 1,140 | $ 498,180.00 |
| 12/15/2012 | 1,140 | $ 498,180.00 |
| 12/17/2012 | 1,140 | $ 498,180.00 |
| 12/19/2012 | 1,140 | $ 498,180.00 |
| 12/21/2012 | 1,140 | $ 498,180.00 |
| 12/23/2012 | 1,140 | $ 498,180.00 |
| 12/25/2012 | 1,140 | $ 498,180.00 |
| 12/27/2012 | 1,140 | $ 498,180.00 |
| 12/29/2012 | 1,140 | $ 498,180.00 |
| 12/31/2012 | 280 | $ 122,360.00 |

Seller Initials: _BEL_      Buyer Initials: _____

CORP OFFICE: P.O. BOX 66 | 1077 1ST STREET WEST | INDEPENDENCE, IOWA 50644 | PH: 877-336-3115
REGIONAL OFFICE: 1914 J.N. PEASE PLACE | CHARLOTTE, NC 28262 | PH: 704-935-5660
FAX: 704-973-0630 | WEB: www.goecg.com | EMAIL: INFO@GOECG.COM



Date: January 7, 2013

To:  Fieldale Farms c/o Eddie Elrod, Tom Hensley, and Gus Arrendale

From: eCreative Group, Inc. DBA Energy & Commodities Global

Gentleman:

First and foremost please allow me to apologize for the delays and issues we've encountered with regards to this transaction. This is certainly not the norm for us and it has taken great toll on me and my staff as I am sure it has yours. It is regrettably the most stressful and difficult transaction we've encountered.

My purpose for formally writing this letter is to not only offer my apologies but also to inform you of where we stand and how I see us being able to move forward one way or the other. Obviously the end goal is to provide Fieldale Farms with product below market price for the foreseeable future and build a lasting working relationship. I believe it is fair to say that that would be the most rewarding way forward for both parties. However, with the complications we have encountered on the banking side of this I fear that not only has my reputation been irreversibly soiled but also your trust in me and my company to be able to perform for Fieldale Farms.

Per my discussions with Eddie in the past week, as I am sure you are aware, I am diligently working to get the first tranche of funds released to us to engage the delivery of product to Fieldale. This process has been a trying one. Both our funders and their bank in Indonesia have constantly telling us that funds were released previously however to date we have not seen them clear our account. We have been provided with the transfer slip for the first tranche as well but cannot seem to garner the actual wire confirmation number from them so that our bankers in Hong Kong can chase up the funds. Without such, Louis is unable to be proactive.

The option of simply cancelling the transaction with them so that deposit funds can be immediately released has also been discussed and I have gone through this with my partners over the weekend. If we take such action it will certainly cancel the first tranche of funds with equals $3 million (of which we planned to pay back the deposit plus the interest Fieldale accrued on the DLC). It will result in a transfer of your initial deposit amount alone within an estimated 5-10 business days (primarily because I'll have to rehash this process of getting funds from Bank Mandiri all over again). I am trying to avoid this as I would like not to have to have the DLC interest outstanding if at all possible. However, if this is the step you'd like me to take I can certainly do so. If we take this route ECG will have to fund the accrued interest from the DLC apart from this transaction which may take a few weeks for me to cover from other transactions.

Aside from the transaction and funding at hand I personally am finishing up a couple other transactions that I have earmarked funds from to make Fieldale Farms whole should further delays from Bank Mandiri occur. Both transactions are to close the middle of this week with funds being available within 3-5 banking days after closing. Neither of these transactions are commodity based so the issue of deliveries and such does not exist. They are simply financial/consulting transactions that will result in payment fairly quickly. It is these transactions that I was referring to when telling Eddie last week that I believed I could work out being able to make deliveries to Fieldale at the discounted product rate without requiring the issuance of a DLC or other bank instrument.

**EXHIBIT "D"**

CORP OFFICE: P.O. BOX 66 | 1827 1ST STREET WEST | INDEPENDENCE, IOWA 50644 | PH: 877-334-5115
REGIONAL OFFICE: 1914 J.N. PEASE PLACE | CHARLOTTE, NC 28262 | PH: 704-935-5060
FAX: 704-973-0630 | WEB: www.GOECG.com | EMAIL: INFO@GOECG.COM



Consequently, I am asking for a little more time to follow the Bank Mandiri issues, as well as my other transactions, through so that ECG may make Fieldale Farms whole and hopefully salvage a relationship that would benefit both parties long term. Again, I cannot express my gratitude enough for your patience and express my complete understanding of your increased level of concern. On a personal level, it is tearing me up that have had to deal with such incompetence at Bank Mandiri and that it has resulted in a major black eye for my company.

In closing, should you require me to engage the cancellation with the funder and Bank Mandiri could you kindly provide me with a cancellation letter from Fieldale Farms so that I may include it with my documentation to them?

I sincerely appreciate your understanding gentlemen and hope that you can see it within you to forgive myself and my company for the issues that have occurred and hope that we may work to rectify the relationship in a mutually beneficial fashion upon clearing all this up.

