IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

GLOBAL DYNAMIC ENTERPRISES, LLC and NAJMEH KERMANI,

Plaintiffs,

v.

ECREATIVE GROUP, INC., d/b/a ENERGY & COMMODITIES GLOBAL, BRIAN JAMES LILLIE, ENTERPRISE HOLDINGS GROUP, LLC, and TRACY KAYE LILLIE,

Defendants.

Civil Case No.

2:16-cv-00276-RWS

**SECOND AMENDED COMPLAINT**[1]

COME NOW, Plaintiffs Global Dynamic Enterprises, LLC, and Najmeh Kermani ("Plaintiffs"), through undersigned counsel, under Fed. R. Civ. P. 15(a)(2) and LR 15.1, and bring this Second Amended Complaint against Defendants, which supersedes and replaces in its entirety the First Amendment to Complaint filed on

[1] Originally filed as an Exhibit to Plaintiff's Motion for Leave to Amend Complaint and Brief in Support (Doc. 22), which the Court granted on August 4, 2017 (Doc. 36).

November 1, 2016, in Habersham County Superior Court, Civil Action File No. 2016-cv-0583 (Doc. 1-1, "Original Complaint)."

**Parties, Jurisdiction, and Venue**

1. Plaintiff Global Dynamic Enterprises, LLC ("GDE") is a Georgia limited liability company organized and authorized to transact business in Georgia with its principal office located in Cobb County, Georgia.
2. Plaintiff Najmeh Kermani ("Kermani") is the managing member of GDE and maintains her personal residence in Cobb County, Georgia.
3. Defendant eCreative Group, Inc. d/b/a Energy & Commodities Global ("ECG") is an Iowa corporation with its principal office located in Kannapolis, North Carolina. ECG may be served with process on its Registered Agent, Tracy Lillie, at its principal office located at 6421 Stone Ridge Court, Kannapolis, North Carolina 28081. ECG was formed on February 16, 2012.
4. Defendant Enterprise Holdings Group, LLC ("EHG") is as a North Carolina limited liability company with its principal office located in in Kannapolis, North Carolina. ECG may be served with process on its Registered Agent, Tracy Lillie, at its principal office located at 6421 Stone Ridge Court, Kannapolis, North Carolina 28081. EHG was formed on September 6, 2012.

5. Defendant Brian James Lillie ("Brian Lillie") is the President and CEO of ECG, is a member of EHG, and at all times relevant to this matter was authorized to and did act on behalf of ECG and EHG. Mr. Lillie may be served with process at his residence located at 6421 Stone Ridge Court, Kannapolis, North Carolina 28081.

6. Defendant Tracy Kaye Lillie ("Tracy Lillie") is Mr. Lillie's wife, is the Treasurer of ECG, is the Manager of EHG, is the registered agent for both ECG and EHG, and at all times relevant to this matter was authorized to and did act on behalf of ECG and EHG. Mrs. Lillie may be served with process at her residence located at 6421 Stone Ridge Court, Kannapolis, North Carolina 28081.

7. Venue and jurisdiction are proper by virtue of Defendants' removal of this action from Habersham County Superior Court, (Doc. 1,) and 28 U.S.C. § 1441.

## Factual Allegations

8. Defendant ECG is a brokerage group that specializes in the exportation of agricultural commodities. Plaintiff GDE is a brokerage group that concentrates in locating and identifying prospective purchasers of agricultural goods and commodities and connecting them with prospective sellers or providers of those goods.

9. In or before March 2012, Brian Lillie and Tracy Lillie met with Kermani, the Governor of the Central Bank in Iran, and others in Washington, D.C., to discuss entering into a business relationship that would involve selling grain to Iranian companies.

10. In March 2012, in connection with sanctions imposed by the United States Government on Iran, Iranian banks were refused access to SWIFT, the worldwide financial messaging system used to arrange transfers of money.

11. Because Iranian banks no longer had access to SWIFT, Iranian banks could not accept bank guarantees or letters of credit, making transactions with Iran companies unfeasible.

12. Brian Lillie knew that Kermani had excellent contacts both in Iran and the United States, and the two discussed entering into a business arrangement in the United States. Brian Lillie and Kermani focused on the poultry industry due to its large presence in in Georgia and Kermani's contacts with representatives of and proximity to leading businesses in that industry.

13. Commissions on grain transactions such as the ones discussed by Brian Lillie and Kermani typically amount to a minimum of 10% of the contract value, to be split as agreed upon.

14. In or around June 2012, Brian Lillie represented to GDE and Kermani that he could obtain below-market prices on corn and soybean meal.

15. Beginning in June of 2012, GDE and Kermani contacted Non-Party Fieldale Farms Corporation ("Fieldale") to discuss Fieldale potentially purchasing corn and soybean meal sold by ECG. Fieldale is an integrated poultry processor with its principal office located in Baldwin, Habersham County, Georgia.

16. On July 30, 2012, Brian Lillie and Kermani visited Fieldale's Baldwin, Georgia, headquarters to meet with representatives from Fieldale to discuss a potential business arrangement. Present at the meeting were Kermani, Jeff Talley, who at the time was serving as Kermani's legal counsel, Golden Barron, who had facilitated the contact between Kermani and Fieldale, Tom Hensley, Fieldale's CEO, Eddie Elrod, Fieldale's CFO, Gus Arrendale, Fieldale's owner, a grain purchaser, and Brian Lillie. At the meeting, ECG and Brian Lillie represented to all present that they (ECG and Brian Lillie) could obtain below-market prices on corn and soybean meal.

**Relevant Provisions of the Agreements**
**The BVA and Amended BVA**

17. On July 30, 2012, ECG and GDE entered into a Business Venture Agreement ("BVA"). A true and correct copy of the BVA is attached as part of Exhibit A.

18. ECG and Brian Lillie provided Fieldale, GDE, and Kermani with a copy of a License issued to ECG by the Office of Foreign Assets Control of the U.S. Department of the Treasury dated August 15, 2011, authorizing ECG to ship agricultural commodities to Iran.