Sincerely Yours,

Brian J. Lillie
President/CEO
eCreative Group, Inc.
DBA Energy & Commodities Global

*P.S. I would also like to offer the execution of a promissory note from ECG to Fieldale Farms in relation to the funds owed back to Fieldale so that we have a formal obligation in place for both parties. This will allow me to issue an official pay order with regards to the other transaction so that I may have them distribute funds directly to you upon closing and pay out.*

CORP OFFICE: P.O. BOX 66 | 1827 1ST STREET WEST | INDEPENDENCE, IOWA 50644 | PH: 877-334-5115
REGIONAL OFFICE: 1914 J.N. PEASE PLACE | CHARLOTTE, NC 28262 | PH: 704-935-5060
FAX: 704-973-0630 | WEB: www.GOECG.com | EMAIL: INFO@GOECG.COM

# Rustin L. Smith

| | |
|---|---|
| From: | Brian Lillie <brian@ecreativegroup.com> |
| Sent: | Monday, January 07, 2013 2:33 PM |
| To: | 'Naj K' |
| Subject: | read this through and give me your thoughts before is send it over |
| Attachments: | ECG-Fieldale 1-7-2013.pdf |

Brian Lillie
President/CEO
Office: 877-334-5115 || Direct: 704-497-2397

eCreative Group, Inc. || Energy & Commodities Global || ECG Action || Enterprise Holdings Group LLC || Three Wide Media LLC

DISCLAIMER: This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited. Sender is a Business Advisor, Consultant, and Facilitator and makes no warranties, representations, or guarantees as to the recipient, seller, or parties. All due diligence is the responsibility of the recipient. Upon receipt you, as the Recipient, hereby acknowledge this warning and disclaimer.

## PROMISSORY NOTE

$1,525,195.00

January 23, 2013
Independence, Iowa

FOR VALUE RECEIVED, the undersigned, eCreative Group, Inc. DBA Energy & Commodities Global, an Iowa S-Class Corporation ("Borrower") with its principal place of business located at 1827 1st Street West, Independence, IA 50644, promises to pay to the order of Fieldale Farms Corporation ("Lender"), at 555 Broiler Blvd., Baldwin, GA 30511, or at such other address as Holder designates to Borrower in writing, the sum of ONE MILLION FIVE HUNDRED TWENTY FIVE THOUSAND ONE HUNDRED NINETY FIVE UNITED STATES DOLLARS ($1,525,195.00 USD), together with interest from the date of this Note on the unpaid principal balance from time to time outstanding, at the flat rate of 4%.

### I. TERMS OF REPAYMENT

a. **Payments.** Unpaid principal after the Due Date shown below shall accrue interest at a rate of 2% monthly until paid.

The unpaid principal and accrued interest shall be payable in full on February 23, 2013 (the "Due Date").

b. **Application of Payments.** All payments on this Note shall be applied first in payment of accrued interest and any remainder in payment of principal.

c. **Acceleration of Debt.** If any payment obligation under this Note is not paid when due, the remaining unpaid principal balance and any accrued interest shall become due immediately at the option of the Lender.

### II. SECURITY

This Note shall be secured by Bank Drafts issued by Bank of China Limited Hong Kong and assigned to Enterprise Holdings Group LLC (See Exhibits A and B). The Lender is not required to rely on the above security instrument and the assets secured therein for the payment of this Note in the case of default, but may proceed directly against the Borrower.

### III. PREPAYMENT

The Borrower reserves the right to prepay this Note by making payment in full of the then remaining unpaid principal and accrued interest.

### IV. COLLECTION COSTS

If any payment obligation under this Note is not paid when due, the Borrower promises to pay all costs of collection, including reasonable attorney fees, whether or not a lawsuit is commenced as part of the collection process.

Document Reference No: FDPN 1-23-13 (KE_FD000313)      LENDER INITIALS: _____      BORROWER INITIALS: _____

*NEED BANK DRAFT INFO*

**EXHIBIT "E"**

## V. DEFAULT

If any of the following events of default occur, this Note and any other obligations of the Borrower to the Lender, shall become due immediately, without demand or notice:

1)   the failure of the Borrower to pay the principal and any accrued interest in full on or before the Due Date;
2)   the death of the Borrower or Lender;
3)   the filing of bankruptcy proceedings involving the Borrower as a debtor;
4)   the application for the appointment of a receiver for the Borrower;
5)   the making of a general assignment for the benefit of the Borrower's creditors;
6)   the insolvency of the Borrower;
7)   a misrepresentation by the Borrower to the Lender for the purpose of obtaining or extending credit.

In addition, the Borrower shall be in default if there is a sale, transfer, assignment, or any other disposition of any assets pledged as security for the payment of this Note, or if there is a default in any security agreement which secures this Note.

## VI. SEVERABILITY OF PROVISIONS

If any one or more of the provisions of this Note are determined to be unenforceable, in whole or in part, for any reason, the remaining provisions shall remain fully operative.