19. Also on July 30, 2012, ECG and GDE entered into the First Amended Business Venture Agreement ("Amended BVA"). A true and correct copy of the BVA is attached as part of Exhibit A.

20. Also on July 30, 2012, ECG and GDE entered into a Commission Agreement, as contemplated under the BVA. A true and correct copy of the Commission Agreement is attached as Exhibit B.

21. Under the BVA, the Parties agreed and represented as follows:

22. ECG "has standard payment terms including contract and purchase order guarantee in the form of a Standby Letter of Credit (SBLC) **or** Bank Guarantee (BG) from a top world bank. [SBLC] and [BG] language and terms shall be approved solely by [ECG] on a case by case basis." (BVA, ¶ 2(e)) (emphasis supplied).)

23. "Once agreement is reached between [ECG] and buyers on banking issues, which shall include but not be limited to, payment method, payment process, payment terms, establishment of **any** Bank Guarantees, establishment of **any** standby

letters of credit, etc., [ECG] shall enter into a Purchase Agreement with the Client/Buyer with the assistance of [GDE]" (BVA, ¶ 2(g) (emphasis supplied).)

24. "A Commission Agreement detailing [GDE's] compensation and agreed mode of disbursement shall be lodged with the final contract and deemed binding." (BVA, ¶ 2(g).)

25. "Thereafter, it shall then be the sole responsibility of [ECG] to make sure the requested product is loaded and shipped out to the specific destination." (BVA, ¶ 2(h).)

26. "A separate fee/commission agreement shall be entered into and shall outline compensation to be paid to [GDE] for every transaction to be performed in connection with this AGREEMENT." (BVA, ¶ 3(a).)

27. "The fee or commission agreement shall be drafted and acknowledged by signature, and this shall be performed in conjunction with or simultaneously with any buyer/purchase agreement that is entered into between [ECG] and any Client/Buyer under the terms of this AGREEMENT." (BVA, ¶ 3(a).)

28. ECG is responsible for "the providing of a satisfactory and marketable product that shall be delivered in accordance with the terms of any sales contract." (BVA, ¶ 1(b)(iii).)

29. ECG is responsible for "payment for any losses, fines, penalties, expenses, costs, damages incurred in any given transaction as well as being solely responsible for any costs or expenses associated with any and all bank or financing related matters, including...costs associated with setting up accounts, taxes...wire fees, costs associated with establishing any investment accounts, costs associated with fees to be paid to any investment company or banker that [ECG] may choose..." (BVA, ¶ 1(b)(x).)

30. ECG is responsible "to make timely payment of commissions and fees earned as specified herein to [GDE]." (BVA, ¶ 1(b)(xii).)

31. "The fee or commission agreement shall be drafted and acknowledged by signature, and this shall be performed in conjunction with or simultaneously with any buyer/purchase agreement that is entered into between [ECG] and any Client/Buyer under the terms of this AGREEMENT." (BVA, ¶ 3(a).)

32. "[O]nce the product arrives at the Buyer Destination and monies are released (regardless of whether in the form of cash monies, Bank Guarantees, etc.) to [ECG], [ECG] shall issue a commission check or payment to [GDE] immediately unless mutually agreed upon by the parties." (BVA, ¶ 2(i).)

33. "Commissions . . . To be paid as a part of AGREEMENT shall be paid at the times such contracts designated, concluded or monies changing hands between parties, unless otherwise agreed among the 'PARTIES'." (BVA, ¶ 3(b).)

34. The Commission Agreement supersedes the BVA with respect to the payment terms of the commission earned by GDE.

35. "The 'PARTIES' hereby irrevocable and unconditionally agree and guarantee to honor and respect all such fees, or remuneration arrangements made as part of a commission." (BVA, ¶ 3(b).)

36. ECG is responsible "for all costs associated with the procuring of any product, freight and shipping and delivery of the product, and any insurable guarantees associated with the product." (BVA, ¶ 1(b)(iv).)

37. ECG "acknowledges that the clients procured and supplied by [GDL] on Attachment A…belong to and constitute the work product of [GDL] and that [ECG] has no right, claim, title, or privilege to same. The 'PARTIES' hereto acknowledge and agree that those customers on Attachment A are the ones which are subject to the terms of this paragraph." (BVA, ¶ 4.)

38. The Parties agree that, as GDL "procures new clients, [the BVA] shall be amended to reflect [GDL's] right to future clients." (BVA, ¶ 4.)

39. "Signature on this agreement received by the way of Facsimile, Mail and/or email shall be deemed to be an executed contract. The parties agree that Electronic signature shall be valid and accepted as a hand signature." (BVA, ¶ 17.)

40. The Amended BVA memorializes the "parties desire to expand the original [BVA] to include locating and selling agricultural commodities to individuals or entities located here in the United States." (Amended BVA, 3rd recital.)

41. The Parties agreed that "the clients procured and supplied by [GDE] on Attachment A [to the Amended BVA] . . . belong to and constitute the work product of [GDE] and [ECG] has no right, claim, title or privilege t[o] same." (Amended BVA, ¶ 2.)

42. Among the clients who belong to and constitute the work product of GDE are Fieldale and Peco Foods of Tuscaloosa, Alabama ("Peco"). (Amended BVA, Attachment A.)

**<u>The Commission Agreement</u>**

43. Under the Commission Agreement, ECG represented that it was "satisfied that all terms and responsibilities imposed under the terms of the [BVA] have been met." (Commission Agreement, 6th recital.)

44. The Commission Agreement is silent as to modification.

45. Under the Commission Agreement, the Parties agreed and represented as follows:

46. GDE "has been able to locate and identify numerous prospective buyers of agricultural commodities…" (Commission Agreement, 3rd recital.)

47. The Commission Agreement incorporates the BVA: "the parties have previously entered into a [BVA], dated July 30, 2012, which outlines the parties rights, obligations, responsibilities, etc . . . Said Agreement is incorporated by reference herein, as if stated verbatim" (Commission Agreement, 4th recital.)