## VII. MISCELLANEOUS

All payments of principal and interest on this Note shall be paid in the legal currency of the United States. The Borrower waives presentment for payment, protest, and notice of protest and nonpayment of this Note.

No renewal or extension of this Note, delay in enforcing any right of the Lender under this Note, or assignment by Lender of this Note shall affect the liability or the obligations of the Borrower. All rights of the Lender under this Note are cumulative and may be exercised concurrently or consecutively at the Lender's option.

## VIII. GOVERNING LAW

This Note shall be construed in accordance with the laws of the State of Georgia.

IN WITNESS WHEREOF, this Agreement has been executed and delivered in the manner prescribed by law as of ___/ – 23 – 2013_____.

BORROWER

ECREATIVE GROUP, INC. DBA ENERGY & COMMODITIES GLOBAL

By: _____
 Brian Lillie, Its CEO

STATE OF _North Carolina_ )
 ) SS.
COUNTY OF _Cumberland_ )

On this _23rd_ day of _January_, before me personally appeared Brian Lillie, the CEO of eCreative Group, Inc., and known to be the individual authorized as signatory for the Borrower, whom executed the foregoing instrument on behalf of the corporation.

_____
Notary Public

LENDER

FIELDALE FARMS CORPORATION

By: _____
 Eddie Elrod, Its CFO

STATE OF _Georgia_ )
 ) SS.
COUNTY OF _____ )

On this ____ day of _____, before me personally appeared Eddie Elrod, the CFO of Fieldale Farms Corporation, and known to be the individual authorized as signatory for the Lender, whom executed the foregoing instrument on behalf of the corporation.

_____
Notary Public

## EXHIBIT A

## SECURITY AGREEMENT

This Agreement is made on January 25, 2013, between eCreative Group, Inc. DBA Energy & Commodities Global,
Borrower, address:
1827 1st Street West, Suite B
Independence, IA 50644 USA


and Fieldale Farms Corporation,
Secured Party, address:
555 Broiler Blvd.
Baldwin, GA 30511 USA


For valuable consideration, the parties agree as follows:

1.  The Borrower grants the Secured Party a security interest under Article 9 of the Uniform Commercial Code (U.C.C.) in the following property or asset which will be considered collateral:

    One (1) Bank Draft issued by Bank of China Limited Hong Kong and assigned to Enterprise Holdings Group LLC in the aggregate amount of $2,500,000.00 (TWO MILLION FIVE HUNDRED THOUSAND UNITED STATES DOLLARS). The Bank Drafts are cashable on December 18, 2013 by the bearer of the drafts.

    The Bank Draft number is: _____

2.  This security interest is granted to secure payment by the Borrower to the Secured Party on the following obligation:

    PROMISSORY NOTE NUMBER: FDPN 1-23-13 (RE_FD000313)


3.  In the event of default by the Borrower in payment of any of the amounts due on the obligation listed under Paragraph 2, the Secured Party may declare the entire obligation immediately due and payable and will have all of the remedies of a secured party under the Uniform Commercial Code.

4.  In the event of such default, Borrower will also be responsible for any costs of collection, including court costs and reasonable attorney fees.

5.  The Borrower agrees allow the Secured Party to maintain physical possession to the collateral and the Secured Party agrees to use reasonable care in holding the collateral and agrees not to sell or dispose of the collateral.


Document Reference No: FDPN 1-23-13 (RE_FD000313)      LENDER INITIALS: ᏚᏒ      BORROWER INITIALS: BFL

6. The Borrower represents that the collateral is owned free and clear and that there are no other security agreements, indebtedness, or liens relating to the property offered as collateral. Borrower also states that it has full authority to grant this security interest.

7. No modification of this agreement will be effective unless it is in writing and is signed by both parties. This agreement binds and benefits both parties and any successors.

8. Time is of the essence of this agreement. This document, including any attachments, is the entire agreement between the parties. This agreement is governed by the laws of the State of Georgia.

The parties have signed this agreement on the date specified at the beginning of this agreement.

_____
Signature of Borrower

_Brian James Lillie For eCreativ Group, INC._
Printed Name of Borrower

_____
Signature of Secured Party

_____
Printed Name of Secured Party

STATE OF _North Carolina_ )
                                             ) SS.
COUNTY OF _Cabarrus_ )

   On this _23rd_ day of _January_, 20_15_, Brian Lillie, authorized signatory of the Borrower, personally appeared before me and I acknowledge that he executed the foregoing instrument.

_____
Notary Public

EXHIBIT B

BANK DRAFT AND BANK CONFIRMATION LETTER

Kepada : PT Bank Mandiri (Persero) Tbk
harap dilakukan transaksi berikut

( G Early )  ( Moderate )  — Harq Sharp  (  )  ( G Edith  )
Jakarta — AIC (Lewis?)
w... ECG might tonight
— # —  l  —  l  —  Jakarta
— # —