48. "[P]ursuant to the terms of the [BVA], [GDE] has been able to locate an Iranian/U.S.A. Business known as Fieldale Farms to purchase corn/soybean meal." (Commission Agreement, 5th recital.)

49. GDE "has provided information of her buyer to [ECG] and [ECG] is satisfied that all terms and responsibilities under the terms of the [BVA] have been met. (Commission Agreement, 6th recital.)

50. ECG and Fieldale "have been able to enter into a Sales Contract related to the purchase of corn/soybean in accordance with the terms and conditions of" the BVA. (Commission Agreement, 7th recital.)

51. ECG "acknowledges 'but for' the efforts and contacts of [GDE] it would not have been able to effectuate its contract with [FFC] and that said efforts deserve compensation." (Commission Agreement, 8th recital.)

52. ECG and GDE "have discussed and reached a commission agreement as it relates to monies to be paid to GDE as compensation for her efforts in relation to this transaction." (Commission Agreement, 9th recital.)

53. ECG is obligated to "pay to [GDE] a commission fee of $1,000,000…for the transaction dated July 30, 2012 involving the Iranian/U.S.A. Business Company Fieldale Farms wherein it purchased _corn/soybean meal." (Commission Agreement, ¶ 1.)

54. Accordingly, GDE earned its $1 million commission by virtue of its efforts that led to the execution of the Delivery Contract, as that term is defined below.

55. The time for ECG's making of the commission payment earned by GDE was "upon release of the Bank Guarantee to" ECG. (Commission Agreement, ¶ 1.)

56. The term "Bank Guarantee" is not defined in the Commission Agreement or the BVA.

57. No Bank Guarantee, labeled as such, was approved by ECG, as only it had the right to do under (BVA, ¶ 2(e).)

58. No Bank Guarantee, labeled as such, was in fact involved in the Commission Agreement or the Delivery Contract, as that term is defined below.

59. ECG was obligated to "pay "in accordance with the directions of [GDE] as it relates to the particular bank institution, deposit method; etc." (Commission Agreement, ¶ 1.)

60. ECG was obligated to pay the $1 million commission earned by GDE regardless of whether ECG delivered any product to Fieldale.

61. Fieldale "shall remain solely the client of [GDE]." (Commission Agreement, ¶ 2.)

**The Delivery Contract**

62. On August 21, 2012, ECG and Fieldale entered into an agreement providing that ECG will supply 55,000 dry metric tons of loose soybean meal for $24,035,000.00 and 55,000 dry metric tons of #2 yellow corn for $13,475,000.00 (the "Delivery Contract"). The Delivery Contract's total value was $33,510,000.00. A true and correct copy of the Delivery Contract is attached as Exhibit C.

63. Pursuant to the Delivery Contract, Fieldale was to wire a $1,000,000.00 deposit to ECG's account at Wells Fargo Bank in Iowa and obtain and provide to ECG a stand by letter of credit for $2,751,000.00 as a guarantee of final payment of shipments ("SBLC") and an irrevocable and transferrable documentary letter of

credit for $33,759,000.00 from Rabobank Nederland to be issued as a payment instrument ("DLC"). (Delivery Contract, ¶¶ 3-4.)

64. The Delivery Contract makes no mention of a Bank Guarantee.

**ECG's Non-performance**

65. Fieldale in fact wired $1,000,000.00 to ECG and obtained and provided the SBLC and DLC as obligated under the Delivery Contract.

66. On information and belief Unbeknownst to Fieldale and Plaintiffs, once ECG received the $1,000,000.00 deposit from Fieldale, Brian Lillie and Tracy Lillie transferred those funds to other entities controlled by Brian Lillie, including without limitation EHG. On information and belief, Brian Lillie and Tracy Lillie used a portion of the deposit to service their business and personal debts, to purchase their current residence located at 6421 Stone Ridge Court, Kannapolis, NC 28081 for a price of $750,000.00, and on bills, travels, and other projects.

67. Tracy Lillie served as accountant for Brian Lillie, ECG, EHG, and other entities controlled by Brian Lillie. On information and belief, Tracy Lillie, by agreement with or at the direction of, Brian Lillie, altered financial documents and tax returns create the false impression that ECG had properly handled the funds deposited by Fieldale.

68. The stand by letter of credit expired on December 18, 2012 because ECG never delivered corn or soybean as obligated. For the same reason, the documentary letter of credit expired on December 21, 2012.

**<u>The Peco Deal</u>**

69. Kermani also had a relationship with Danny Hickman, owner of Peco, another large poultry company. (*See* Attachment A to Amended BVA.)

70. Under the BVA, Kermani also delivered Peco to ECG.

71. On or around September 6, 2012, Brian Lillie and ECG met with Mr. Hickman and discussed entering into a contract to supply soybean meal and corn to Peco under a delivery contract worth $49,665,000.00. (*See* Peco Delivery Contract, attached as Exhibit F.)

72. On September 24, 2012, Brian Lillie sent Mr. Hickman a draft of the Peco Delivery Contract and sample documentary letter of credit text.

73. During or after September 2012, Mr. Hickman told Kermani that he would sign a contract similar to the Fieldale Delivery Contract if Gus Arrendale of Fieldale would provide Mr. Hickman with a good recommendation. Mr. Hickman told Kermani to let him know when the Fieldale deal was completed, and as long as he could pick up the phone and call Mr. Arrendale, Kermani would have Peco's business.

74. Mr. Hickman was never able to receive a positive report from Mr. Arrendale.

75. The Peco Delivery Contract was never executed.

76. Kermani's commission under the Peco Delivery Contract would have been at least $1 million.

**Delay by Defendants**

77. On July 30, 2012, Brian Lillie texted Kermani, "We'll get what we need for Fieldale. I am not worried about that."

78. Brian Lillie sent Kermani four documents via email on August 8, 2012, that were meant to serve as assurances to Fieldale that ECG was ready and able to carry out its obligations under the Delivery Contract. ("Assurance Documents," attached as Exhibit G.): (1) Letter dated June 18, 2012, from Noble Group ("Noble") stating that Noble, a global supplier of grains and oilseeds, was ready, willing, and able to supply products to ECG; (2) Letter dated June 20, 2012, from Streamline Logistics providing a reference for ECG and stating that Streamline "has an outstanding working relationship with" ECG; (3) Letter dated July 30, 2012, from Streamline Logistics stating that it would be facilitating customs clearance of the grain to be delivered by Nobel to Fieldale for ECG; and (4) Letter dated August 6, 2012, from Noble, providing pricing information for shipments scheduled for September and October, 2012.

79. From August through December of 2012, ECG and Brian Lillie represented to Fieldale, GDE, and Kermani that they were unable to perform the Delivery Contract and Commission Agreement, *inter alia*, because Wells Fargo mistakenly transferred Fieldale's deposit from the ECG account to one or more foreign banks, and those banks effectively "stole" the money or otherwise would not release the funds at their request.

80. On August 22, 2012, Kermani, via text, asked Brian Lillie if the Fieldale deal was done. Brian Lillie responded, "DLC got issued. I have to work with wells Fargo tomorrow to get it transferred."

81. On December 26, 2012, Brian Lillie sent an email to Mr. Elrod of Fieldale, copying Kermani, stating that he was working to get the funds released, asking for an extension of the expired DLC, and explaining why an extension would be preferable if the parties intended to move the deal forward.

82. On December 28, 2012, Kermani emailed Brian Lillie asking what was the fastest way to move the Fieldale deal forward. Brian Lillie responded on December 30 that he would need to borrow $4 million, to be paid back in 90 days.

83. On December 31, 2012, Kermani emailed Brian Lillie to pass along some questions from a potential investor. On January 2, 2013, Brian Lillie responded via email with details of the $4 million loan transaction he envisioned.

84. In a letter to Fieldale dated January 7, 2013, ECG and Brian Lillie attempt to explain the alleged foreign banking issue and offer to give Fieldale a Promissory Note that would refund the $1,000,000.00 deposit and $525,195.88 that Fieldale incurred in bank fees for the transaction. A true and correct copy of the letter is attached as Exhibit D.

85. On January 23, 2013, ECG executed a Promissory Note in favor of Fieldale on January 23, 2013, in the amount of $1,525,195.00 to be paid in full on February 23, 2013 ("Note," attached as Exhibit E). As security for the Note, ECG, through Brian Lillie, represented that ECG pledged as security certain bank drafts in the amount of $2,500,000.00, allegedly issued by Bank of China Limited Hong Kong and assigned to EHG.

86. Both before and after ECG executed the Note to Fieldale, Brian Lillie repeatedly promised Kermani, verbally and in emails and text messages, that he would pay GDE the $1,000,000.00 commission as soon as he satisfied Fieldale's reimbursement requests. In fact, Kermani continued negotiating and working with Fieldale to allow time for Brian Lillie to close other deals so that he could supposedly obtain the funds to reimburse Fieldale and pay GDE its commission. ECG and Brian Lillie used the Note it gave to Fieldale, and the representations

contained therein, to further induce GDE and Kermani into providing additional time to pay the commission.

87. On January 25, 2013, EHG, through Brian Lillie, executed a promissory note in the amount of $4,000,000.00 in favor of William A. Griffin, Jr. As security for the Note, EHG, through Brian Lillie, represented that EHG pledged as security certain bank drafts in the amount of $2,500,000.00, allegedly issued by Bank of China Limited Hong Kong and assigned to EHG. ("Griffin Note," attached as Exhibit H.)

88. The Bank Drafts that purportedly secure the Griffin Note are the same Bank Drafts used to secure the Fieldale Note. (*Compare* Exhibit E with Exhibit H.)

89. On March 11, 2013, Mr. Elrod of Fieldale emailed Brian Lillie to ask when ECG would be able to repay the funds it owed Fieldale. Mr. Elrod attached a summary of five previous updates from Brian Lillie ranging from January 17, 2013, to March 4, 2013. Brian Lillie responded on March 12, 2013, stating that he was "so close," that Fieldale should "have optimism," and attributing the delay to "the problem that was created by Bank Mandiri." (Mar. 12, 2013 Elrod email, attached as Exhibit I.)

90. Ultimately, ECG failed to satisfy its obligation to Fieldale under the Note to Fieldale. Fieldale filed a lawsuit against ECG on January 3, 2014, in Habersham

County Superior Court, seeking damages in excess of $13 million for breaches of the Delivery Contract and the Note. *See Fieldale Farms Corporation v. eCreative Group, Inc. d/b/a Energy & Commodities Global*, No. 14-cv-0004 (Habersham County Superior Court filed Jan. 3, 2104).

91. On August 26, 2014, Fieldale amended its complaint to add Brian Lillie as a party defendant and to add claims for fraud, conversion, and attorneys' fees against both Brian Lillie and ECG.

92. Fieldale and Brian Lillie and ECG eventually resolved Fieldale's lawsuit by settlement.

93. At no time did ECG deliver a single shipment of corn or soybean meal to Fieldale under the Delivery Contract.

94. ECG was at fault for its failure to deliver any shipments of corn or soybean meal to Fieldale under the Delivery Contract.

**Repeated Empty Promises to Kermani**

95. Throughout the litigation with Fieldale and after the settlement, Brian Lillie continued his verbal and written assurances to Kermani that he could and would obtain the money to pay GDE its full commission.

96. Kermani and Brian Lillie corresponded regularly via text, phone, email, and otherwise. Each time Kermani would ask for the status of her commission

payment, Brian Lillie would persist in making excuses, deflecting, failing to respond, and not paying.

97. For example, on January 14, 2015, Kermani texted Brian Lillie, asking him to let her know "where we are at with funds." Brian Lillie responded six hours later, "Need to call you this evening."

98. On the morning of January 21, 2015, Kermani texted Brian Lillie, saying, "I hope confirmation comes in today. Call me as soon as you can." BL responded, via text five hours later, "I'm anxiously awaiting a call from Tom. The second I'm done talking to him I'll call you."

99. On February 3, 2015, Kermani texted Brian Lillie, "Funds confirmed?" Brian Lillie responded via text, "Not yet."

100. On February 6, 2015, Kermani texted Brian Lillie asking for "any updates." Brian Lillie did not respond.

101. On the afternoon of February 9, 2015, Kermani texted Brian Lillie asking, "any great news on funds?" Brian Lillie responded over twenty-four hours later, "Give me a few hours. Will call."

102. On March 25, 2015, Kermani texted Brian Lillie, asking, "all done yet?" Brian Lillie responded, "Close. Very Close. Sorry I didn't take your call . . ."

103. In or around April 2015, during a telephone call between Kermani and Brian Lillie, Brian Lillie admitted that he planned to pay Kermani $1 million.

104. On May 5, 2015, Kermani sent an email to Brian Lillie saying, "we talked about the payment breakdown on the phone for me in regards to $1 Million and time frame and I asked you how you wanted to handle it and you asked me the same." (Correspondence between Kermani and Brian Lillie, attached as Exhibit J.)

105. On or around May 14, 2015, during a telephone call between Kermani and Brian Lillie, Brian Lillie admitted again that he planned to pay Kermani $1 million and said that his wife would say he was crazy for "paying commission on a deal that didn't happen."

106. On June 2, 2015, Kermani emailed Brian Lillie, again asking for payment of her $1 million commission and stating that she has received no payment, only delay. On June 3, 2015, Brian Lillie responded, characterizing the commission payment as "a gift": You need to be patient and stop pushing me on it and bringing it up. It's a gift I'm giving you and not something that was earned. So please just back off until I'm able to handle it. If I didn't value you I wouldn't be doing it for you in the first place. But I refuse to be hounded about it." (Ex. J.)

107. On July 29, 2015, Kermani emailed Brian Lillie asking again for her commission: "We clearly agreed on the fact that my commission/payment on Fieldale of $1M would be unchanged even when they didn't get their grain as long as I handled Fieldale in which I did for 3 years plus the all of the other things I did as well. I was able to get you a lot of time to get the other projects going (Dubai, trade program etc.) on so that we all would be compensated as agreed and promised." Brian Lillie responded, again characterizing the commission as a "gift," claiming to be "broke," and insisting that the initial $1 million deposit from Fieldale was "lost." (Ex. J.)

108. On February 29, 2016, Kermani emailed Brian Lillie confirming a discussion between the two during which they agreed on an approach for payment of the commission: "the one million dollars for my efforts on the Fieldale project have not been paid and It's my understanding that you will begin making payments upon this. At your request today, you said you will make an initial payment of$10K or more and the remainder accordingly. This will confirm our conversation today where you agree to make payments towards the one million dollars for our Fieldale agreement." Brian Lillie did not respond to that email but responded to a text from Kermani the following day, March 1, 2016: I just sent $5k a few minutes ago. I'll do another $5k by the weekend. Need to move

some other money over from securities account to do it. Can't transfer externally from it. Only ACH to my own account." (Ex. J.)

109. ECG made a single payment of $5,000.00 toward its obligation to pay Kermani her $1,000,000 commission.

110. ECG never paid the remaining $995,000.000 of the $1,000,000.00 commission owed to GDE.

**Alleged Forgery**

111. After the July 30, 2012 meeting at Fieldale, Brian Lillie took the Commission Agreement home with him.

112. Brian Lillie signed the Commission Agreement using a digital signature. (*See* Exhibit B.)

113. Brian Lillie from time to time employed the same digital signature to execute documents. For example, Brian Lillie's digital signature on the January 7, 2013 letter to Fieldale bears a digital signature identical to the one he used to execute the Commission Agreement. (*Compare* Exhibit D *with* Exhibit B.)

114. Brian Lillie later mailed the executed Commission Agreement to Kermani's P.O. Box.

115. Despite having been in regular communication with Kermani between Kermani's receipt of the executed Commission Agreement and the filing of this

lawsuit, and despite Brian Lillie and Kermani having discussed Kermani's commission, the issue of the legitimacy of Brian Lillie's signature on the Commission Agreement never arose until Defendants' counsel's letter to Plaintiffs' former counsel dated January 17, 2017. (Doc. 15-1.)

**116.** In that January 17, 2017 letter, Defendants' counsel questions the authenticity of Brian Lillie's signature on the Commission Agreement. (Doc. 15-1, pp. 3-4 & n.1 ("We intend to prove that the primary document on which Plaintiffs base their claims is forged.")).

**COUNT I – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**
**Plaintiffs v. EHG, BL, and TL**

117. Plaintiffs hereby adopt and incorporate Paragraphs 1 through 116 as if fully set forth herein.

118. EHG, Brian Lillie, and Tracy Lillie acted improperly toward Plaintiffs without privilege.

119. EHG, Brian Lillie, and Tracy Lillie acted purposely and with malice and with the intent to injure Plaintiffs.

120. By their improper, non-privileged, purposeful, malicious, actions conducted with the intent to injury Plaintiffs, EHG, Brian Lillie, and Tracy Lillie induced Peco not to enter into or continue a business relationship with Plaintiffs.

121. Plaintiffs suffered financial injury by virtue of EHG's, Brian Lillie's, and Tracy Lillie's improper, non-privileged, purposeful, malicious, actions conducted with the intent to injury Plaintiffs.

**COUNT II – FRAUD**
**GDE v. ECG**
**Pleaded in the Alternative**

122. Plaintiffs hereby adopt and incorporate Paragraphs 1 through 121 as if fully set forth herein.

123. ECG, through its representative Brian Lillie, represented in the BVA and the Commission Agreement that it would purchase product on behalf of Fieldale and ensure the product was delivered to Fieldale.

124. ECG, through its representative Brian Lillie, represented in the BVA and the Commission Agreement that it would pay a $1 million commission to GDE upon GDE's procuring of a customer that entered into a Delivery Contract with ECG.

125. ECG's representations to GDE that ECG would purchase product on behalf of Fieldale and ensure the product was delivered to Fieldale and that it would pay a $1 million commission to GDE upon GDE's procuring of a customer that entered into a Delivery Contract with ECG were knowingly false; that is, ECG never intended to compensate Plaintiffs for their services.

126. ECG made its false representations to Plaintiffs in order to induce GDE to provide its proprietary contacts, including Fieldale and Peco, to ECG.

127. GDE justifiably relied on ECG's false representations to GDE's detriment by providing its proprietary contacts, including Fieldale and Peco, to ECG, performing valuable services, including working to assist ECG to carry out its obligations under the Fieldale Delivery Contract despite ECG's having had no intention of doing so, and foregoing other business opportunities.

128. As a direct and proximate result of ECG's fraudulent misrepresentations, GDE suffered damages by providing its proprietary contacts to ECG, performing valuable services for ECG without compensation, foregoing other business opportunities in order to perform those services, and suffering irreparable damage to its reputation due to ECG's fraudulent behavior.

**COUNT III – FRAUD**
**Kermani v. Brian Lillie, ECG, and EHG**
**Pleaded in the Alternative**

129. Kermani hereby adopts and incorporates Paragraphs 1 through 128 as if fully set forth herein.

130. Brian Lillie, individually and in his capacity as representative of ECG and EHG, ECG, made numerous false representations to GDE, Kermani, and Fieldale, among others.[2]

131. Among the false and fraudulent misrepresentations made by Brian Lillie, ECG, and EHG are the following, described with particularity in the recitation of facts, above: The representations in each of the four Assurance Documents at Exhibit G; the representations that Wells Fargo's errors caused ECG's inability to perform the Delivery Contract and Commission Agreement; the January 7, 2013 letter at Exhibit D; the Fieldale Note at Exhibit (in that ECG never intended to meet its obligations under the Note); the Griffin Note (in that ECG never intended to meet its obligations thereunder); the Fieldale and Griffin Notes (in that each was collateralized by the same purported Bank Drafts, the purported value of which exceeded the total indebtedness); the Bank Drafts themselves (in that they falsely stated they had been assigned to EHG); Brian Lillie's emails with Kermani representing that the Fieldale deal could be saved by borrowing $4 million; Brian Lillie's statements to Mr. Elrod in the March 11, 2013 email; and

[2] "If it can be shown that the representation was made for the purpose of inducing third parties to rely and act upon the reliance, then liability to the third party can attach." *Chesapeake Employers' Ins. Co. v. Eades*, 77 F. Supp. 3d 1241, 1258 (N.D. Ga. 2015) (Story, J.); *Badische Corp. v. Caylor*, 257 Ga. 131, 133, 356 S.E.2d 198, 200 (1987).

the multiple written and verbal promises and assurances made by Brian Lillie to Kermani that he would pay her commission, all described in detail above.

132. Brian Lillie's, ECG's and EHG's false representations to GDE, Kermani, Fieldale and its representatives, and others, were knowingly false.

133. Brian Lillie, ECG, and EHG made false representations to GDE, Kermani, and Fieldale and its representatives in order to induce Kermani to continue providing proprietary contacts and valuable services that, unbeknownst to Kermani, served to further Brian Lillie's fraudulent scheme.

134. Kermani justifiably relied on Brian Lillie's, ECG's and EHG's fraudulent misrepresentations to her detriment by providing proprietary contacts to Brian Lillie, ECG, and EHG, performing valuable services for Brian Lillie, ECG, and EHG, including working to assist ECG to carry out its obligations under the Fieldale Delivery Contract despite ECG's having had no intention of doing so, working to secure the investor for the Griffin Note, providing other contacts to Brian Lillie, ECG, and EHG, and foregoing other business opportunities.

135. As a direct and proximate result of Brian Lillie's, ECG's and EHG's fraudulent misrepresentations, Kermani suffered damages by providing her contacts to Brian Lillie, ECG, and EHG, performing valuable services for Brian Lillie, ECG, and EHG without compensation, foregoing other business

opportunities in order to perform those services, and suffering irreparable damage to her reputation due to Brian Lillie's, ECG's, and EHG's fraudulent behavior.

**COUNT IV – CIVIL CONSPIRACY**
**Plaintiffs v. Defendants**

136. Plaintiffs hereby adopt and incorporate Paragraphs 1 through 135 as if fully set forth herein.

137. All Defendants agreed with one another and, upon information and belief, other persons not a party to this action, to participate in unlawful acts by engaging in the many acts of fraud and deceit set forth above.

138. The conspiracy began at a time unknown to Plaintiffs and continues to this day.

139. The objective of the conspiracy is to enrich Defendants financially at the expense of unwitting individuals and entities by making fraudulent misrepresentations to earn their trust and ultimately obtain cash, loans, letters of credit, and other financial instruments that Defendants either can retain for themselves or use as leverage to borrow even larger sums from other individuals and entities.

140. Brian Lillie and Tracy Lillie took part in the conspiracy from its inception, and ECG and EHG joined the conspiracy on the dates of their formation.

141. Each Defendant engaged in one or more overt acts that were done pursuant to and in furtherance of the common scheme.

142. For example, ECG fraudulently misrepresented that it intended to carry out the BVA, Commission Agreement, and Delivery Contract, but it never had the present intent to do so.

143. Brian Lillie made numerous fraudulent misrepresentations to Fieldale, Kermani, and others, in order to extend the time during which he had access to Fieldale's money.

144. EHG fraudulently misrepresented that it had been assigned Bank Drafts that were unlawfully used as security for both the Fieldale and the Griffin Notes.

145. Tracy Lillie altered financial documents and tax returns to create the false impression that ECG had properly handled the funds deposited by Fieldale, when in reality, Tracy Lillie had assisted Brian Lillie, ECG, and EHG in transferring those funds unlawfully to another account.

146. Each of these unlawful overt acts conducted in furtherance of the conspiracy and common scheme operated to injure Plaintiffs by causing Plaintiffs to suffer damages by providing their proprietary contacts to Defendants, performing valuable services for Defendants without compensation, foregoing other business

opportunities in order to perform those services, and suffering irreparable damage to their its reputation due to Defendant's unlawful behavior.

**COUNT V – BREACH OF CONTRACT**
**GDE v. ECG**

147. GDE hereby incorporates Paragraphs 1 through 116 as if fully stated herein.

148. GDE and ECG were parties to the BVA, the Amended BVA, and the Commission Agreement.

149. ECG failed to make sure the requested product was loaded and shipped out to the specific destination in breach of the BVA.

150. ECG failed to provide a satisfactory and marketable product that was delivered in accordance with the terms of the Delivery Contract in breach of the BVA.

151. ECG failed to make timely payment of the commission earned by GDE in breach of the BVA.

152. ECG admitted and acknowledged its obligation to pay the $1 million commission earned by GDE.

153. GDE has suffered damages as a result of ECG's breaches.

154. GDE has satisfied all conditions precedent for the filing of this action.

**COUNT VI – BREACH OF ORAL CONTRACT**
**GDE v. ECG**
**Pleaded in the Alternative**

155. GDE hereby incorporates Paragraphs 1 through 116 as if fully stated herein.

156. Under the BVA, a separate commission agreement was required to be entered into; that agreement was to outline compensation to be paid to GDE.

157. GDE and ECG reached an oral commission agreement.

158. Under their oral commission agreement, GDE would earn its commission by earned its $1 million commission by supplying a customer to ECG that executed a Delivery Contract with ECG.

159. GDE in fact supplied the customer Fieldale, and Fieldale executed the Delivery Contract with ECG.

160. GDE earned its commission under the oral agreement reached by GDE and ECG.

161. ECG failed to make timely payment of the commission earned by GDE in breach of the Parties' oral commission agreement. BVA.

162. ECG admitted and acknowledged its obligation to pay the $1 million commission earned by GDE.

163. GDE has suffered damages as a result of ECG's breaches.

164. GDE has satisfied all conditions precedent for the filing of this action.

**COUNT VII – QUANTUM MERUIT**
**Plaintiffs v. Brian Lillie, ECG, and EHG**

165. Plaintiffs hereby adopt and incorporate Paragraphs 1 through 116, 180-182 as if fully set forth herein.

166. Plaintiffs provided services to Brian Lillie, ECG, and EHG

167. The services provided by Plaintiffs to Brian Lillie, ECG, and EHG were valuable.

168. Brian Lillie, ECG, and EHG requested and knowingly accepted the services provided by Plaintiffs to them.

169. Brian Lillie's, ECG's, and EHT's receipt of the services provided by Plaintiffs without compensating Plaintiffs would be unjust.

170. At the time the services were performed, Plaintiffs had an expectation that they would be compensated by Brian Lillie, ECG, and EHG for the services provided to Brian Lillie, ECG, and EHG.

171. Plaintiffs' expectation that they would be compensated for the services provided to Brian Lillie, ECG, and EHG was reasonable.

172. Brian Lillie, ECG, and EHG derived benefits from Plaintiffs' continued provision of services to Brian Lillie, ECG, and EHG.

173. If Brian Lillie, ECG, and EHG retain the benefits of Plaintiffs' services without providing adequate compensation to Plaintiffs, Brian Lillie, ECG, and EHG will be unjustly enriched.

174. Principles of equity and justice demand that Plaintiffs receive restitution from Brian Lillie, ECG, and EHG under the theory of quantum meruit as a result of their knowing acceptance of the efforts and services rendered by Plaintiffs.

## COUNT VIII – UNJUST ENRICHMENT
## Plaintiffs v. Brian Lillie, ECG, and EHG
## Pleaded in the Alternative

175. Plaintiffs hereby adopt and incorporate Paragraphs 1 through 116, 180-182 as if fully set forth herein.

176. Plaintiff's providing of services to Brian Lillie, ECG, and EHG conferred a benefit upon Brian Lillie, ECG, and EHG.

177. Brian Lillie, ECG, and EHG have not compensated Plaintiffs for Plaintiffs' services.

**178.** Because Brian Lillie, ECG, and EHG have received services from Plaintiffs without compensating Plaintiffs, Brian Lillie, ECG, and EHG have been unjustly enriched by the amount of the reasonable value of Plaintiffs' services and should be required to pay that amount to Plaintiffs.

**COUNT IX – QUANTUM MERUIT**
**GDE v. ECG**
**Pleaded in the alternative**

179. GDE hereby adopts and incorporates Paragraphs 1 through 116 as if fully set forth herein.

180. GDE contends that the Commission Agreement is valid and binding.

181. Defendants dispute the validity of the Commission Agreement.

182. In the event the Commission Agreement is found to be invalid, GDE pleads this Count in the alternative.

183. GDE provided services to ECG.

184. The services provided by GDE to ECG were valuable.

185. ECG requested and knowingly accepted the services provided by GDE to it.

186. ECG's receipt of the services provided by GDE without compensating GDE would be unjust.

187. At the time the services were performed, GDE had an expectation that it would be compensated by ECG for the it provided to ECG.

188. GDE's expectation that it would be compensated for the services provided to ECG was reasonable.

189. ECG derived benefits from GDE's continued provision of services to ECG.

190. If ECG retains the benefits of GDE's services without providing adequate compensation to GDE, ECG will be unjustly enriched.

191. Principles of equity and justice demand that GDE receives restitution from ECG under the theory of quantum meruit as a result of its knowing acceptance of the efforts and services rendered by GDE.

**COUNT X – UNJUST ENRICHMENT**
**GDE v. ECG**
**Pleaded in the alternative**

192. GDE hereby adopts and incorporates Paragraphs 1 through 116, 180-182 as if fully set forth herein.

193. GDE contends that the Commission Agreement is valid and binding.

194. Defendants dispute the validity of the Commission Agreement.

195. In the event the Commission Agreement is found to be invalid, GDE pleads this Count in the alternative.

196. GDE's providing of services to ECG conferred a benefit upon ECG.

197. ECG has not compensated GDE for GDE's services.

**198.** Because ECG has received services from GDE without compensating GDE, ECG has been unjustly enriched by the amount of the reasonable value of GDE's services and should be required to pay that amount to GDE.

**COUNT XI – PROMISSORY ESTOPPEL**
**Plaintiffs v. Brian Lillie, ECG, and EHG**

199. Plaintiffs hereby adopt and incorporate Paragraphs 1 through 116 as if fully set forth herein.

200. Brian Lillie, acting in his individual capacity and in his capacity as representative of ECG and EHG, promised to compensate Plaintiffs fairly for services that they rendered to Brian Lillie, ECG, and EHG.

201. Brian Lillie, ECG, and EHG should have expected Plaintiffs to rely on those promises to pay.

202. Plaintiffs relied on Brian Lillie's, ECG's, and EHG's promises to pay to their detriment, by, among other things, providing valuable services to Brian Lillie, ECG, and EHG and forgoing other business opportunities and clients.

203. Plaintiffs' reliance on Brian Lillie's, ECG's, and EHG's promises to pay was reasonable.

204. As a result of Plaintiffs' detrimental reliance, Plaintiffs suffered significant damages, including the lack of compensation for the provision of valuable services and the loss of other business opportunities.

205. An injustice can be avoided only by enforcing Brian Lillie's, ECG's, and EHG's promises to Plaintiffs, and Brian Lillie, ECG, and EHG, therefore, should be estopped from denying the enforceability of their promises to pay Plaintiffs.

**COUNT XII – PROMISSORY ESTOPPEL**
**GDE v. ECG**
**Pleaded in the alternative**

206. GDE hereby adopts and incorporates Paragraphs 1 through 116, 180-182 as if fully set forth herein.

207. ECG, through its representative Brian Lillie, promised to compensate GDE fairly for services that it rendered to ECG.

208. ECG should have expected GDE to rely on those promises to pay.

209. GDE relied on ECG's promises to pay to its detriment, by, among other things, providing valuable services to ECG and forgoing other business opportunities and clients.

210. GDE's reliance on ECG's promises to pay was reasonable.

211. As a result of GDE's detrimental reliance, GDE suffered significant damages, including the lack of compensation for the provision of valuable services and the loss of other business opportunities.

**212.** An injustice can be avoided only by enforcing ECG's promises to GDE, and ECG, therefore, should be estopped from denying the enforceability of its promises to pay GDE.

**COUNT XIII – ATTORNEYS' FEES**
**All Defendants**

213. Plaintiffs hereby adopt and incorporate Paragraphs 1 through 212 as if fully set forth herein.

214. Defendants' actions have been in bad faith, stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense so as to justify an award to Plaintiffs of their costs of litigation, including reasonable attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

**COUNT XIV – PUNITIVE DAMAGES**
**All Defendants**

215. Plaintiffs hereby adopt and incorporate Paragraphs 1 through 116, 118-146 as if fully set forth herein.

216. Defendants' actions have been willful and wanton and have demonstrated an entire want of care that raises the presumption of conscious indifference to consequences, so as to justify an award of punitive damages pursuant to O.C.G.A. § 51-12-5.1.

**WHEREFORE,** Plaintiffs pray for the following relief:

a. Trial by jury;

b. That GDE be awarded and ECG be ordered to pay the $1 million commission earned by GDE, along with interest;

c. That Plaintiffs be awarded actual and compensatory damages against all Defendants;

d. That Plaintiffs be awarded attorney's fees and costs incurred as a consequence of Defendants' bad faith pursuant to O.C.G.A. § 13-6-11;

e. That Plaintiffs be awarded punitive damages against all Defendants; and

f. Such other relief as is equitable and appropriate.

This 12th day of January, 2018.

RESPECTFULLY SUBMITTED,

**GARLAND, SAMUEL & LOEB, P.C.**

/s/ Matthew D. Daley
EDWARD T.M. GARLAND
Georgia Bar No. 284900
MATTHEW D. DALEY
Georgia Bar No. 328815
***Counsel for Plaintiffs***

3151 Maple Drive

Atlanta, Georgia 30305
Phone: 404-262-2225
Fax: 404-365-5041
etg@gsllaw.com
mdd@gsllaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

GLOBAL DYNAMIC ENTERPRISES, LLC and NAJMEH KERMANI,

Plaintiffs,

v.

ECREATIVE GROUP, INC., d/b/a ENERGY & COMMODITIES GLOBAL, BRIAN JAMES LILLIE, ENTERPRISE HOLDINGS GROUP, LLC, and TRACY KAYE LILLIE,

Defendants.

Civil Case No.

2:16-cv-00276-RWS

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1D of the Local Rules for the United States District Court of the Northern District of Georgia, I hereby certify that the within and foregoing has been prepared using Times New Roman 14-point font in accordance with Local Rule 5.1.

/s/ Matthew D. Daley
Matthew D. Daley
Georgia Bar No. 328815

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| GLOBAL DYNAMIC ENTERPRISES, LLC and NAJMEH KERMANI,<br><br>Plaintiffs,<br><br>v.<br><br>ECREATIVE GROUP, INC., d/b/a ENERGY & COMMODITIES GLOBAL, BRIAN JAMES LILLIE, ENTERPRISE HOLDINGS GROUP, LLC, and TRACY KAYE LILLIE,<br><br>Defendants. | Civil Case No.<br><br>2:16-cv-00276-RWS |

**CERTIFICATE OF SERVICE**

I hereby certify that I have this date served the within and foregoing with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all counsel of record.

This 12th day of January, 2017.

Respectfully submitted,

/s/ Matthew D. Daley
Georgia Bar No. 328815